UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X

UNITED STATES OF AMERICA                    **MEMORANDUM AND ORDER**

            - against -                      10-CR-627 (KAM)

RODNEY WATTS,

            Defendant.
-------------------------------X

**MATSUMOTO, United States District Judge:**

        The government charges defendant Rodney Watts ("Mr. Watts") with various counts of Bank Fraud, Making a False Statement, and Conspiracy to Commit Bank, Mail, and Wire Fraud. Presently before the court are the government's and Mr. Watts' respective pretrial requests and motions *in limine* to preclude evidence at trial pursuant to the Federal Rules of Evidence. For the reasons discussed below, the court hereby grants in part and denies in part the government's and Mr. Watts' respective motions *in limine* and other pretrial motions and requests.

## BACKGROUND

        Familiarity with the facts and prior opinions of this court in this matter is presumed and only the background relevant to these motions is set forth below.

## I.   __The Charges Against Mr. Watts__

Mr. Watts is charged in the first four counts of a five-count second superseding indictment.[1]  (*See* ECF No. 295, Superseding Indictment ("S-2 Indictment").)  Count One charges Mr. Watts with Conspiracy to Commit Bank, Mail, and Wire Fraud in or about and between January 2007 and July 2010 in violation of 18 U.S.C. §§ 1349, 3551 *et seq.*  (*Id.* ¶¶ 18-19.)  Count Two charges Mr. Watts with Bank Fraud in or about and between January 2007 and July 2010 in violation of 18 U.S.C. §§ 2, 1344, 3551 *et seq.*  (*Id.* ¶¶ 20-21.)  Count Three charges Mr. Watts with Making a False Statement on or about January 6, 2010 by "willfully overvalu[ing] property and security, for the purpose of influencing the action of Amalgamated Bank upon one or more loans" in violation of 18 U.S.C. §§ 2, 1014, 3551 *et seq.*  (*Id.* ¶¶ 22-23.)  Count Four charges Mr. Watts with Making a False Statement on or about May 24, 2010 in violation of 18 U.S.C. §§ 2, 1014, 3551 *et seq.* (*Id.* ¶¶ 24-25.)

The S-2 Indictment charges that Mr. Watts was the chief financial officer and chief investment officer of GDC

---

[1] Mr. Watts' co-defendant Thomas Foley ("Foley") was also charged with counts One through Four, and his co-defendant Courtney Dupree ("Dupree") was charged with counts One through Five.  (*See* S-2 Indictment.)  At Mr. Watts' request, his trial was severed from that of Foley and Dupree so that Mr. Watts could pursue an interlocutory appeal to the Second Circuit of a previous order by this court.  (*See* Minute Entry of Oct. 17, 2011.)  Following the trial of Foley and Dupree before this court, the jury, on December 30, 2011, returned a verdict finding Dupree guilty of counts One through Four, and acquitting Foley of all charges.  (*See* ECF No. 506, Jury Verdict.)  Count Five as to Dupree was not presented to the jury at trial and remains open.  (*See id.*)

Acquisitions, LLC, a holding company of related subsidiaries (collectively, "GDC") at the center of this action.  (*See id.* ¶ 4.)  The first four counts of the S-2 Indictment arise out of an alleged scheme to defraud Amalgamated Bank ("Amalgamated"), a federally insured financial institution, and C3 Capital, LLC ("C3"), a private equity investment firm, by obtaining, and attempting to obtain, loans for GDC subsidiaries on the basis of false financial statements and other material misrepresentations between January 2007 and July 2010.  (*Id.* ¶¶ 5, 6, 8.)

## II.   The Parties' Instant Motions and Requests

Watts' trial is currently scheduled to begin on April 29, 2013.  (*See* Trial Management Order of Feb. 6, 2013.)  The government has made nine motions *in limine* in advance of trial.  (*See generally* ECF No. 608, First Mot. in Limine by USA ("Gov. Mem.").)[2]  Watts has likewise made nine motions *in limine*.  (*See generally* ECF No. 610, Mot. in Limine by Rodney Watts ("Watts. Mem.").)[3]  Watts has also filed a request, pursuant to Federal Rule of Criminal Procedure 32.2(b)(5)(A), that the trial jury be retained to determine the forfeitability of the property identified in the government's Bill of Particulars for the Forfeiture of Property.  (ECF No. 609, Dft.'s Rule 32.2(B)(5)(A)

---

[2] *See also* ECF No. 614, Mem. in Opp. ("Watts Opp."); ECF No. 626, Reply to Response ("Gov. Reply").

[3] *See also* ECF No. 617, Response in Opp. ("Gov. Opp."); ECF No. 623, Reply to Response ("Watts Reply").

Notification.)  Watts further requests that the jury venire be
given a questionnaire prior to the date of jury selection, if
possible, and that Watts' consulting firm be permitted to
conduct internet searches of prospective jurors during jury
selection, and exercise peremptory challenges the following day.
(ECF No. 656, Ltr. submitting courtesy copies at 1-2; ECF No.
667, Ltr. concerning in camera submission at 2-3.)  The court
heard oral argument on the parties' motions on February 1, 2013.
(*See* Minute Entry of Feb. 1, 2013.)  At oral argument, the
government raised the issue of Watts' production of Federal Rule
of Criminal Procedure 26.2 material.  (Tr. of Oral Argument
dated Feb. 1, 2013 ("Tr.") at 63-64.)  The parties' respective
motions *in limine* and pretrial requests are addressed in turn
below.

## DISCUSSION

## I.  Motion *in Limine* Standard

The purpose of a motion *in limine* is to allow the
trial court to rule on the admissibility and relevance of
certain forecasted evidence before the evidence is actually
offered at trial.  *See Luce v. United States*, 469 U.S. 38, 40
n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir.
1996).  "Evidence should be excluded on a motion *in limine* only
when the evidence is clearly inadmissible on all potential
grounds."  *United States v. Paredes*, 176 F. Supp. 2d 179,

181 (S.D.N.Y. 2001). Courts considering a motion *in limine* may reserve decision until trial so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 286-87 (S.D.N.Y. 1996). Furthermore, the court's ruling regarding a motion *in limine* is "subject to change when the case unfolds, particularly if the actual testimony differs from what was [expected]." *Luce*, 469 U.S. at 41.

## II.  Admissibility of Evidence Pursuant to the Federal Rules of Evidence

The Federal Rules of Evidence govern the admissibility of evidence at trial.  Rule 402 requires that evidence be relevant to be admissible.  Fed. R. Evid. 402.  Relevant evidence is defined as evidence having "any tendency to make the existence of any fact" that is of consequence to the determination of the action "more probable or less probable" than it would be without the evidence.  Fed. R. Evid. 401.  The court's determination of what constitutes "relevant evidence" is guided by the nature of the charges and the defendant's defense theories.

In addition to the relevancy of the evidence that the government seeks to admit or preclude, however, such evidence is subject to the probative-prejudice balancing test of Federal Rule of Evidence 403.  Rule 403 permits the exclusion of

evidence, even if relevant, "if its probable value is

substantially outweighed by a danger of . . . unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting

of time, or needlessly presenting cumulative evidence."  Fed. R.

Evid. 403.  The Second Circuit has stated that the "'district

court is obviously in the best position to do the balancing

mandated by Rule 403,' and, accordingly, this Court grants

'broad discretion' to the district court to admit or exclude

evidence pursuant to Rule 403."  *United States v. George*, 266

F.3d 52, 63 (2d Cir. 2001) (quoting *United States v. Birney*, 686

F.2d 102, 106 (2d Cir. 1982)) (citation omitted).  The court

applies the foregoing analysis to the parties' respective

motions.

**III.  The Government's Motions *in Limine***

    **1.  Application of the Law of the Case Doctrine to
Watts' Trial**

The government asks the court to apply the "law of the

case" doctrine to all motions *in limine* filed in advance of

Watts' trial.  (*See* Gov. Mem. at 1-3.)  The government argues

that because Watts' trial was stayed only after he had joined in

one of Dupree's motions *in limine* filed in advance of the

Dupree/Foley trial, the court should avoid reconsidering issues

previously decided in that prior trial.  (*Id.* at 1 (citing ECF

No. 357, Ltr. Joining Dupree's Mot. in Limine).)  Indeed, the

court did address several issues in advance of the Dupree/Foley trial which are again at issue in advance of Watts' trial. *See generally United States v. Dupree*, 833 F. Supp. 2d 255 (E.D.N.Y. 2011) (government's motions *in limine*), *vacated in part on other grounds*, No. 11-5115-cr, 2013 U.S. App. LEXIS 1921 (2d Cir. Jan. 28, 2013); *United States v. Dupree*, No. 10-CR-627, 2011 U.S. Dist. LEXIS 139810 (E.D.N.Y. Nov. 28, 2011) (Dupree's pretrial motions and motions *in limine*). Watts, however, asserts that the government's argument for application of the law of the case doctrine is too broad. (*See* Watts Opp. at 3-6.)

Under the law of the case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) (internal quotation marks omitted); *see also United States v. Plugh*, 648 F.3d 118, 123-24 (2d Cir. 2011). The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Carr*, 557 F.3d at 102. "A court's reconsideration of its own earlier decision in a case may, however, be justified in compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *Id*. The law of the case doctrine "may be properly invoked only if the

parties had a full and fair opportunity to litigate the initial determination." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 219 (2d Cir. 2002) (internal quotation marks omitted). Lastly, application of the doctrine is "discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996) (internal quotation marks omitted); *accord Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."); *Westerbeke Corp.*, 304 F.3d at 219.

Here, despite the fact that Watts' trial was severed at his request, it does not appear that Watts' trial should be entirely governed by all rulings in the Dupree/Foley trial. Watts joined only in Dupree's motion *in limine* to limit the government's introduction of certain financial documents on October 3, 2011, just two weeks prior to the court issuing a stay of Watts' criminal trial in order for Watts to pursue an appeal to the Second Circuit, and before the court issued its decision on that motion. (*See* Ltr. Joining Dupree's Mot. in Limine; Minute Entry of Oct. 17, 2011.)[4] Therefore, except for the one motion that Watts joined, Watts cannot be said to have had a full and fair opportunity to litigate all of the motions

_____

[4] Mr. Watts did not join in any of Dupree's other motions *in limine*, several of which were filed only after Mr. Watts' criminal trial was stayed. (*See, e.g.*, ECF No. 424, Fourth Motion *in limine* to exclude testimony of Irma Nusfaumer.)

*in limine* at issue in the Dupree/Foley trial. *Westerbeke Corp.*, 304 F.3d at 219; *cf. United States v. Guy*, 903 F.2d 1240, 1242 (9th Cir. 1990) (finding doctrine inapplicable because the case "involve[d] different parties convicted in different trials.") Because Watts did not have the opportunity to fully litigate all of the motions *in limine* in the Dupree/Foley trial, and because he has now brought motions on other evidence, the court will exercise its discretion to decline to apply the law of the case doctrine to the instant pretrial motions and motions *in limine*. Instead, each motion will be considered in turn.

**2. References to the Possible Consequences of Watts' Conviction**

Both parties agree that, consistent with the court's prior ruling in the Dupree/Foley trial, (*see Dupree*, 833 F. Supp. 2d at 261-63), neither party shall make reference to the potential punishments Mr. Watts would face upon conviction, (*see* Gov. Reply at 1; Watts Opp. at 1 n.1). Both parties also agree, however, that Mr. Watts should be able to cross-examine government witnesses about any cooperation agreements with the government and plea allocutions, and to cross-examine said witnesses about the consequences facing said witnesses as a result of their guilty pleas. (*See* Gov. Reply at 1; Watts Opp. at 1 n.1.)

As the Supreme Court has held, "[i]nformation regarding the consequences of a verdict is . . . irrelevant to the jury's task." *Shannon v. United States*, 512 U.S. 573, 579 (1994); *see also United States v. Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences."); *Brown v. Artus*, No. 04 Civ. 3601, 2008 U.S. Dist. LEXIS 104863, at *26 (S.D.N.Y. Dec. 24, 2008) ("'Where the jury is permitted to speculate concerning a defendant's possible punishment, a jury cannot properly perform th[e] function' of 'determin[ing] guilt or innocence based upon an impartial consideration of the evidence, unswayed by emotion, fear or prejudice.'" (quoting *United States v. Cook*, 776 F. Supp. 755, 757 (S.D.N.Y. 1991))), *adopted by* 2009 U.S. Dist. LEXIS 44789 (S.D.N.Y. May 27, 2009); *United States v. Maisonneuve*, 954 F. Supp. 114, 116 (D. Vt. 1997) ("It is well settled that juries are not to consider penalties in reaching their verdicts.").

Thus, it is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion that would result. *See Shannon*, 512 U.S. at 579. The parties are in agreement as to this prohibition, and further agree that Mr. Watts may cross-examine government witnesses about the consequences of their guilty pleas and allocutions.

(Gov. Reply at 1; Watts Opp. at 1 n.1.)  The court therefore grants the government's motion to exclude references to the possible consequences of Mr. Watts' conviction.

**3.  Limiting Cross-Examination or Direct Testimony Concerning a Government Witness's Treatment For Depression to the Topics Permitted in the First Trial**

The government asks the court to limit direct testimony and cross-examination regarding a particular government witness's treatment for depression in the same manner as in the Dupree/Foley trial.  (*See* Gov. Mem. at 3-4.)  The court previously limited cross-examination of this witness regarding mental health treatment to: "(1) the nature and quantity of the medication prescribed; (2) the dates of use; (3) the purpose for which the witness was prescribed the medication; and (4) whether the medication affected the witness's ability to perceive and recall events or to testify accurately about the facts at issue in the case."  *Dupree*, 833 F. Supp. 2d at 266.

Mr. Watts responds that he does not intend to cross-examine this particular government witness regarding her/his mental health treatment beyond the limits set by the court in the Dupree/Foley trial.  (*See* Watts Opp. at 1 n.1.)  Thus, the court grants the government's motion to limit direct testimony and cross-examination regarding the particular government witness's treatment for depression to the topics outlined above. In order to balance Mr. Watts' Sixth Amendment right to confront

11

the witness with the interests in minimizing the witness's
personal embarrassment and in preventing confusion of the issues
by the jury, there shall be no other topics of cross-examination
regarding the witness's mental health history, and no documents
shall be admitted with respect to prescribed medication.

### 4. Cross-Examination Regarding Veronica Finn's Husband

The government moves to limit Mr. Watts' cross-
examination of expected government witness Veronica Finn
("Finn"), a former employee of GDC, with regard to Finn's
husband Martin Finn, a retired FBI agent.  (Gov. Mem. at 4-5.)
The government's motion *in limine* overlaps in sum and substance
with Mr. Watts' fifth motion *in limine*, although the parties
advocate differing positions.  (*See* Watts Mem. at 20-24.)  The
court addresses the scope of Mr. Watts' cross-examination of
Finn in Section IV.5, *infra*.

### 5. Direct Testimony or Cross-Examination Regarding Any of the Allegations of Prosecutorial Misconduct in the Dupree/Foley Trial

The government moves to preclude any testimony
regarding potential allegations of prosecutorial misconduct on
the basis that this court has previously found such allegations
to be meritless.  (Gov. Mem at 5.)  Mr. Watts has indicated that
he does not intend to examine witnesses or raise allegations of
prosecutorial misconduct that were addressed and precluded by
the court prior to the Dupree/Foley trial.  (Watts Opp. at 1 n.1

(citing *Dupree*, 833 F. Supp. 2d at 270).)  Accordingly, the
court grants the government's motion to preclude Mr. Watts from
presenting evidence or eliciting testimony during direct or
cross-examination regarding potential allegations of
prosecutorial misconduct.

**6.  Admissibility of the Recordings of Mr. Watts as
Admissions, and Conditional Admissibility of
Recordings of Emilio Serrano and Frank Patello as
Non-Hearsay**

The government argues that audio recordings of Mr.
Watts should be admitted pursuant to Federal Rule of Evidence
801(d)(2)(A).  (Gov. Mem. at 6-7.)  Rule 801(d)(2)(A) provides
that a statement is not hearsay when it is offered against an
opposing party and "was made by the party in an individual or
representative capacity."  Fed. R. Evid. 801(d)(2)(A); *United
States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements
made by the defendant may be introduced by the government in a
criminal trial to prove the truth of the facts stated in them
because they are admissions of an adverse party."); *United
States v. Reed*, No. 10-CR-826, 2012 U.S. Dist. LEXIS 36947, at
*6 (E.D.N.Y. Mar. 19, 2012) (granting motion *in limine* to admit
recorded phone calls by defendant as party admissions.)  The
government notes that tapes 1-7, 3-5, 9-1, 12-7, and parts of
tapes 12-5 and 16-7 include statements made by Mr. Watts.  (Gov.
Mem. at 7.)

Mr. Watts does not specifically dispute the government's argument regarding the admissibility of recordings of him as party admissions. (*See generally* Watts Opp.; Watts Mem.) Mr. Watts does, however, argue that recordings of him having conversations about documents that have not been produced by the government should be precluded, *infra*, Section IV.2. As discussed in Section IV.2, the court disagrees. Based on established law regarding the admissibility of an opposing party's out-of-court statements, the court grants the government's motion *in limine* with regard to the admissibility of recordings of Mr. Watts. *See Russo*, 302 F.3d at 43.

The government's motion *in limine* also addresses the admissibility of recordings between Emilio Serrano ("Serrano") and Frank Patello ("Patello"), two former GDC employees, and overlaps in sum and substance with Mr. Watts' first motion *in limine*. (*See* Gov. Mem at 5-7; Watts Mem. at 4-9.) The court therefore addresses the admissibility of the recordings between Serrano and Patello in Section IV.1, *infra*.

**7.    Admissibility of the Testimony of Martha Xenakis, Mark Jozefowski, and Irma Nusfaumer Regarding Pre-Billing in 2007, Fictitious Billing in 2008, and Fictitious Accounts Receivable in 2009**

The government's seventh motion *in limine* involves evidence that is substantially similar to the evidence at issue in the government's eighth motion *in limine*. Specifically, both

motions *in limine* involve the expected testimony of Irma
Nusfaumer ("Nusfaumer"), and the seventh motion *in limine* also
involves expected testimony of Martha Xenakis ("Xenakis") and
Mark Jozefowski ("Jozefowski").  Accordingly, the court
addresses both the seventh and eighth motions in the instant
section.

        The government moves to admit the testimony of
Xenakis, Jozefowski, and Nusfaumer, former employees of GDC and
GDC subsidiaries, regarding Mr. Watts and Dupree's alleged "pre-
billing" in 2007 during GDC's relationship with PNC Bank
("PNC"), a previous lender to GDC, and testimony by Nusfaumer
about fictitious billing in 2008 prior to GDC's relationship
with Amalmagated, and fictitious accounts receivable created in
2009 for the purpose of obtaining financing from another
company, possibly Siemens.  (*See* Gov. Mem. at 7-10.)  The 2007
dealings between GDC and PNC are not alleged in the indictment,
nor are the 2008 pre-Amalgamated fictitious billing or the 2009
attempt to obtain financing from another company.  (*See*
*generally* S-2 Indictment.)  The government initially argued for
the admissibility of this evidence of uncharged conduct on two
bases: (1) pursuant to Federal Rule of Evidence 404(b), and (2)
that this conduct is "inextricably intertwined" with the charged
offenses.  (*See id.* at 8-9.)  Rule 404(b) permits the admission
of evidence of uncharged crimes or other wrongful acts for the

purpose of proving motive, opportunity, intent, preparation, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2).  Moreover, "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."[5]  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

The government, in its reply brief and at oral argument, altered its previous argument, additionally contending that the testimony by Xenakis, Jozefowski, and Nusfaumer about pre-billing in 2007, fictitious billing in 2008, and fictitious accounts receivable created in 2009 is evidence of the charged conduct.  (Gov. Reply at 9-10, 18; Tr. at 77-78.)  The government asserts that the three witnesses are expected to testify that pre-billing in late 2007, prior to the start of the relationship between the GDC subsidiaries and either Amalgamated

---

[5] Prior to the Dupree/Foley trial, the court ruled that:

> [E]vidence of prior acts of Mr. Dupree and Mr. Watts regarding the PNC loan is not properly characterized as background evidence because the acts of Watts and Dupree regarding the PNC loan are not inextricable intertwined with the charged offense.  They do not arise of the same transaction and are not necessary to complete the story of the crime on trial.

(Dupree/Foley Tr., Dec. 1, 2011 at 38.)

or C3, was incorporated into the GDC subsidiaries' loan application materials to GDC in 2008. (*See* Gov. Reply at 9-10.) According to the government, these witnesses will also testify that Mr. Watts and Dupree were aware of and, in fact, directed this pre-billing, and that they knowingly submitted this information in loan application materials to Amalgamated. (*See id.* at 10.) The government next argues that testimony about fictitious billing in 2008 is evidence of charges in the indictment. (*Id.* at 18.) Lastly, the government argues that testimony about fictitious accounts receivable in 2009 is evidence both of charged conduct and uncharged conduct regarding attempts to obtain financing from Siemens, and that the evidence "completes the story of the crime on trial." (*Id.* at 19.)

Mr. Watts opposes the admissibility of expected testimony by Xenakis, Jozefowski, and Nusfaumer regarding 2007 pre-billing and 2008 fictious sales, contending that such testimony is neither evidence of charged conduct, nor admissible pursuant to Rule 404(b). (*See* Tr. at 78-86; Watts Opp. at 9-24.) As detailed below, the court disagrees with Mr. Watts' arguments that this testimony is not evidence of charged conduct.

At oral argument on the motion *in limine*, Mr. Watts argued that the Second Circuit's recent decision in *United States v. Nkansah*, 699 F.3d 743 (2d Cir. 2012), dictates that

Xenakis, Jozefowski, and Nusfaumer's testimony about 2007 pre-
billing is inadmissible because this conduct occurred before GDC
became involved with Amalgamated in 2008, and therefore Mr.
Watts could not have specifically intended to defraud
Amalgamated at the time this conduct took place.  (*See* Tr. at
79.)  As the *Nkansah* court noted, convictions for bank fraud are
limited to situations where the defendant "(1) engaged in a
course of conduct designed to deceive a federally chartered or
insured financial institution into releasing property; and (2)
possessed an intent to victimize the institution by exposing it
to actual or potential loss."  699 F.3d at 748 (internal
quotation marks omitted).  The court also noted that in the
Second Circuit, "where the direct legal exposure to losses is
sufficiently well known, a jury may infer that the defendant
intended to expose the bank to loss."  *Id.* at 750; *United States
v. Barrett*, 178 F.3d 643, 648 (2d Cir. 1999); *United States v.
Jacobs*, 117 F.3d 82, 93 (2d Cir. 1997).  Thus, Mr. Watts is
correct that in order for testimony about 2007 pre-billing to be
admissible as evidence of the offenses with which he is charged,
that testimony must bear on Mr. Watts' intent to defraud
Amalgamated or C3.

Mr. Watts, however, misconstrues the timing and nature
of the fraudulent intent at issue in this case.  Although the
2007 pre-billing occurred some months before GDC applied for

loans from Amalgamated in 2008, the question with regard to Mr.
Watts' criminal liability for fraud against Amalgamated is what
his intent was at the time that he is alleged to have submitted
what he allegedly knew to be the falsified 2007 pre-billing data
to Amalgamated in connection with the loan.  Thus, the fact that
the 2007 pre-billing is thought by the government to have
originally been undertaken for purposes of an uncharged fraud
against PNC is not dispositive of admissibility.  What
determines the admissibility of testimony about 2007 pre-billing
is whether it bears on Mr. Watts' intent to use the purportedly
falsified 2007 pre-billing to obtain financing from Amalgamated
in 2008.

In *Nkansah*, the government was unable to "prove beyond
a reasonable doubt that appellant intended to expose the banks
to loss."  *Id.* at 750.  Here, the expected testimony of Xenakis,
Jozefowski, and Nusfaumer's about 2007 pre-billing is relevant
to the government's attempt to prove beyond a reasonable doubt
Mr. Watts' intent to defraud Amalgamated as of the time that the
allegedly fraudulent 2007 pre-billing data was submitted to
Amalgamated in connection with the loan application, and in
connection with obtaining funds once the loan was consummated.
*Nkansah* does not militate against the admissibility of this
evidence.

Mr. Watts also argues that the expected testimony of Xenakis, Jozefowski, and Nusfaumer "contains no specifics," and that the government has failed to provide "documentary support for its vague assertions." (Watts Opp. at 11; *see id.* at 11-14.) According to Mr. Watts, without reference to specific documents that relate to the testimony of Xenakis, Jozefowski, and Nusfaumer, it will be impossible for Mr. Watts to effectively cross-examine these witnesses about the 2007 pre-billing and 2008 falsified billing, and that the prejudicial effect of this testimony will therefore far outweigh its probative value. (*See id.* at 11; Tr. at 82-86.)

However, "[a]ny lack of corroboration goes only to the weight of the evidence, not to its sufficiency." *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003) (internal quotation marks omitted); *see also id.* ("The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal."). Contrary to Mr. Watts' contention, the Second Circuit's decision in *United States v. Lyles* does not preclude evidence of similar acts in the absence of documentary proof. Although the Second Circuit noted that similar acts are "typically" established by documentary proof, it further noted that "[i]n the case of first-hand testimony, the jury can reach a decision as to the occurrence of the similar act by evaluating the credibility of witnesses, aided by their observation of

direct and cross examination." *United States v. Lyles*, 593 F.2d 182, 195 (2d Cir. 1979). Further, *Lyles* says nothing about the admissibility of testimony as evidence of charged conduct, as opposed to as similar uncharged acts. Therefore, even if there is a lack of documentation of 2007 pre-billing, 2008 fictitious billing, and 2009 fictitious accounts receivable, the expected testimony of Xenakis, Jozefowski, and Nusfaumer about these acts is admissible.

Additionally, the S-2 Indictment charges Mr. Watts with having participated in the alleged fraud scheme from January of 2007 to July of 2010, a period which encompasses the 2007 pre-billing, the 2008 fictitious billing, and the 2009 fictitious accounts receivable. (S-2 Indictment ¶ 8). Thus, this case is distinguishable from others in which courts have precluded evidence from time periods outside the span of the charged offenses. *Cf. Lyles*, 593 F.2d at 195 (finding inadmissible evidence of uncharged conduct that occurred three years after the charged conspiracy); *United States v. Kahale*, 789 F. Supp. 2d 359, 384-85 (E.D.N.Y. 2009) (finding inadmissible evidence of conduct that occurred several years before the charged conspiracy). The testimony by Xenakis, Jozefowski, and Nusfaumer about pre-billing in 2007 and the creation of fictitious sales in 2008 is directly relevant to Mr.

Watts' knowledge of and involvement in conduct charged in the S-2 indictment.

During oral argument on the motions *in limine*, the government agreed that it would not mention PNC or other sources of financing other than Amalgamated and C3, the only lenders at issue in this case. (Tr. at 78.) The government's concession was stated in response to the court's concern that evidence of uncharged fraud against PNC or other unrelated lenders could delay Mr. Watts' trial and confuse the jury. (*See* Tr. at 77.) Consequently, during Mr. Watts' trial, the government shall not discuss or elicit testimony about PNC or Siemens. (*See* Watts Mem. at 9-10 (regarding admissibility of Nusfaumer's testimony about a possible attempt to obtain financing from Siemens in 2009).) Nor may the government elicit testimony from Nusfaumer about the defendants' alleged *original* purpose for creating fraudulent accounts receivable for the School Construction Authority in 2009 in connection with Siemens, which the government admits is uncharged criminal activity. (*See* Gov. Reply at 19-20). The government may elicit Nusfaumer's testimony that the fraudulent accounts receivable were created and presented to Amalgamated.

For the foregoing reasons, the government's motion to admit testimony by Xenakis, Jozefowski, and Nusfaumer about pre-billing in 2007, the creation of fictitious sales in 2008, and

fictitious accounts receivable in 2009 is granted as evidence relevant to the instant charged offenses regarding Mr. Watts and his alleged role in fraudulently obtaining funds from Amalgamated and C3. Because the expected testimony from these three witnesses is admissible as evidence of the charged offenses, the court declines at this time to address the admissibility of the same evidence pursuant to Rule 404(b). The government's motion to admit testimony by Nusfaumer about uncharged fraudulent acts that are specifically related to PNC, Siemens or lenders other than Amalgamated and C3, is denied.

8. **Admissibility of Nusfaumer's Expected Testimony About Other Acts of Fraud During GDC's Relationship with PNC Bank and Her Testimony About Acts of Fraud to Obtain Financing from Another Financing Source in the Fall or Winter of 2009**

For the reasons discussed in Section III.7, *supra*, the government's motion is denied insofar as it relates to testimony by Nusfaumer about uncharged fraudulent acts that are specifically related to PNC or Siemens; however, the government may elicit Nusfaumer's testimony that fraudulent accounts receivable were created in the fall or winter of 2009 and presented to Amalgamated or C3.

9. **Admissibility of Evidence that Mr. Watts Had a Good-Faith Belief That the Loans Would Ultimately be Repaid**

The government moves to preclude Mr. Watts from presenting evidence or making arguments that he had a good-faith

belief that Amalgamated or C3 ultimately would be repaid any money loaned. (*See* Gov. Mem. at 10-11.) Mr. Watts opposes the government's motion, arguing that it would prevent him from presenting a good-faith defense at trial, and that such an exclusion would be contrary to Second Circuit law. (*See* Watts Opp. at 6-9.)

In order to establish a scheme to defraud, the government must prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (internal citations omitted). The government's proof of fraudulent intent must "demonstrate that the defendant had a conscious knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted) (alterations in original); *see also United States v. Bifulco*, 127 F. App'x 548, 550 (2d Cir. 2005) ("Only a showing of intended harm will satisfy the element of fraudulent intent.").

Mr. Watts argues that he should be permitted to present a good faith defense at trial, and objects to what he describes as the "government's draconian request for a wholesale pretrial preclusion of a good faith defense." (Watts Opp. at

8.)  Mr. Watts argues that because the "nebulous" line between a
defendant's intent to cause "no harm" and "no ultimate harm," as
discussed by the Second Circuit in *United States v. Rossomando*,
144 F.3d 197 (2d Cir. 1998), the issue of intent must be decided
by the jury based on the trial evidence.  (*Id.*)  Mr. Watts
intends to present as evidence of his good faith that he had no
equity in the companies for which he worked, and received no
profit from the loans.  (*Id.* at n.3.)  Mr. Watts, however, does
not indicate whether he intends to present evidence that he had
a good faith belief that the statements he submitted to
Amalgamated and C3 were truthful and accurate, and therefore
that he had no intent to expose the institutions to actual or
potential loss.  The government replies that it is not moving to
preclude all good faith defenses but, rather, seeks to preclude
evidence that the loans Mr. Watts obtained or attempted to
obtain from Amalgamated and C3 would be repaid.  (Gov. Reply at
3.)

It is correct that a defendant's good-faith belief
that his or her statements or representations were truthful may
refute the intent to defraud required to sustain a fraud
conviction.  *See, e.g.*, *United States v. Alkins*, 925 F.2d 541,
550 (2d Cir. 1991) ("If an individual believes that the
information set forth in a mailing is true, it follows that he
cannot have the requisite intent to defraud.").  Yet, a

25

defendant's good-faith belief in the truth of his statements or representations is very different from a defendant's belief that his untrue statements or representations will ultimately cause no harm. *See, e.g.*, *United States v. Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) (noting that if a securities fraud defendant was found by a jury to have intentionally caused others to issue false or misleading statements, and that defendant knew that this conduct was illegal, "he properly would be found guilty, even if he 'firmly believed' that, in the end, his strategy would 'work out'"); *United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) ("The definition of good faith 'addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan . . . .'" (quoting 1A Sand, *et al.*, Modern Federal Jury Instructions, ¶ 44.01)).

A defendant's criminal liability for fraud does not necessarily depend upon a victim having sustained actual financial or property loss; rather, the government need only establish that the defendant intended to expose the victim to actual or potential loss or harm. *See Nkansah*, 699 F.3d at 750; *see also United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991) ("[T]he government is not required to show that the intended victim was actually defrauded. The government need only show that the defendants contemplated some actual harm or

injury."). The Second Circuit has recognized that concrete harm
can include depriving a party of material information. *See*
*United States v. Dinome*, 86 F.3d 277, 284 (2d Cir. 1996). "To
be material, the information withheld either must be of some
independent value or must bear on the ultimate value of the
transaction." *Id.* (internal quotation marks omitted). Thus,
where a defendant intentionally withholds or falsifies material
information on a loan application, even if the defendant intends
that the lender will be made whole at some future juncture, the
defendant will have already exposed the lender or investor to
"immediate harm by denying [the lender] the right to control
[its] assets by depriving [the lender] of the information
necessary to make discretionary economic decisions." *United*
*States v. Levis*, 488 F. App'x 481, 486 (2d Cir. 2012) (internal
quotation marks omitted) (alterations in original); *see also*
*Rossomando*, 144 F.3d at 201 n.5 ("[T]he value of credit . . .
transactions inherently depend[s] on the ability of banks . . .
to make refined, discretionary judgments on the basis of full
information . . . ."); *id.* at 201 (noting with approval scenario
in which if a defendant supplies false information to obtain a
bank loan, "the defendant's good-faith intention to pay back the
loan is no defense because he intended to inflict a genuine harm
upon the bank--*i.e.*, to deprive the bank of the ability to
determine the actual level of credit risk and to determine for

itself on the basis of accurate information whether, and at what price, to extend credit to the defendant.").[6]  Accordingly, if the jury concludes that Mr. Watts intentionally deceived Amalgamated and C3 in seeking loans, his good-faith belief that the loans would ultimately be repaid would be irrelevant because "intent to harm is inextricably bound to the intent to deceive." *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir. 1996).

Under the foregoing Second Circuit decisions, in situations in which a defendant has improperly presented evidence of his good-faith belief in the ultimate success or repayment of a fraud scheme, the Second Circuit has upheld an instruction to the jury, that provides in sum and substance, that "[n]o amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by [the defendant]."  *See Levis*, 488 F. App'x at 486 (upholding instruction even though defendant, who had made misrepresentations regarding an independent valuation of his company to investors, "meant to cause no ultimate harm to

---

[6] Mr. Watts cites *United States v. Rossomando* for the proposition that "an honest belief that a scheme will not result in a financial loss to a purported victim is a valid defense to mail fraud."  Watts Opp. at 8.  The court cannot yet determine the applicability of *Rossomando* in this respect because whereas Rossomando's defense "was not that he thought the [victim] would not 'ultimately' lose money, but that he thought it was *never* going to lose money," Mr. Watts has not indicated whether he intends to argue that he had a good faith belief that the information he provided to Amalgamated and C3 was accurate, and thus that he lacked the requisite fraudulent intent to harm the institutions.  144 F.3d at 202 (emphasis in original); *see also Nkansah*, 699 F.3d at 748 n.1.

investors"); *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) ("The 'no ultimate harm' instruction given in the present case ensured that jurors would not acquit if they found that the defendants knew the [representation] was a sham but thought it beneficial for the stock price in the long run."); *United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008) (upholding instruction in case where defendants were found to have mislead investors about how investment monies would be spent).

Mr. Watts primarily relies upon two cases to oppose the government's motion: *Nkansah*, 699 F.3d 743, and *United States v. Cleary*, 565 F.2d 43 (2d Cir. 1977). These cases, however, are factually distinguishable from Mr. Watts' case and thus not controlling.

In *Nkansah*, the criminal defendant appealed his convictions for, *inter alia*, bank fraud. 699 F.3d at 746. Defendant was convicted of bank fraud as part of a group scheme in which fraudulent tax returns were filed with the IRS, resulting in tax refund checks for some of the fraudulent returns being electronically deposited by the Treasury Department into bank accounts controlled by members of the criminal scheme. *See id.* at 746-47. The Second Circuit first noted that convictions for bank fraud are limited to situations where "the defendant (1) engaged in a course of conduct designed

to deceive a federally chartered or insured financial institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss." *Id.* at 748. The court thus overturned Nkansah's bank fraud conviction, finding that "there is not the well-known exposure to loss that might support a finding beyond a reasonable doubt of appellant's intent to victimize [the banks]." *Id.* at 750.

In contrast to Amalgamated and C3 in Mr. Watts' case, the banks at issue in *Nkansah* were never at a risk of loss because the Treasury checks were genuine and the criminal defendants were authorized signatories to the bank accounts; therefore, "until alerted by the Treasury to the scheme, the banks may well have been holders in due course with the risk of loss borne entirely by the Treasury." *Id.* In other words, although the banks in *Nkansah* were used as an intermediary in the scheme to defraud the Treasury, there was no evidence that Nkansah intended to expose, or did expose, the banks to potential losses, and thus Nkansah could not have been found guilty of bank fraud. Mr. Watts, however, is alleged to have directly caused Amalgamated to incur millions of dollars in losses from fraudulently obtained loans. Thus, *Nkansah* does not support Mr. Watts' position.

*Cleary* is likewise distinguishable from this case. Cleary, an assistant manager of a bank, was charged with and convicted of misapplication of bank funds for approving loans to third-parties while knowing that the loan proceeds were in fact going in whole or in part to a man named Passarelli. *See* 565 F.2d at 45-46. Passarelli applied for the loans on behalf of the third-parties using falsified documents. *See id.* The Second Circuit overturned Cleary's conviction because the record was "devoid of proof that Cleary was aware of the forgeries and false statements" made by Passarelli. *Id.* at 46. Thus, the Circuit concluded that "[t]he interests of justice require that another jury be given the opportunity to determine the question of Cleary's *criminal intent*." *Id.* at 48 (emphasis added).

The court agrees with the government that Mr. Watts' alleged conduct is more akin to that of Passarelli than of Cleary. (Gov. Reply at 7-8.) Mr. Watts, like Passarelli, is alleged to have been involved in the original creation and submission of falsified loan application materials to Amalgamated. To the extent that Mr. Watts intends to present evidence that he, like Cleary, was unaware of false statements made to Amalgamated, or that he had a good-faith belief that the application materials were accurate, he may do so; however, his belief that the Amalgamated loans would ultimately be repaid has no bearing on these separate and distinct defenses. *See*

*Chandler*, 98 F.3d at 716 ("Chandler (1) obtained credit from the bank and (2), in doing so, intended to deceive the bank. Notwithstanding Chandler's protestations that she intended to repay, her intentionally deceptive conduct is inexplicable other than as a means of intentionally exposing [the bank] to an unwanted risk."). Thus, *Cleary* also does not support Mr. Watts' position.

Mr. Watts has every right to present evidence that he, like Cleary, had a good-faith belief that the application materials submitted to Amalgamated were in fact truthful and accurate, and thereby attempt to refute the element of fraudulent/criminal intent; however, he has no right to present evidence regarding the irrelevant issue of his good-faith belief that the fraudulently obtained loans would ultimately be paid back. *See Alkins*, 925 F.2d at 550; *cf. Cleary*, 565 F.2d at 47-48. The government's motion to preclude Mr. Watts from presenting evidence or arguing that he had a good-faith belief that the Amalgamated loans would ultimately be repaid is therefore granted.

## IV.  <u>Mr. Watts' Motions in Limine</u>

### 1.  **Admissibility of Recordings of Serrano and Patello Based on Hearsay Exception for Co-Conspirators**

Watts argues that the recordings of telephone conversations between Serrano and Patello are inadmissible

because they were recorded after Patello withdrew from the bank fraud conspiracy and, thus, are not subject to the hearsay exception for co-conspirators pursuant to Federal Rule of Evidence 801(d)(2)(E). (Watts Mem. at 4-8.) At the time of the conversations at issue in May and June of 2010, Serrano was a government cooperator who was working at GDC as an assistant controller, and Patello, a former controller and chief financial officer at GDC, had left the company in March of 2010 and was not aware that Serrano was a cooperator, or that Serrano was recording their conversations. *See Dupree*, 833 F. Supp. 2d at 273.

The government asserts that Patello had not yet withdrawn from the conspiracy, (Gov. Opp. at 1-5), and that the court should either conditionally admit the recordings at trial, or unconditionally admit the recordings prior to trial, pursuant to *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), (Gov. Mem. at 6, 7). In *Geaney*, the Second Circuit established the practice of deferring ruling on whether there is sufficient independent corroborating evidence of a party's participation in a conspiracy for out-of-court co-conspirator statements to be admitted until the conclusion of the government's case. 417 F.2d at 1120. The *Geaney* court noted that "[w]hile the practicalities of a conspiracy trial may require that hearsay be admitted 'subject to connection,' the judge must determine, when

33

all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances." *Id.* The tapes at issue here include those designated by the government as 1-7, 3-4, 3-5, 3-6, 9-1, 10-5, 10-6, 12-7, 14-1, and 16-7.[7] (Gov. Mem. at 5-6.)

Rule 801(d)(2)(E) provides that an out-of-court statement offered against an opposing party which is "made by the party's coconspirator during and in furtherance of the conspiracy" is admissible as non-hearsay. Fed. R. Evid. 801(d)(2)(E); *see also United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011). "To admit an out-of-court declaration under this rule, the district court must find by a preponderance of the evidence '(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'" *Farhane*, 634 F.3d at 161 (quoting *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008)).

---

[7] At the Dupree/Foley trial, the court conditionally admitted each of the tapes offered into evidence by the government during its case-in-chief, *see Dupree*, 833 F. Supp. 2d at 277, and eventually admitted the tapes as non-hearsay co-conspirator statements pursuant to Rule 801(d)(2)(E), (*see* Dupree/Foley Trial Tr. ("Dupree/Foley Tr.") at 3248-66).

Despite the court's findings in the Dupree/Foley trial as to the first and third factors, and strong evidence presented at the Dupree/Foley trial that Mr. Watts was a member of the charged conspiracy, the court will defer ruling as to Mr. Watts' membership in the conspiracy until the conclusion of the government's case-in-chief in accordance with the long-established procedures followed in the Second Circuit after *Geaney*. *See Dupree*, 833 F. Supp. 2d at 273. With regard to the third factor, the Second Circuit has held:

> As the "in furtherance" term implies, the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy, or by prompting the listener - who need not be a coconspirator - to respond in a way that promotes or facilitates the carrying out of a criminal activity.

*United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (internal citations omitted); *see also In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh*, 552 F.3d 93, 139 (2d Cir. 2008); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) ("The principal question in the 'in furtherance' issue is whether the statement promoted, or was intended to promote, the goals of the conspiracy. 'Idle

chatter' does not meet the test, nor does a 'merely narrative' description by one coconspirator of the acts of another. Coconspirator statements may be found to be 'in furtherance' . . . if they 'prompt the listener to respond in a way that facilitates the carrying out of criminal activity.'" (citations omitted)).

"[O]nce a party withdraws from a conspiracy subsequent statements by a coconspirator do not fall within this exemption." *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988). "Withdrawal from a conspiracy requires 'affirmative action . . . to disavow or defeat the purpose' of the conspiracy." *Id.* (quoting *United States v. James*, 609 F.2d 36, 41 (2d Cir. 1979)). Such an affirmative action or disavowal may be either "the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Sadiki Komunyaka*, 658 F.3d 140, 143 (2d Cir. 2011). Generally, the burden of establishing withdrawal from a conspiracy rests "firmly on the defendant regardless of when the purported withdrawal took place." *Smith v. United States*, 133 S. Ct. 714, 719 (2013); *see also Sadiki Komunyaka*, 658 F.3d at 143 ("[W]ithdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof at trial."). In the context of admitting co-conspirator statements, the offering

party has the burden of establishing the existence of the conspiracy, that the declarant and the party against whom the statement is offered were members of the conspiracy at the time of the statement, and that the statement was made during and in furtherance of the conspiracy. *See Al-Moayad*, 545 F.3d at 173. "[A] statement is not made during the course of the conspiracy when it is made after the main objective of the conspiracy has been accomplished." *United States v. Lombardozzi*, No. S1 02 CR 273, 2003 U.S. Dist. LEXIS 6859, at *4 (S.D.N.Y. Apr. 24, 2003) (citing *Krulewitch v. United States*, 336 U.S. 440 (1949)).

Mr. Watts correctly argues that Serrano cannot have been a conspirator at the time of the recordings because he withdrew and was cooperating with the government. (Watts Mem. at 5.) This fact, however, does not affect the admissibility of the conversations if Patello's statements nonetheless satisfy the requirements of Rule 801(d)(2)(E). *Farhane*, 634 F.3d at 160-62 (affirming district court's admission of tape-recorded conversations between a co-defendant, on the one hand, and a confidential informant or undercover agent, on the other hand, under Rule 801(d)(2)(E)); *In re Terrorist Bombings*, 552 F.3d 93 at 139 ("Though [Rule 801(d)(2)(E)] requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member."); *United*

*States v. Sanin*, Nos. 96-1417(L), 96-1481, 96-1482, 1997 U.S.
App. LEXIS 12280, at *10-11 (2d Cir. May 23, 1997)
("[S]tatements made to a non-co-conspirator can still be
admitted under Rule 801(d)(2)(E) if the purpose of making the
statements is to facilitate achievement of the conspiracy's
goal.")

Regarding Mr. Watts' and the government's arguments as
to whether Patello's statements were made during the course of
and in furtherance of the conspiracy, the court first addresses
Mr. Watts' citation to the government's opening statements and
closing arguments.  As jurors are, and will be, instructed, a
lawyer's opening statements and closing arguments are not
evidence.  *United States v. Arboleda,* 20 F.3d 58 (2d Cir. 1994)
("A summation is not evidence.  It is simply an attorney's
argument to the jury on the circumstances of the case."); 1
Sand, *et al.*, Modern Federal Jury Instructions ¶ 5.02 (2010)
("[S]tatements by counsel are not evidence."); *see also United
States v. Burden*, 600 F.3d 204, 222 (2d Cir. 2010) (noting with
approval district court instruction to jury that closing
arguments are not evidence).  Therefore, the court disregards
the parties' contentions as to the substance and meaning of the
government's opening and closing statements in the Dupree/Foley
trial, as these statements have no bearing on whether Patello
did or did not withdraw from the conspiracy before Serrano

recorded conversations with him. (*See, e.g.*, Watts Mem. at 7-8;
Gov. Opp. at 3-4; Watts Reply at 3.)

Moreover, Patello cannot be said to have withdrawn
from the conspiracy prior to his recorded conversations with
Serrano. Rather, although Patello resigned from his position at
GDC in March of 2010, he remained actively involved with the
conspiracy thereafter. (Dupree/Foley Tr. at 2503-04.) For
example, in the recordings at issue, Patello (1) inquires about
what is happening at GDC, including Amalgamated's audit of GDC
and the submission of another falsified Borrowing Base
Certificate; (2) explains to Serrano how GDC created a company
to conceal information from Amalgamated; (3) recounts a recent
conversation, with co-conspirator Dupree, regarding a call
Patello received from an Amalgamated representative and Dupree's
advice on how to respond to conceal the fraud; (4) discusses how
Patello called an Amalgamated representative after business
hours, presumably to maintain the appearance that nothing is
wrong and to hide the fact that he had left GDC; (5) comments on
how he is still waiting for his severance payment from GDC; (6)
makes several statements indicating that he hopes GDC will
survive financially and that the conspiracy will remain
concealed so that he does not get caught; and (7) reassures
Serrano that, in the event the conspiracy is exposed, he will
protect Serrano. *Dupree*, 833 F. Supp. 2d at 274-75 (summarizing

content of tapes after court review); *see also* Dupree/Foley Tr.
at 2507-08 (Patello testifying about conspiracy-related conduct
after his resignation).  Patello's statements, which describe
conversations and contact with, and directions by, alleged co-
conspirator Dupree, as well as contact with Amalgamated to
conceal the conspiracy, are sufficient to establish Patello's
continued participation in the conspiracy.  *See United States v.*
*Friesel*, 224 F.3d 107, 118 (2d Cir. 2000) ("[R]esignation from a
criminal enterprise, standing alone, does not constitute
withdrawal as a matter of law; more is required.  Specifically,
the defendant must not take any subsequent acts to promote the
conspiracy . . . and must not receive any additional benefits
from the conspiracy." (internal citations omitted)).

Although several of the recorded statements involve
narratives relating to past events, such statements "meet the
in-furtherance test if they serve some current purpose in the
conspiracy."  *United States v. Thai*, 29 F.3d 785, 813 (2d Cir.
1994).  Patello's statements, described above, served to inform
Serrano about the history of the conspiracy, advise Serrano of
his knowledge of the progress or status of the conspiracy,
solicit information regarding the same from Serrano, and
reassure Serrano that he is still adhering to Dupree's
directives to conceal the conspiracy from Amalgamated.  In
addition, although Patello counseled Serrano to avoid

involvement in the ongoing conspiracy, he also reassured Serrano

on many occasions that they and the others were less likely to

get caught as more time had passed since their direct

involvement in the conspiracy and the aging of the financial

information submitted to Amalgamated.  Thus, Patello was

reassuring Serrano and encouraging him to avoid exposing the

ongoing conspiracy.  *See United States v. Eisen*, 974 F.2d 246,

269 n.8 (2d Cir. 1992) (finding that withdrawal from the

conspiracy was not achieved by resignation from the firm because

defendant was still a member of the conspiracy at the time of

these efforts, "and, clearly, acts or statements designed to

conceal an ongoing conspiracy are in furtherance of that

conspiracy."); *Beech-Nut Nutrition Corp.*, 871 F.2d at 1198-99

(finding co-conspirator statements admissible because they were

designed to "cover up" the conspiracy and encourage the listener

"to not [ ] reveal incriminating information").

Furthermore, irrespective of how Patello or any other

witness may characterize his resignation from GDC, on September

24, 2010, Patello pleaded guilty before this court to an

information charging him with being a member of the instant

conspiracy from March of 2008 until July of 2010.  (*See United

States v. Patello*, Docket No. 10-CR-709, ECF No. 6, Tr. of

Guilty Plea at 23-27.)  That is, Patello specifically allocuted

to having been an active member of the conspiracy from March of

2008 until September of 2010. (*See id.*) The court accepted Patello's plea after determining that Patello was fully aware of his rights and the consequences of his plea, that he was acting voluntarily, and that there was a factual basis for his plea. (*Id.* at 28.) Even if the court disregarded the substance of the recordings regarding Patello's involvement in the conspiracy after his resignation from GDC, his guilty plea alone would provide the court with an adequate basis on which to find that Patello recorded conversations with Serrano "during the course of and in furtherance of the conspiracy." *Farhane*, 634 F.3d at 161.

Therefore, consistent with *Geaney*, the court will conditionally admit the recorded conversations during the government's case-in-chief, pending the government's presentation of evidence, including of Mr. Watts' membership in the conspiracy. The government's request to unconditionally admit the recorded evidence prior to trial is denied. Although the government proved at the Dupree/Foley trial the first factor (the existence of a conspiracy), and the third factor (that the statements were made during the course of and in furtherance of the conspiracy), at the conclusion of the government's case at the Watts trial, the court will re-examine whether the government has established by a preponderance of the evidence the three factors, including whether Mr. Watts was a member of

42

the conspiracy. *See id.* In making these findings, the court
will consider the statements themselves, as well as any
independent corroborating evidence. *See United States v.
Mulder*, 273 F.3d 91, 103 (2d Cir. 2001). If the requisite
findings cannot be made for a particular statement, the court
will instruct the jury to disregard the statement.

To minimize the risk of unfair prejudice to Mr. Watts
from the conditional admission of the recorded statements, and
to expedite trial while the jury is in session, after the
conclusion of each trial day, the government shall provide the
court and Mr. Watts with a transcript of the recorded statements
that it intends to offer into evidence during the next trial
day. This procedure will enable the court to determine in
advance whether a particular statement is not admissible prior
to its disclosure to the jury to the extent it is possible to
make such a finding prior to its presentation.

## 2. Admissibility of Recordings Made By Serrano Where the Government Failed to Preserve and Identify the Documents Referred to in the Recordings

Mr. Watts moves to preclude the government from
introducing recordings made by Serrano in which participants
discuss documents that the government has not identified and
preserved, and alternatively moves to have a spoliation adverse
inference instruction given to the jury. (Watts Mem. at 9.)
Mr. Watts argues that the FBI failed to adequately supervise

Serrano during the roughly three-week period of time during which he made some 44 recordings of his conversations with GDC employees, the majority of which feature conversations with Mr. Watts. (*See id.*) Mr. Watts asserts that the FBI's failure to supervise Serrano resulted in a failure by Serrano to copy or retain many documents discussed by Mr. Watts and Serrano on the recordings.[8] (*See id.* at 9-13.) Mr. Watts argues that the government's failure to preserve and produce relevant documents warrants either prohibiting the government from introducing recordings for which copies of the subject documents are unavailable, or permitting a spoliation adverse inference instruction to the jury. (*See id.* at 14-17.) The government counters that there is no basis in law for precluding recordings on the basis that the physical documents discussed therein may not have been seized or gathered for submission into evidence. (*See* Gov. Opp. at 5-11.) The court agrees that there is no basis in law to require the government to have ordered Serrano to copy or retain any of the documents discussed on recordings

---

[8] Mr. Watts also asserts in his memorandum of law that the government had thus far failed to respond to Mr. Watts' requests for any of the documents discussed in the recordings. (Watts Mem. at 13.) In its opposition memorandum and at oral argument, the government averred to having "produced all material in its possession subject to Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972) and 18 U.S.C. § 3500. To the extent the government has any of the documents discussed on the recordings, the government has long since produced them." (Gov. Opp. at 6 n.1; *see also* Tr. at 16.)

between him and other defendants in order to admit those recordings into evidence.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire and Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A party seeking remedial relief due to spoliation must establish: (1) that the opposing party had control over the evidence and an obligation to preserve it at the time it was destroyed; (2) that the evidence is unavailable due to negligence, gross negligence, or intentional behavior; and (3) that the unavailable evidence was relevant to the party's case. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107-08 (2d Cir. 2002).

Although Mr. Watts characterizes the government as having failed to preserve the documents discussed on the recordings, the government cannot be said to have ever actually possessed or controlled said documents. Indeed, GDC and its employees, including Mr. Watts, had control over the evidence he now seeks. Most of the cases cited by Mr. Watts are distinguishable from this case because they involve civil litigations in which there was no question that the allegedly spoliating party previously possessed and controlled the evidence at issue before allowing it to be destroyed. *See id.*;

*Reilly v. NatWest Mkts. Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999); *Liberman v. FedEx Ground Package Sys.*, No. 09-CV-2423, 2011 U.S. Dist. LEXIS 4401, at *6-7 (E.D.N.Y. Jan. 18, 2011); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs, LLC*, No. 05 Civ. 9016, 2010 U.S. Dist. LEXIS 4546, at *37 (S.D.N.Y. Jan. 15, 2010); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 429-30 (S.D.N.Y. 2004).

The cases cited by Mr. Watts involving the use of government cooperators in criminal investigations similarly do not suggest that the government has a duty to collect documents that are discussed in recordings. *Guccione v. United States America* pertains to the government's civil liability pursuant to the Federal Tort Claims Act for intentional torts committed by informants, but says nothing about a duty to collect or retain evidence. *See* No. 85 Civ. 0333, 1987 U.S. Dist. LEXIS 8262, at *15-16 (S.D.N.Y. Sept. 10, 1987). *United States v. Suarez* pertains to the deletion of relevant text messages by government agents who unquestionably possessed and controlled the evidence on their personal Blackberry phones. *See* No. 09-932, 2010 U.S. Dist. LEXIS 112097, at *5-6 (D.N.J. Oct. 19, 2010). There, the court found that the government intentionally deleted the evidence and therefore granted defendant's request for an adverse inference instruction. *Id.* at *24-25. In contrast to *Guccione* and *Suarez*, here the government never possessed all of

the documents discussed on the recordings, nor is there evidence that the government destroyed those documents.[9]  To the extent that Serrano did happen to provide government agents with copies of GDC documents, any documents seized by the government were properly retained and produced to Mr. Watts.

By Mr. Watts' logic, no witness in a criminal trial could ever be permitted to offer direct testimony about documents or other physical evidence, such as weapons or illicit narcotics, unless the government could also produce said documents or other physical evidence.  No prosecutor or defense lawyer should be so constrained in the presentation of evidence.  The fact that the documents discussed by Serrano, Mr. Watts, and others on the recordings at issue here may not be available as evidence is merely a factor for the jury to consider in assessing the evidentiary weight of Serrano's recordings and direct testimony.  *See Hamilton*, 334 F.3d at 179 ("Any lack of corroboration goes only to the weight of the evidence, not to its sufficiency. . . . The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal." (quotation marks omitted)); *United States v. Gonzalez*, 110 F.3d

---

[9] As the government notes, even assuming, *arguendo*, that the government had previously possessed and destroyed relevant evidence, the Supreme Court has counseled that "unless a criminal defendant can show bad faith on the part of the [government], failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  There is no evidence or argument here that the government acted in bad faith, even if it did not collect all of the documents discussed in the recordings.

936, 941 (2d Cir. 1997) ("It is well settled that where . . . the government's case is based primarily on eyewitness testimony describing criminal activity, any lack of corroboration [with physical evidence] goes only to the weight of the evidence, not to its sufficiency.  The weight is a matter for argument to the jury, not a ground for reversal on appeal."); *Guity v. Ercole*, No. 07 Civ. 0728, 2007 U.S. Dist. LEXIS 82064, at *16-17 (S.D.N.Y. Nov. 6, 2007); *Simpson v. Portuondo*, No. 01 Civ. 1379, 2001 U.S. Dist. LEXIS 9581, at *37-38 (S.D.N.Y. July 12, 2001).

Mr. Watts' invocation of Federal Rule of Evidence 106 is equally unavailing.  (Watts Mem. at 17-18.)  Rule 106 states, in full, that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  Rule 106 reflects "a principle of fairness requiring the introduction of an entire or related document if necessary for the fair and impartial understanding of the admitted portion or document." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 102 (2d Cir. 1995) (quotation marks omitted).  Thus, when a party introduces only part of a document into evidence, Rule 106 requires that an adverse party be permitted to present the entire document "when it is essential to explain an already admitted document, to

place the admitted document in context, or to avoid misleading the trier of fact." *Id.* (quotation marks omitted). As a basis on which to *admit* evidence, Rule 106 does not support *precluding* the government from introducing Serrano's recordings. Rather, Rule 106 would support Mr. Watts' right to introduce one of Serrano's recordings in its entirety in the event that the government introduced only a portion of it.

Lastly, Mr. Watts adds to his reply memorandum a new argument in favor of precluding the recordings--"[r]ecordings must be sufficiently comprehensible to be considered by a jury and may be deemed inadmissible where the unintelligible portions are sufficiently substantial that they render the tape misleading." (Watts Reply at 6.) Mr. Watts argues that the absence of documents referenced on the recordings essentially renders the recorded discussion of those documents incomprehensible. (*See id.*) However, as Mr. Watts acknowledges, the cases he cites for this proposition deal with instances in which a recording is either audibly incomprehensible, *see, e.g.*, *United States v. Bryant*, 480 F.2d 785, 790 (2d Cir. 1973) ("It is plain that some parts of the tape were totally inaudible. Other parts were so garbled that only some jurors were able to understand what was being said."), or which contains "code" or terms of art--for example, language used by professional gamblers--that render it "unintelligible to

49

others not engaged in such activities," *Williams v. United States*, 365 F.2d 21 (7th Cir. 1966). Neither situation is presented here; there is no question about the auditory clarity of the recordings, and the language and terminology used by Serrano and those with whom he was speaking is generally colloquial and easily explained by Serrano's direct testimony. (*See, e.g.*, Dupree/Foley Tr. at 766-68 (recording introduced into evidence and then played, followed by direct explanatory testimony by Serrano).)

For the above reasons, the court denies Mr. Watts' request to exclude recordings made by Serrano in which unavailable documents are discussed, and, in the alternative, denies the request to give a spoliation adverse inference instruction to the jury.

### 3. Preclusion of Direct or Cross-Examination Testimony Concerning Any Illness, Medical Diagnosis, or Other Ailment Afflicting a Witness or Members of the Witness's Family

Mr. Watts moves to preclude testimony and argument concerning any illness, medical diagnosis, or other ailment or misfortune afflicting a witness or member of a witness's family on the basis that the probative value of such matters is substantially outweighed by a danger of unfair prejudice in the form of jury sympathy for matters with no bearing on the case. (*See* Watts Mem. at 18-19.) In his reply papers and at oral

argument, Mr. Watts conceded that this argument applies only to the testimony of expected government witnesses Nusfaumer and Serrano.[10] (*See* Watts Reply at 8-9; Tr. at 29.)  With regard to Nusfaumer and Serrano, the government argues that their family circumstance are relevant because "they help explain why two mid-level employees who each had no equity stake, relatively low status, and a relatively low salary would participate in such a serious fraud for so long."  (Gov. Opp. at 11.)

The Advisory Committee Notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Further, it is "well within [a] court's discretion to draw the line to exclude testimony that . . . could well cause the jury to be influenced by sympathies having no bearing on the merits of the case."  *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991).  Additionally, when a court conducts a Rule 403 balancing, it must weigh "[i]f an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, . . . . with an appreciation of the offering party's need for

---

[10] The government argued in opposition to Mr. Watts' motion that Mr. Watts and his co-conspirators had used the family circumstances of Patello to hide the alleged fraud from Amalgamated, thereby establishing the relevancy of Patello's family circumstances.  (*See* Gov. Opp. at 12-13.)  Mr. Watts agrees that testimony about Patello's family is relevant in this regard, subject to preventing the government from using this information to "engender sympathy for its witness or to shore up [his] 'motivation' . . . ." (Watts Reply at 8-9.)

evidentiary richness and narrative integrity in presenting a case . . . ." *Old Chief v. United States*, 519 U.S. 172, 182-83 (1997).

During her tenure with GDC, Nusfaumer expressed concern about losing her health insurance because of the medical needs of her two autistic children. (*See* Dupree/Foley Trial Tr. at 1728:9-15; Watts Mem. at 19 (quoting same).) During his tenure, Serrano had extensive health bills related to his daughter, who had undergone a leg amputation. (*See* Dupree/Foley Trial Tr. at 1724; Watts Mem. at 18-19 (quoting same).)

At oral argument, Mr. Watts agreed that the government may ask Nusfaumer and Serrano why they remained at GDC after the alleged fraud became clear to them, so long as their answers are limited to their desire to retain their regular salaries and other benefits. (*See* Tr. at 33-34.) The court agrees with Mr. Watts that during their direct testimony, the witnesses may testify about their desire to retain their salaries and other benefits, including health benefits for themselves and their families. The specific details regarding the health issues confronting the children of Nusfaumer and Serrano that motivated them to retain their employment and insurance at GDC are of limited probative value when balanced against the risk of unfairly currying sympathy from the jury. *See* Fed. R. Evid. 403. Therefore, and in light of the parties' agreement at oral

argument, the court grants Mr. Watts' motion to preclude testimony and argument concerning any specific illness of the witness's children, medical diagnoses, or other ailments or misfortunes afflicting Nusfaumer, Serrano, or any member of their families.  This limitation shall apply to the testimony by Nusfaumer and Serrano themselves, as well as to any other witness who may possess knowledge of Nusfaumer and Serrano's family circumstances.  If, however, on cross-examination, Mr. Watts persists in asking Nusfaumer, Serrano, or any other witness why Nusfaumer and Serrano stayed at GDC even after a witness provides the general rationales outlined above, then the court will be inclined to allow those witnesses to describe in detail what the court views as the serious concerns of Nusfaumer and Serrano regarding their children's extraordinary health issues during their tenures at GDC.

## 4. References by the Government of GDC as a "Shell" Company

Mr. Watts moves to prohibit the government or any witness from referring to or identifying GDC as a "shell company" or "shell corporation."  (*See* Watts Mem. at 19-20.) Mr. Watts argues that "shell corporation" is a pejorative term that should not be permitted at trial pursuant to Rule 403. (*Id.* at 19-20 (citing *United States v. Ross*, 77 F.3d 1525, 1535-36 (7th Cir. 1996) (characterizing corporation created to evade

bankruptcy rules and to commit mail and wire fraud as a "shell corporation")).)

The government argues that there is no need to prohibit witnesses' use of the term "shell company" because Serrano's one prior use of that term in the Dupree/Foley trial was innocuous and made in passing. (Gov. Opp. at 14 (quoting Serrano's response to a question about what GDC is: "It's a holding company that is a shell for other subsidiaries.").) The government also argues that "shell company" is not, *per se*, a pejorative term. (*See id.*)

The court finds that the terms "shell company" or "shell corporation" could be perceived to have a pejorative meaning. No evidentiary value is added by allowing Serrano or any other witness to use those terms; a more useful description of GDC for the jury would be that it is a "holding company," and a witness will be permitted to explain his or her use of the term "holding company." The court therefore directs that the government and any of its witnesses refrain from using the terms "shell corporation" or "shell company." The government is directed to expressly instruct its witnesses to avoid use of the terms "shell corporation" or "shell company" at trial. Nonetheless, as the court discussed at oral argument, in the event that a witness accidentally uses either of those terms,

the government will not be presumed to have disregarded the court's instruction to avoid those terms. (*See* Tr. at 58-59.)

**5.    Clarification About Cross-Examination of Finn Regarding Her Husband's Former Position as an FBI Agent, Her Non-Privileged Communications With Him, and the Government's Decision Not to Charge Her**

Mr. Watts seeks "clarification" of the court's prior pretrial order in the Dupree/Foley trial regarding the permissive scope of cross-examination of Finn, a former GDC officer and government witness who has not been charged in connection with the instant case. (*See* Watts Mem. at 20-24.) Mr. Watts specifically argues that, in light of the government's cross-examination of Dupree in the Dupree/Foley trial about whether Dupree ever contacted the FBI after Patello's March 10, 2010 disclosure of fraudulent financial reporting at GDC, Mr. Watts should be able to ask Finn, who was also present at the March 10th meeting, the same question. (*See* Watts Mem. at 20-22.) Mr. Watts also argues that he should be permitted to ask Finn questions concerning the government's decision not to charge her with a crime. (*Id.* at 23-24.) The government counters that the court's prior order from the Dupree/Foley trial is clear and should be applied unchanged to Mr. Watts'

trial.[11]  (Gov. Opp. at 14-18; *see* Gov. Mem. at 4-5; Gov. Reply at 1.)

As set forth below, the court previously granted in part and denied in part the government's motion *in limine* to preclude certain testimony regarding Finn in the Dupree/Foley trial:

> The court grants the [government's] motion in part by (1) precluding defendants from suggesting or arguing that, *because of Mr. Finn*, the United States Attorney's Office treated Ms. Finn favorably in deciding not to charge her in this case at this time; (2) precluding references to prosecutorial misconduct or corruption involving Mr. Finn, as further discussed below, and (3) precluding any inquiry into communications between Mr. and Mrs. Finn regarding GDC on the basis that such communications are presumptively confidential and therefore protected from disclosure pursuant to the spousal communications privilege.  The court denies the motion in part by (1) permitting defendants to cross-examine Ms. Finn regarding whether she has any bias or motive that may affect her testimony resulting from Mr. Finn's position as a former FBI agent, his relationship with the original investigating agent on the case, and his presence at the FBI's search of GDC's offices, and (2) by allowing defendants to inquire whether other witnesses were aware that Mr. Finn was present at the search of GDC's offices, and if so, whether his presence affected such witnesses' testimony.

---

[11] The government also initially opposed Mr. Watts' proposed line of cross-examination regarding the government's ultimate decision not to charge Finn with a crime, in part, on the basis that it insinuates prosecutorial misconduct or corruption on the part of the government.  (*See* Gov. Opp. at 15.)  As noted *supra*, however, Mr. Watts does not intend to pursue a prosecutorial misconduct argument.  (Watts Opp. at 1 n.1 (citing *Dupree*, 833 F. Supp. 2d at 270).)

*Dupree*, 833 F. Supp. 2d at 269 (emphasis in original).  Although the parameters of Finn's cross-examination established at the Dupree/Foley trial should also apply to the Watts trial, Mr. Watts seeks further latitude to cross-examine Finn.

"It is a clearly established principle of Supreme Court jurisprudence that the Confrontation Clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against him in order to show bias or improper motive for their testimony."  *Brinson v. Walker*, 547 F.3d 387, 392 (2d Cir. 2008); *see also United States v. Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008) ("One way of discrediting a witness is 'cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.'" (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).  As Mr. Watts asserts, "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility.  To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination . . . ."  (Watts Mem. at 22-23 (quoting *On Lee v. United States*, 343 U.S. 747, 757 (1952)).)  Cross-examination is not unlimited, however, and "[t]rial judges retain wide

latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Figueroa*, 548 F.3d at 229.

According to evidence presented at the Dupree/Foley trial, Finn possesses direct knowledge of the alleged fraud as of a specific date and is, therefore, expected to testify in Mr. Watts' case. The parties agree that Finn is married to a former FBI agent who is purported to have worked with the original investigating agent on the case, and that Finn's husband was present during part of the FBI search of GDC's offices. These facts provide a basis to inquire whether Finn has any bias or motive that may affect her testimony, including whether her husband's status influenced her actions or her testimony. *See Davis*, 415 U.S. at 317 (concluding that the "jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided 'a crucial link in the proof . . . of petitioner's act.'" (citation omitted)).

Mr. Watts agrees that cross-examination of Finn "should not involve communications protected by the spousal

privilege" and that cross-examination will not concern confidential communications. (Watts Mem. at 23.) Rather, Mr. Watts seeks to cross-examine Finn about whether she "played a role in alerting law enforcement to issues of purported fraud--either through her husband or anyone else." (Gov. Opp. at 14-15 (citing Watts Mem. at 23).) The government agrees that this line of questioning "is permissible so long as it does not tread on the marital privilege between Mr. and Ms. Finn." (*Id.* at 15.) The court does not believe that questioning Finn about her possible role in alerting law enforcement, whether on her own or through her husband's connections with law enforcement, would implicate the couple's marital privilege so long as the substance of their communications is protected. Accordingly, the court grants Mr. Watts' motion to the extent that he seeks to question Finn about whether she played a role in alerting law enforcement to issues of purported fraud at GDC.

Mr. Watts also seeks to cross-examine Finn about the government's purportedly favorable treatment of Finn, the only one of the five GDC officers not charged in this case. (Watts Mem. at 23.) As examples of favorable treatment about which he seeks to cross-examine Finn. (Watts Mem. at 23-24.) Mr. Watts asserts that because "someone--presumably from the FBI--crossed out" Finn's name from a map of the GDC offices used by the FBI during its search, and because the government did not prosecute

Finn, Mr. Watts is entitled to cross-examine Finn about these issues. (*See* Watts Mem. at 23-24; Watts Reply at 10-11; ECF No. 610-2, Decl. of Marion Bachrach Ex. D ("GDC map").) The government counters that Finn's crossed-off name merely illustrates the fact that "[t]he FBI did not search Veronica Finn's office because the warrant did not cover Human Resources files." (Gov. Opp. at 15; *see also* Tr. at 47-48.)

Mr. Watts principally relies upon two cases to support his request to cross-examinine Finn about the government's decision not to charge her: *United States v. White*, 692 F.3d 235 (2d Cir. 2012), and *Davis v. Alaska*, 415 U.S. 308. (*See* Watts Reply at 10-11; Tr. at 41.) Neither case supports his argument.

In *White*, appellant challenged his conviction for being a felon in possession of a firearm. 692 F.3d at 238. "The only significant issue at trial was whether White possessed a firearm, and, more specifically, whether the jury would believe the officers' claim that one was recovered from his front pocket." *Id.* at 247. A related issue at trial was whether White or one of the four women with whom he was traveling in a minivan possessed the firearm. *See id.* at 238. "The defense's strategy was to seek to demonstrate that the [firearm in question] was found in the vehicle and not on White's person." *Id.* The district court, however, excluded evidence that the four women traveling with White were initially

charged with possession of the gun allegedly found in White's
pocket. *Id.* at 239. White had argued to the district court
that "if the gun had actually been recovered from his person,
none of the other individuals would have been charged with
possession of that particular gun" because, pursuant to New York
Penal Law § 265.15(3), a firearm found in an automobile is not
deemed to be the possession of all passengers in the automobile
if the firearm is found on the person of a particular passenger.
*Id.* at 240, 245. Thus, White argued, "the charges [initially
brought against] the other occupants constituted evidence that
no firearm was, in fact, found in his pocket." *Id.* at 245.

The Second Circuit agreed with White and vacated his
conviction and remanded for a new trial. *See id.* at 253. The
court held that, in light of Penal Law § 265.15(3), the initial
"decision to charge all passengers traveling in the vehicle with
possession of all firearms recovered on that day supports
White's theory that none of the firearms was found on his person
and discredits the officers' testimony to the contrary." *Id.* at
247.

Mr. Watts' case is distinguishable from *White* for
several reasons. First, the *White* court was primarily concerned
with rejecting "an inflexible approach that evidence of the
Government's charging decisions is never admissible by a
criminal defendant. District courts may not automatically

exclude such evidence without an inquiry into its relevance and probative value." *Id.* at 246. As the *White* court cautioned, "it cannot be said that evidence of the Government's charging decisions, in all cases, 'is speculative or remote, or does not tend to *prove or disprove a material fact* in issue at . . . trial.'" *Id.* (citation omitted) (emphasis added). The Second Circuit thus rejected what the district court had erroneously viewed as a *per se* rule against admitting evidence of the government's charging decisions. *See id.* The *White* court found that "[i]n a criminal case the accused may introduce any legal evidence tending to prove that another person may have committed *the crime with which the defendant is charged*." *Id.* at 245-46 (internal quotation marks omitted) (emphasis added).

Assuming, *arguendo*, that Finn could also have been charged with conspiracy to commit bank fraud, unlike in *White*, Finn's assumed criminal exposure would not tend to prove that Finn, rather than Mr. Watts, committed the offenses with which Mr. Watts is charged, nor otherwise lend weight to his defense. This is because a conspiracy necessarily involves the agreement amongst more than one actor to engage in criminal conduct for which all members of the conspiracy may be found equally culpable. *See United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012) (listing elements of conspiracy). Although Mr. Watts may properly impeach Finn's credibility and elicit evidence of

bias, the imputation of Finn's purported criminal liability for the same conspiracy with which Mr. Watts is charged would not, in and of itself, tend to establish that Finn, rather than Mr. Watts, committed the offenses with which Mr. Watts is charged. *Cf. id.*

Moreover, although Mr. Watts contended at oral argument that Finn could also have been charged with conspiracy to commit bank fraud, (*see* Tr. at 42-43.), there was no evidence presented at the Dupree/Foley trial or in support of Mr. Watts' motion that Finn was involved in the bank fraud conspiracy. (*See generally* Dupree/Foley Trial Tr. at 1692-1785.) Finn's trial testimony lacked any indication of her involvement in the conduct charged in the indictment. Rather, Finn testified to having asked Foley about possible illegal conduct at GDC, (*id.* at 1713), that she was worried about her criminal liability as an executive officer of GDC despite the fact that she had no knowledge of or involvement in the day-to-day operations in the accounting department, (*id.* at 1766), that she had no part in a bank audit of GDC, (*id.* at 1771), and that her office at GDC contained sensitive personal information regarding GDC employees, such as social security numbers and insurance information, (*id.* at 1779). Furthermore, in the absence of a showing by Mr. Watts that the government's charging decision with regard to Finn "is central to [his] claim of innocence,"

*White*, 692 F.3d at 246, "the presumption of regularity supports [the government's] prosecutorial decision[]" not to charge Finn, *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks omitted).

At oral argument, Mr. Watts also invoked *Davis v. Alaska*. (Tr. at 41.) In *Davis*, the Supreme Court considered

> whether the Confrontation Clause requires
> that a defendant in a criminal case be
> allowed to impeach the credibility of a
> prosecution witness by cross-examination
> directed at possible bias deriving from the
> witness' probationary status as a juvenile
> delinquent when such an impeachment would
> conflict with a State's asserted interest in
> preserving the confidentiality of juvenile
> adjudications of delinquency.

415 U.S. at 309. The defendant/petitioner in a robbery trial sought to impeach a juvenile probationary prosecution witness to show that the witness

> acted out of fear or concern of possible
> jeopardy to his probation. Not only might
> [the witness] have made a hasty and faulty
> identification of petitioner to shift
> suspicion away from himself as one who
> [committed the robbery], but [the witness]
> might have been subject to undue pressure
> from the police and made his identifications
> under fear of possible probation revocation.

*Id*. at 311. The trial court granted the government's motion for a protective order barring introduction of the witness's probationary status as a juvenile delinquent. *Id*.

The Supreme Court reversed the defendant/petitioner's conviction, concluding that "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided 'a crucial link in the proof . . . of petitioner's act.'" *Id.* at 317 (citation omitted). The Supreme Court first noted that "[t]he partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." *Id.* at 316 (internal quotation marks omitted). The Supreme Court explained that evidence of the witness's bias based on his juvenile probationary status "was admissible to afford a basis for an inference of undue pressure because of [the witness's] vulnerable status as a probationer, . . . as well as of [the witness's] possible concern that he might be a suspect in the investigation." *Id.* at 317-18.

Unlike in *Davis*, where the juvenile probationary witness faced criminal exposure and consequences, Mr. Watts seeks to impeach Finn by assuming that Finn was engaged in criminal activity and could have been charged for the same offenses as Mr. Watts. Furthermore, unlike the witness in *Davis* for whom there was a clear public record of his prior crime and probationary status, Mr. Watts' purely conclusory theory of Finn's preferential treatment by the government is the sort of

"speculative and baseless line of attack on the credibility of an apparently blameless witness" which *Davis* sought to remedy the appearance of. *Id.* at 318. *Davis* does not support granting Mr. Watts the latitude to cross-examine Finn as to why the government elected not to prosecute her given the lack of any factual basis to believe that Finn could have been prosecuted.

Lastly, the specter of Finn's purported criminal culpability is made no more real by her name having been crossed off of the FBI's search map of the GDC offices. The map of GDC identifies the various offices according to the name of its occupant; therefore, the name of each GDC executive officer, including Finn, Mr. Watts, Dupree, Foley, and Patello, appear on the map. (*See* GDC map.) Mr. Watts does not offer any evidence that Finn had knowledge of and would be able to testify about the FBI map. Nor does Mr. Watts offer any plausible basis to suggest that Finn's name was crossed off of the map for the purpose of hiding Finn's identity or otherwise granting her preferential treatment. Indeed, Finn previously testified at the Dupree/Foley trial to having been present at the GDC offices on the day of the FBI's search, and telling agents that she wanted an attorney present before being interviewed by them. (Dupree/Foley Trial Tr. at 1766.) The court finds that the FBI's markings on the GDC map do not sufficiently support Mr. Watts' claim that Finn received preferential treatment from the

government to allow Mr. Watts to cross-examine her about the government's decision not to charge her with a crime.[12]

The fact that Finn is married to a former FBI agent who is alleged to have worked with the original investigating agent on this case, and who was present at the search of GDC's offices, provides a basis for Mr. Watts to inquire whether Finn has any bias or motive that may affect her testimony. *See Davis*, 415 U.S. at 317. As in the Dupree/Foley trial, however, the court "limits such cross-examination by precluding any questioning suggesting that, *because of Mr. Finn*, the United States Attorney's Office treated Ms. Finn favorably in deciding not to charge her at this time." *Dupree*, 833 F. Supp. 2d at 268 (emphasis in original). Additionally, Mr. Watts is permitted to ask Finn if she ever feared also being charged with conspiracy to commit bank fraud and, if so, the basis for her fear. He may also ask whether her testimony has been affected by the government's decision not to charge her. Mr. Watts may not inquire about or suggest that Finn was not charged because of preferential treatment by any member of the government.

---

[12] The court also notes that even assuming, *arguendo*, that Finn did receive preferential treatment from the government due to her husband's connection with the FBI or for any other reason, Mr. Watts has offered no basis on which to believe that Finn herself possesses any knowledge about the government's decision-making process in this regard. Such information would more likely lie with the government and its investigators, against whom Mr. Watts has confirmed that he will not pursue allegations of prosecutorial misconduct. (Watts Opp. at 1 n.1.*; see also Dupree*, 833 F. Supp. 2d at 269-72 (precluding defendants from suggesting to the jury that government actions are the result of prosecutorial misconduct).)

**6.  Admission of Prior Testimony of Dupree**

Mr. Watts moves to admit Dupree's prior testimony during the Dupree/Foley trial pursuant to Federal Rules of Evidence 804(b) and 801(d)(1)(A), should Dupree "be unavailable for any reason, including assertion of his Fifth Amendment right against self-incrimination." (Watts Mem. at 24.)  Indeed, "[w]hen a [F]ifth [A]mendment privilege is properly asserted by a trial witness, that witness becomes 'unavailable' for purposes of rendering potentially applicable all of the hearsay exceptions described in [R]ule 804(b)." *United States v. Bahadar*, 954 F.2d 821, 828 (2d Cir. 1992).

Mr. Watts' motion is entirely contingent on whether or not Dupree is available to testify at Mr. Watts' trial, an issue which cannot be addressed until the time that Dupree is actually called to testify. (*See* Gov. Opp. at 18.)  Thus, it would be premature for the court to decide the admissibility of Dupree's prior testimony prior to the time of trial.  Accordingly, Mr. Watts' motion is denied without prejudice to renew at trial in the event that Dupree is "unavailable" to testify, as set forth in the Federal Rules of Evidence.  In the event that Dupree is unavailable to testify at Mr. Watts' trial, the court will then

determine whether and how much of Dupree's prior trial testimony
may be admitted as evidence in Mr. Watts' trial.[13]

### A.    Impeachment of Dupree's Testimony Under Rule 609

In its opposition papers, the government raises a
related issue which merits addressing at this time.  The
government argues that if Dupree is unavailable to testify at
the Watts trial, and his prior trial testimony is admitted by
the court, the government should be allowed to impeach that
testimony with evidence of Dupree's conviction under Federal
Rule of Evidence 609(a)(2).  (Gov. Opp. at 19.)

Rule 609(a)(2) states that evidence of a criminal
conviction "for any crime regardless of the punishment, . . .
*must be admitted* if the court can readily determine that
establishing the elements of the crime required proving . . . a
dishonest act or false statement."  Fed. R. Evid. 609(a)(2)
(emphasis added).  The offenses of which Dupree was convicted
involved dishonest acts and false statements, and, thus, satisfy
the requirements of Rule 609(a)(2).  Based on the language of
Rule 609(a)(2), the government argues that the court must permit

---

[13] On February 5, 2013, the government advised the court that it
intends to dismiss Count Five of the S-2 Indictment against Dupree during his
sentencing for the four counts of the indictment for which he was convicted.
(ECF No. 661, Ltr. advising the Court.)  Dupree is currently scheduled to be
sentenced by this court on May 29, 2013.  (Scheduling Order of Feb. 15,
2013.)  Tentative resolution of Count Five may decrease the possibility of
Dupree rendering himself unavailable to testify through invocation of his
Fifth Amendment right against self-incrimination.  At any rate, Dupree's
right against self-incrimination would be his to invoke and argue, not Mr.
Watts' or any other party's.

it to introduce evidence of Dupree's conviction in the event his prior testimony is admitted into evidence. (*See* Gov. Opp. at 19.) Mr. Watts disputes the government's ability to impeach Dupree's prior testimony with evidence of his conviction on four grounds, each of which is addressed below. (*See* Watts Reply at 11-14.)

Mr. Watts first argues that Rule 609(a)(2) does not apply in this instance because although Dupree has been found guilty by a jury, he has not yet received a judgment of conviction. (*See* Watts Reply at 11.) This argument was expressly rejected by the Second Circuit in *United States v. Vanderbosch*, in which the court held that "a jury verdict of guilty prior to entry of judgment is admissible for impeachment purposes if it meets the other requirements of Fed. R. Evid. 609." 610 F.2d 95, 97 (2d Cir. 1979). The Second Circuit also noted that "[j]udgment, as a procedural formality, has little effect on the probative value of the conviction for purposes of attacking credibility."[14] *Id*.

At oral argument, defense counsel acknowledged the holding of *Vanderbosch*, but argued that this case presents different circumstances because here the introduction of Dupree's guilty verdict would not be "neutral," meaning that the

---

[14] Furthermore, the pendency of an appeal from a guilty verdict "does not render evidence of a conviction inadmissible. Evidence of the pendency of an appeal is admissible." Fed. R. Evid. 609(e).

details of Dupree's guilty verdict would be a "giveaway" of the connection between Dupree's verdict and the charges facing Mr. Watts.  (*See* Tr. at 55.)  Defense counsel, however, has cited no authority for the proposition that the holding in *Vanderbosch* and the application of Rule 609(a)(2) can be limited on the basis of the so-called lack of neutrality of a guilty verdict or conviction.  Accordingly, Mr. Watts' argument that Rule 609(a)(2) does not apply to Dupree's guilty verdict is squarely refuted by the Second Circuit's holding in *Vanderbosch*.

Second, Mr. Watts argues that the government cites no authority to support the admissibility of a co-conspirator's conviction for the "exact same crimes and for the exact same conduct" as are alleged against Mr. Watts.  (Watts Reply at 11-12.)  Rule 609(a)(2) does not contain any such limitation.  As noted above, Mr. Watts has himself failed to offer any authority suggesting that the government's request somehow falls outside of the clear parameters of *Vanderbosch* and Rule 609(a)(2).  Thus, in terms of admissibility, when a party seeks to impeach the testimony of a witness with a prior conviction, there is no legal basis for a court to distinguish between prior convictions which are or are not related to the offenses for which the defendant presently stands accused at trial.

Mr. Watts third argues that even if Dupree's conviction is admissible, it nonetheless should be excluded on

the basis of Rule 403 as being overly prejudicial. (*See* Watts Reply at 12-13.) In support of this argument, Mr. Watts primarily relies on the Second Circuit's decision in *United States v. Hayes*, which noted that in 1977 it was "an open question whether the trial judge retains residual discretion under Fed. R. Evid. 403 to exclude a conviction [involving dishonesty or false statement] on grounds of confusion, waste of time, or extreme prejudice." 553 F.2d 824, 827 n.4 (2d Cir. 1977). Mr. Watts also cites two other circuit decisions that acknowledge the *Hayes* court's "open question" statement: *United States v. Kiendra*, 663 F.2d 349, 353-54 (1st Cir. 1981), and *United States v. Toney*, 615 F.2d 277, 279 (5th Cir. 1980).

As the government correctly noted at oral argument, however, each of these decisions predate the Supreme Court's 1989 decision *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504 (1989). (Tr. at 56.) In *Green*, the Supreme Court held that the absence "of any balancing language," in Rule 609(a)(1) and 609(a)(2) "bars exercise of judicial discretion pursuant to Rule 403." 490 U.S. at 525-26; *see also id.* at 526 ("Federal Rule of Evidence 609(a)(1) requires a judge to permit impeachment of a civil witness with evidence of prior felony convictions regardless of ensuant unfair prejudice to the witness or the party offering the testimony.")

In response to the *Green* decision, Congress amended

Rule 609 in 1990, incorporating into subpart (a)(1) a balancing

requirement under Rule 403 for admission of prior convictions

against a witness who is not a defendant. *See* Fed. R. Evid.

609(a)(1)(A)(convictions punishable by death or imprisonment for

more than one year "must be admitted, subject to Rule 403, in a

civil case or in a criminal case in which the witness is not a

defendant"); *see also United States v. Spencer*, 25 F.3d 1105,

1109 (D.C. Cir. 1994) (noting amendment of Rule 609 in response

to *Green*).  Importantly, the 1990 amendment of Rule 609 did not

alter the language of subpart (a)(2). *See* Fed. R. Evid.

609(a)(2).  Consequently, the Supreme Court's holding in *Green*

with regard to Rule 609(a)(2) and the required admission of

convictions for crimes involving dishonesty or false statements

was unchanged by Congress.  "Therefore, the Court has no

discretion to exclude convictions involving false statements

under Rule 403 because such convictions are inherently more

probative than prejudicial as bearing on the witness's capacity

for truthfulness." *Commerce Funding Corp. v. Comprehensive*

*Habilitation Servs.*, No. 01 Civ. 3796, 2005 U.S. Dist. LEXIS

7902, at *25-26 (S.D.N.Y. May 2, 2005); *see also United States*

*v. Estrada*, 430 F.3d 606, 617 (2d Cir. 2005) (noting that crimes

which bear directly on honesty are "automatically admissible

under Rule 609(a)(2)"); *Fletcher v. City of New York*, 54 F.

Supp. 2d 328, 331 (S.D.N.Y. 1999) (citing 4 Jack B. Weinstein &
Margaret A. Berger, Weinstein's Federal Evidence, § 609.03[1]
(2d ed. 1998)).

Finally, Mr. Watts argues that it is especially
important for the court to exercise its discretion under Rule
403 because the introduction of Dupree's conviction "would
plainly usurp the role of the jury at Mr. Watts' trial" because
the jury "may easily conflate different members of [the]
conspiracy." (Watts Reply at 13.) As set forth above, the
court has no such discretion under Rule 609(a)(2).[15] Further,
the court will instruct the jury that it may not infer or assume
anything about Mr. Watts' guilt or innocence on the basis of
Dupree's conviction for the same charges.

To summarize, if Dupree is unavailable to testify at
Mr. Watts' trial, and Mr. Watts therefore elects to introduce
Dupree's prior testimony into evidence, Rule 609(a)(2) mandates
admission of Dupree's prior convictions for bank fraud,

---

[15] Mr. Watts cites two prior decisions of this court in support of
his fourth argument that the court exercise discretion under Rule 403.
(Watts Reply at 13.) Unlike this case, however, neither case involved
impeachment with evidence of a prior conviction involving dishonesty or false
statements, meaning that the admissibility of prior convictions in those
cases was evaluated pursuant to Rule 609(a)(1) and therefore had to satisfy a
Rule 403 balancing test. *See Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529,
543-45 (E.D.N.Y. 2011) (discussing admissibility in a civil rights action of
plaintiff's conviction for assault in the second degree); *United States v.
Brown*, 606 F. Supp. 2d 306, 313-14 (E.D.N.Y. 2009) ("Illegally possessing a
firearm is not an example of prior untruthfulness nor is it a crime of
deception, and such a conviction does not offer insight into how credible a
witness . . . would be." (quotation marks omitted)). Mr. Watts also cites to
*United States v. Shapiro*, 565 F.2d 479, 481 (7th Cir. 1977), which also pre-
dates *Green* and therefore is likewise irrelevant to this case.

conspiracy to commit bank fraud, and false statements, all
offenses involving dishonesty or false statements, in order to
impeach the credibility of Dupree's prior testimony.[16]  An
instruction, as described above, will be given to the jury.

> B.    *Impeachment of Dupree's Credibility Under
>       Rule 806*

In its opposition papers, the government also argues
that if Dupree's prior testimony is admitted into evidence, the
government should be able to impeach Dupree's character for
truthfulness with extrinsic evidence pursuant to Federal Rule of
Evidence 806.  (Gov. Opp. at 20-21.)  Federal Rule of Evidence
806 provides, in pertinent part, that "[w]hen a hearsay
statement . . . has been admitted in evidence, the declarant's
credibility may be attacked . . . by any evidence that would be
admissible for those purposes if the declarant had testified as
a witness."  Fed. R. Evid. 806.  The government argues that if
Dupree's prior testimony is admitted, it would be entitled to
impeach Dupree's credibility with evidence of "specific
instances of conduct" other than prior convictions.  (Gov. Opp.
at 20); Rule 806, Notes of Advisory Committee on Rules (citing
Rule 608).

---

[16] At a minimum, the government would be entitled to admit "the
statutory name of [Dupree's] offense, the date of conviction, and the
sentence imposed . . . ."  *Estrada*, 430 F.3d at 617 (discussing Rule
609(a)(1)).

Mr. Watts first counters that Rule 806 would not apply if Dupree's prior testimony is admitted pursuant to Rule 801(d)(1)(A), which delineates, in part, statements which are not considered hearsay. (*See* Watts Reply at 14; Fed. R. Evid. 801(d)(1)(A).) Indeed, because Rule 801(d)(1)(A) only applies if Dupree does, in fact, testify at Mr. Watts' trial, Dupree's testimony at Mr. Watts' trial would not be hearsay and Rule 806 would therefore not apply.

Mr. Watts second argues that allowing the government to impeach Dupree's testimony with specific instances of misconduct besides criminal convictions would be unfairly prejudicial under Rule 403. (*See* Watts Reply at 14.) Because the government has not indicated what specific instances of misconduct by Dupree it would seek to introduce, it is not possible for the court to rule on their admissibility now. *See United States v. Friedman*, 854 F.2d 535, 570 (2d Cir. 1988) ("[W]hether a declarant's past conduct may actually cast doubt on the credibility of his statements must be determined by comparing the circumstances of the past conduct with those surrounding the hearsay statements admitted into evidence." (internal quotation marks and citation omitted)). Therefore, decision as to the admissibility of specific instances of misconduct by Dupree for the purpose of impeaching his testimony under Rule 806 is denied without prejudice to renew at trial.

**7.    Reading the Indictment to the Jury**

Mr. Watts moves to preclude the court from reading the S-2 Indictment to the jury on the grounds that it is a long "speaking" indictment that includes an unduly prejudicial narrative written by the prosecution.  (Watts Mem. at 27-28.) The government counters that whether or not the court reads the indictment to the jury is a matter within the court's discretion.  (Gov. Opp. at 21.)

Indeed, the Second Circuit long ago made clear that "in protracted cases involving numerous counts . . . reference to the indictment often serves as a helpful guide in delineating the issues the jury may be called on to decide. . . . The decision to do so rests in the sound discretion of the court." *United States v. Press*, 336 F.2d 1003, 1016 (2d Cir. 1964) (internal citations omitted); *see also United States v. Esso*, 684 F.3d 347, 350 (2d Cir. 2012) ("[T]rial courts may, in their discretion, 'permit[] the jury to take a copy of the indictment into the jury room, after taking care to instruct the jury that the indictment [is] not to be considered evidence.'" (quoting *United States v. Giampino*, 680 F.2d 898, 901 n.3 (2d Cir. 1982)).

The S-2 Indictment is thirteen-pages long and contains a fair amount of narrative drafted by the government.  (*See generally* S-2 Indictment.)  With this in mind, the court elected

to read to the jury only a summary of the four relevant counts during opening proceedings of the Dupree/Foley trial.  (*See* Dupree/Foley Trial Tr. at 258-59.)  The court again elects to read to the jury only a summary of the four counts with which Mr. Watts is charged at the opening of his trial.[17]  The court, however, reserves decision as to whether or not the jury will be provided with the full indictment during deliberations.  During the court's opening remarks to the jury and the jury charge at the close of trial, the jury will be instructed to the effect that "[t]he indictment brought by the government against the defendant[] is only an accusation and nothing more.  It is not proof of guilt, evidence, or anything else." (*Id.* at 258.)  Therefore, Mr. Watts' motion to preclude the court from reading the entire S-2 Indictment to the jury at the opening of trial is granted.

**8.** **Argument and Testimony That Government Witnesses Pleaded Guilty to Conspiring With or Lying With Mr. Watts**

Mr. Watts moves to prohibit the government from stating in its opening and closing arguments that any of its cooperating witnesses (namely Serrano, Patello, and Nusfaumer) have pled guilty to conspiring to commit bank fraud *with Mr. Watts.*  (Watts Mem. at 28-29.)  Mr. Watts also asks that the

---

[17] As agreed to by the parties at oral argument, the court shall make no mention to the jury about Count Five and paragraph seventeen of the S-2 Indictment, neither of which applies to Mr. Watts.  (Tr. at 60.)

court instruct the jury that it may draw no conclusion or inference about the guilt of Mr. Watts from the fact that a prosecution witness pled guilty to charges similar to those with which Mr. Watts has been charged. (*Id.*) As Mr. Watts correctly notes, the Second Circuit has held that it is reversible error for a court to refuse to give such a charge where a testifying codefendant has pled guilty to a crime charged against the defendant on trial. *United States v. Ramirez*, 973 F.2d 102, 105 (2d Cir. 1992).

The government agrees that their witnesses' testimony regarding their guilty pleas may not implicate Mr. Watts by name, and that Mr. Watts is entitled to the jury instruction that he requests at the close of the case and, if the court elects, during the witnesses' testimony. (*See* Gov. Opp. at 21-22.) The government also agreed at oral argument that it would avoid eliciting such testimony at trial. (*See* Tr. at 61.)

Therefore, Mr. Watts' motion is granted to the extent that the government is prohibited from stating in opening or closing argument, or eliciting from its witnesses during examination, the fact that cooperating witnesses have pled guilty to conspiring to commit bank fraud with Mr. Watts specifically. The government, however, remains entitled to elicit each witness's testimony that he or she pled guilty to conspiring to commit bank fraud generally. *United States v.*

*Aronson*, 319 F.2d 48, 52 (2d Cir. 1963) ("[It is] not error, if proper cautionary instructions are given, for the jury to be informed during trial that one or more defendants have pleaded guilty . . . .") (internal quotation marks omitted); *see also United States v. Singh*, 628 F.2d 758, 761 (2d Cir. 1980) (the government may "bring out on direct examination the circumstances surrounding a witness's motivation for cooperating with the Government or other matters damaging to the witness's credibility."). If general testimony of this kind is elicited from the government's cooperating witnesses, the court will duly instruct the jury that it may not draw any conclusions or inferences of any kind about the guilt of Mr. Watts from the fact that a cooperating witness pled guilty to similar charges. *See, e.g.*, *Ramirez*, 973 F.2d at 105; 1 Sand, *et al.*, Modern Federal Jury Instructions Criminal ¶ 7.01[2] (2010).

**9.  Mr. Watts' Written Requests for Identification and Production of Documents and Materials, and Access to Original Documents**

At oral argument, Mr. Watts and the government confirmed that the government had fully produced all documents and materials to Mr. Watts. (Tr. at 62-63.) The parties also confirmed that Mr. Watts was provided access to original documents. (*Id.*) Therefore, this last motion *in limine* by Mr. Watts is moot.

## V.    Other Pretrial Motions and Requests

### 1.    Mr. Watts' Request That the Jury be Retained to Determine the Forfeitability of Property at His Criminal Trial

On November 30, 2012, Mr. Watts filed a request to have the jury at his trial retained to determine the forfeitability of the property identified in the government's Bill of Particulars for the Forfeiture of Property.  (*See* Dft.'s Rule 32.2(B)(5)(A) Notification (citing ECF No. 118, Bill of Particulars).)

On January 25, 2013, the government filed a responsive letter, asserting that in light of the assets delineated in the Bill of Particulars having already been adjudged forfeitable by the Dupree/Foley jury following Dupree's guilty verdict, there is no need for the government to seek a finding of forfeitability from the Watts jury as to those exact same assets.  (*See* ECF No. 638, Ltr. Re. Rule 32.2(b)(5)(A) Notification at 3-4.)  Rather, the government has reserved the right to seek entry of a forfeiture money judgment against Mr. Watts pursuant to Federal Rule of Criminal Procedure 32.2(b)(1) in the event that he is found guilty.  (*See id.*)

The court agrees with the government that the finding of the Dupree/Foley jury as to the forfeitability of the assets delineated in the Bill of Particulars obviates the need for a second forfeitability finding by the Watts jury.  (*See* Tr. at

72-73.)  Further, as the government correctly asserts, in the event that Mr. Watts is found guilty and the government subsequently seeks entry of a forfeiture money judgment against him, Rule 32.2(b)(1) does not provide a right to a jury determination of the money judgment amount.  *See* Fed. R. Crim. P. 32.2(b)(1)(A) ("If the government seeks a personal money judgment [against the defendant], the court must determine the amount of money that the defendant will be ordered to pay."); *United States v. Roberts*, 631 F. Supp. 2d 223, 225-26 (E.D.N.Y. 2009) (noting that defendants are not entitled to have the jury decide the amount of a forfeiture money judgment); *United States v. Galestro*, No. 06-CR-285, 2008 U.S. Dist. LEXIS 53834, at *33 (E.D.N.Y. July 15, 2008) ("[I]f the government does not seek specific property, but rather a personal money judgment, the court itself determines the amount of money that the defendant will be ordered to pay."); *accord United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) (holding that jury right under Rule 32.2 is limited to determination of nexus between specific property and the crime of conviction, but does not extend to amount of forfeiture money judgment).

To the extent that Mr. Watts seeks to re-litigate the forfeitability of the assets delineated in the Bill of Particulars, the court denies that request because the Dupree/Foley jury determination on that issue rendered the

82

forfeitability of those specific assets moot as to Mr. Watts'

trial.[18]  *Cf. United States v. Watts*, 477 F. App'x 816, 818 (2d

Cir. 2012) (dismissing as moot Mr. Watts' appeal of this court's

orders regarding the pretrial restraint of assets following

Dupree/Foley jury finding of forfeitability).  In the event that

Mr. Watts is convicted and the government elects to pursue a

forfeiture money judgment against Mr. Watts, the amount of that

judgment will be decided by the court.  Fed. R. Crim. P.

32.2(b)(1).

> **2. Mr. Watts' Request for a Jury Venire Questionnaire,
> Authority to Conduct an Internet Search of Prospective
> Jurors During Jury Selection, and to Retain the Jury
> Venire Until the Following Day**

Mr. Watts requests that the court give the jury venire

a questionnaire, if possible on a date prior to that of jury

selection, and that Mr. Watts' jury consulting firm be permitted

---

[18] To the extent that Mr. Watts' request to retain the jury
implicates his claimed interest in certain of the funds previously adjudged
forfeitable on the basis of an assignment of funds by GDC to Mr. Watts' trial
counsel, (*see* ECF No. 549, Verified Petition for Hearing to Adjudicate Third-
Party Claims of Rodney Watts and DePetris & Bachrach, LLP), the court has
already considered and dismissed Mr. Watts' claim as part of an ancillary
proceeding to the Dupree trial, held pursuant to Federal Rule of Criminal
Procedure 32.2(c), *see United States v. Dupree*, No. 10-CR-627, 2013 U.S.
Dist. LEXIS 11122, at *52 (E.D.N.Y. Jan. 28, 2013).  Mr. Watts is currently
appealing the court's decision dismissing his claim in the ancillary
proceeding.  (ECF No. 682, Notice of Appeal.)  Re-litigation of Mr. Watts'
claim to those specific funds is therefore precluded by issue preclusion.
*Bear, Stearns & Co. v. 1109580 Ont., Inc.*, 409 F.3d 87, 91 (2d Cir. 2005)
("Collateral estoppel is permissible as to a given issue if (1) the identical
issue was raised in a previous proceeding; (2) the issue was actually
litigated and decided in the previous proceeding; (3) the party had a full
and fair opportunity to litigate the issue; and (4) the resolution of the
issue was necessary to support a valid and final judgment on the merits."
(internal quotation marks omitted)).

to conduct internet searches of prospective jurors during jury selection.  (Ltr. submitting courtesy copies at 1-2.)

As the court confirmed during oral argument, the court's jury department will not produce venire lists prior to the morning on which the venire appears for jury selection. (Tr. at 92.)  Therefore, Mr. Watts' request that prospective jurors be given a questionnaire prior to the day of jury selection must be denied.

As the court also advised the parties at oral argument, Mr. Watts' proposed voir dire largely consists of questions that the court routinely asks during jury selection. (*Id.*)  It is the practice of this court to question the jury venire orally, rather than by written questionnaire.  Mr. Watts' request that the venire be asked the questions which he has proposed will likely be granted for the most part, subject to the court's practice of asking the questions orally, and the court's discretion to alter or modify the exact wording of Mr. Watts' proposed questions as it deems appropriate.  Mr. Watts' request that the jury venire be given a written questionnaire is therefore denied.

Regarding Mr. Watts' request that his consulting firm be permitted to conduct internet searches of prospective jurors during jury selection, the court indicated at oral argument that it was receptive to allowing the parties to conduct internet

searches of prospective jurors, subject to certain precautions and limitations. (*See id.* at 92-94.) First, Mr. Watts and his consulting firm are prohibited from making unauthorized or improper direct contact with prospective or current jurors. This includes, but is not limited to, abstaining from searching jurors through LinkedIn or any other social networking platform which could, in certain circumstances, leave a record with the account holder of having been searched by a specific party. Second, in the interest of avoiding any potential chilling effect on prospective jurors, all parties are barred from informing jurors that internet searches are being conducted of them. Third, in the event that Mr. Watts' consulting firm, his counsel, or the government learn of any information supporting a good faith belief that a juror may have neglected to disclose information bearing on his/her fitness to serve as a juror in this case, that party is to inform the court and opposing counsel immediately. *See United States v. Daugerdas*, 867 F. Supp. 2d 445, 484 (S.D.N.Y. 2012) ("An attorney's duty to inform the court about suspected juror misconduct trumps all other professional obligations, including those owed a client. Any reluctance to disclose this information--even if it might jeopardize a client's position--cannot be squared with the duty of candor owed to the tribunal.").

Accordingly, subject to the above precautions and limitations, Mr. Watts' request to conduct internet searches of prospective jurors during jury selection is granted.[19]

On February 15, 2013, Mr. Watts renewed his request that the jury venire be given a questionnaire, and additionally asked that his jury consultant be given "the ability overnight to review responses and look for publicly available information to support proper preemptory strikes and suggest needed follow-up questions to the Court." (Ltr. concerning *in camera* submission at 2-3.)

The court once again declines Mr. Watts' request to administer a written questionnaire to the jury venire. Mr. Watts' request to retain the entire jury venire overnight is unprecedented in this court for a non-capital case. Allocating two calendar days for jury selection would require an immense cost to the court, and would impose a substantial and unnecessary burden on the individual members of the jury venire. Consequently, Mr. Watts' request to retain the jury venire overnight in order to increase the time for his consultant to research prospective jurors online is denied. Consistent with the practices of this and other courts in the Eastern District

---

[19] In his February 15, 2013 letter to the court, Mr. Watts confirmed that DOAR, Mr. Watts' jury consulting firm, intends to "adjust its privacy settings to prevent jurors from seeing that they have been looked up by anyone connected with the case." (ECF No. 667, Ltr. concerning in camera submission at 2.)

of New York, jury selection for Mr. Watts' trial shall start and finish on a single day, April 29, 2013.

### 3. The Government's Request that Defense Counsel Produce Their Handwritten Notes of Meetings with Two Potential Witnesses

Lastly, during oral argument, the government raised the issue of Mr. Watts' production of Federal Rule of Criminal Procedure 26.2 material.[20] (*See* Tr. at 63-64.) In response, Mr. Watts' counsel stated that they were hesitant to produce their handwritten notes, portions of which may illustrate attorney thought processes. (*See* Tr. at 64-66.) Therefore, the court offered to review defense counsels' notes, and proposed redactions, *in camera*, in order to determine which, if any, of counsels' notes come within the ambit of Rule 26.2. (Tr. at 66-67; Minute Entry of Feb. 1, 2013.) On February 15, 2013, the court received four sets of handwritten notes from defense counsel for *in camera* review. (*See* Ltr. concerning in camera submission at 1.) These notes were made by two members of Mr. Watts' legal team during meetings with two potential witnesses in August 2010 and March 2011. (*Id.*)

Rule 26.2(a) provides in relevant part as follows:

---

[20] Although the government referred to Mr. Watts' production of "3500 material," it is clear that it meant to reference Rule 26.2. Fed. R. Crim. P. 26.2 Notes of Advisory Committee on 1979 amendments ("The rule . . . is designed to place the disclosure of prior relevant statements of a defense witness in the possession of the defense on the same legal footing as is the disclosure of prior statements of prosecution witnesses in the hands of the government under the Jencks Act, 18 U.S.C. § 3500 . . . ."); *see also United States v. Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995).

> After a witness other than the defendant has
> testified on direct examination, the court,
> on motion of a party who did not call the
> witness, must order an attorney for . . .
> the defendant and the defendant's attorney
> to produce, for the examination and use of
> the moving party, any statement of the
> witness that is in their possession and that
> relates to the subject matter of the
> witness's testimony.

Fed. R. Crim. P. 26.2(a). Rule 26.2(f)(2) defines a witness's "statement," in part, as "a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording." Fed. R. Crim. P. 26.2(f)(2). Mr. Watts' counsel argue that their handwritten notes do not come within Rule 26.2 because they are not a "substantially verbatim" recital of the witnesses' oral statements, and that the notes should actually be protected as attorney work product. (*See* Ltr. concerning in camera submission at 1.)

Having reviewed defense counsels' submission *in camera*, the court finds that no portions of the notes constitute Rule 26.2 material that must be produced to the government. Defense counsels' notes are composed of "typical lawyer's quasi-shorthand annotations" which by no means are substantially verbatim recitals of witness statements. *United States v. Dayan*, No. S3 03 Cr. 1471, 2004 U.S. Dist. LEXIS 25503, at *3 (S.D.N.Y. Dec. 16, 2004) (quoting *United States v. Marcus*

*Schloss & Co.*, No. 88 Cr. 796, 1989 U.S. Dist. LEXIS 6271, at *8 (S.D.N.Y. June 5, 1989)).  As such, defense counsels' notes cannot "fairly be deemed to reflect fully and without distortion what had been said to [defendant's counsel] and thus be used to impeach the witness[es'] testimony at trial."  *United States v. Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995) (internal quotation marks omitted); *see also United States v. Sainato*, 29 F. Supp. 2d 116, 118 (E.D.N.Y. 1998) (finding notes that were "rough, choppy, disjointed, scattered jottings full of sentence fragments" did not fall within Rule 26.2).

Defense counsels' notes, which include underlining, arrows, and circling, "also reflect the mental impressions and thought processes of counsel, which entitles them to protection under the work product doctrine."  *Dayan*, 2004 U.S. Dist. LEXIS 25503, at *4.  "Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital."  *United States v. Nobles*, 422 U.S. 225, 238 (1975); *see also United States v. Jacques Dessange, Inc.*, No. S2 99 CR 1182, 2000 U.S. Dist. LEXIS 3734, at *9 (S.D.N.Y. Mar. 27, 2000) (noting that there is a "strong societal interest" in giving a criminal defense attorneys' notes "the greatest protection").

The court therefore denies the government's request that Mr. Watts be made to produce his attorneys' handwritten notes as Rule 26.2 material.

## CONCLUSION

For the reasons discussed above, the court grants in part and denies in part the government's and Mr. Watts' respective motions *in limine* and other pretrial motions and requests.

**SO ORDERED.**

Dated:    March 22, 2013
            Brooklyn, New York

                        _____/s/_____
                        KIYO A. MATSUMOTO
                        United States District Judge
                        Eastern District of New York