UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X

UNITED STATES OF AMERICA                    **MEMORANDUM AND ORDER**

        - against -                         10-CR-627 (S-2)(KAM)

RODNEY WATTS,

            Defendant.
-------------------------------X

**MATSUMOTO, United States District Judge:**

        On May 20, 2013, defendant Rodney Watts ("Mr. Watts"
or "defendant") was convicted of a conspiracy to commit finbank
fraud, wire fraud, and mail fraud; bank fraud; and two counts of
making a false statement in connection with a complex $18
million scheme to defraud Amalgamated Bank by obtaining or
attempting to obtain loans on the basis of false financial
statements and other material misrepresentations between January
2007 and July 2010.  Presently before the court are Mr. Watts'
motions for a judgment of acquittal pursuant to Federal Rule of
Criminal Procedure 29 ("Rule 29"), or, alternatively, for a new
trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule
33").  For the reasons set forth below, Mr. Watts' motions are
denied.

## <u>BACKGROUND</u>

### I.    **The Charges Against Mr. Watts**

Mr. Watts, a Wharton Business School graduate and the former chief financial officer ("CFO") and chief investment officer ("CIO") of GDC Acquisitions, LLC ("GDC"), was charged in four counts of a five-count Second Superseding Indictment.  (*See* ECF No. 295, Second Superseding Indictment ("S-2 Indictment").) Count One charged Mr. Watts with Conspiracy to Commit Bank, Mail, and Wire Fraud in violation of 18 U.S.C. §§ 1349, 3551 *et seq.*  (*Id.* ¶¶ 18-19.)  Count Two charged Mr. Watts with Bank Fraud in violation of 18 U.S.C. §§ 2, 1344, 3551 *et seq.*  (*Id.* ¶¶ 20-21.)  Counts Three and Four charged Mr. Watts with Making a False Statement on or about January 6, 2010, and May 24, 2010, respectively, by "willfully overvalu[ing] property and security, for the purpose of influencing the action of Amalgamated Bank upon one or more loans" in violation of 18 U.S.C. §§ 2, 1014, 3551 *et seq.*  (*Id.* ¶¶ 22-25.)

Courtney Dupree ("Dupree"), GDC's chief executive officer, was charged in Counts One through Five of the S-2 Indictment.[1]  Thomas Foley ("Foley"), GDC's outside counsel and subsequently its general counsel and chief operating officer,

---

[1] Count Five charged Dupree with an additional count of Bank Fraud in violation of 18 U.S.C. §§ 2, 1344, 3551 *et seq.*  (S-2 Indictment ¶¶ 26-27.)  Count Five was not presented to the jury and was subsequently dismissed by the government at the time of Dupree's sentencing on May 29, 2013.  (*See* ECF No. 733, Judgment.)

was also charged in Counts One, Two, and Four of the S-2 Indictment.  Foley went to trial with Dupree in December of 2011 and was acquitted of all charges, and Dupree was convicted of Counts One through Four.  Mr. Watts' trial, which was previously stayed pending a Second Circuit appeal, was held between April 29, 2013, and May 20, 2013.

The core of the fraud charges in the S-2 Indictment are that Mr. Watts, together with others, deliberately engaged in a scheme to defraud Amalgamated Bank ("Amalgamated") by falsely overstating assets, including accounts receivable figures, on borrowing base certificates ("BBCs"), accounting records, and consolidated financial statements that were provided to Amalgamated and were used by the bank to determine the amount that GDC's subsidiaries could borrow from it in any given month.  (*Id.* ¶¶ 8-17.)  Additionally, it was alleged that Mr. Watts and others further defrauded Amalgamated by having GDC covertly purchase Image Lighting, Inc. in violation of the loan agreement with Amalgamated, and concealing the purchase from Amalgamated.  (*Id.* ¶ 15.)  Finally, the S-2 Indictment alleged that Mr. Watts and others attempted to obtain approximately $5 million in funding from C3 Capital, LLC ("C3 Capital" or "C3"), a private equity investment firm, by submitting false financial statements and accounts receivable aging reports to C3 Capital

that fraudulently inflated the Company's accounts receivable. (*Id.* ¶ 16.)

## II.  **The Jury Trial and Verdict**

After jury selection on April 29, 2013, trial commenced with opening statements the following day on April 30, 2013.  The government presented evidence over the course of the next two weeks and rested its case on May 14, 2013.  Thereafter that same day, after commencing his defense case, Mr. Watts made a preliminary oral motion for acquittal pursuant to Rule 29, which the court denied on the record.  (Trial Transcript ("Tr.") 2954.)  Mr. Watts then presented a defense case over the next two days consisting of expert testimony on accounting principles from Saul Solomon ("Solomon"), and three fact witnesses.  After Mr. Watts rested his case on May 15, 2013, the parties gave their closing arguments on May 17, 2013.  Finally, on May 20, 2013, the jury was charged and began deliberations.

After several hours of deliberation, on May 20th the jury returned its verdict finding Mr. Watts guilty of Counts One through Four.  (*See* ECF No. 727, Jury Verdict.)  Specifically, with respect to Count One, the jury found that Mr. Watts conspired to commit bank fraud, mail fraud, and wire fraud. (*Id.* at 1.)

**III. The Government's Case-in-Chief**

The case against Mr. Watts involved several weeks of testimony by fact witnesses, including the Company's former employees, customers, and lenders, as well as hundreds of exhibits consisting of emails and lengthy financial documents, and recorded conversations of defendant and others made by a government cooperator. Given the complexity of the fraud scheme, the immense volume of evidence presented at trial, and the "heavy burden" faced by Mr. Watts in challenging the sufficiency of the evidence supporting his conviction, the court will not attempt to summarize all of the evidence supporting defendant's conviction, but will instead highlight the most compelling evidence from which the jury could find beyond a reasonable doubt the essential elements of the offenses charged. *See United States v. Davis*, 690 F.3d 127, 131-32 (2d Cir. 2012). In summarizing the evidence at trial, the court is mindful that "[i]n reviewing a [Rule 29] challenge to the sufficiency of the evidence underlying a guilty verdict, [the court] 'must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor.'" *United States v. Cain*, 671 F.3d 271, 302 (2d Cir. 2012) (quoting *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004)). The court is also mindful that although the Second Circuit accords it "greater deference to grant a new trial under Rule 33 than to grant a

motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008) (internal quotation marks omitted).

As discussed below, in addition to the physical and documentary evidence presented, the majority of the government's case is based on the testimony of three former employees of GDC who cooperated with the government and pleaded guilty to participating in a conspiracy to commit bank fraud with Mr. Watts. These former employees include (1) Emilio Serrano ("Serrano"), GDC's former assistant comptroller; (2) Irma Nusfaumer ("Nusfaumer"), GDC's former comptroller; and (3) Frank Patello ("Patello"), GDC's former CFO. All three of these former employees face a maximum prison sentence of 30 years for their participation in the instant bank fraud conspiracy.

## A. GDC and its Subsidiaries

GDC was a holding company that owned three wholly-owned primary operating subsidiaries, all of which were acquired by GDC prior to 2007: (1) JDC Lighting, LLC ("JDC Lighting"), which sold commercial lighting fixtures for commercial property; (2) Unalite Electric and Lighting, LLC ("Unalite"), a lighting maintenance company for corporations and other large enterprises; and (3) Hudson Bay Environments Group, LLC ("Hudson Bay") (collectively, "the Borrower Subsidiaries") (together with

GDC, "the Company"), which sold commercial office furniture to schools, hospitals, and government entities.  (Tr. 360.)

At all relevant times between January 2007 and July 2010, Mr. Watts acted as either the CFO or CIO of GDC.  From the beginning of the charged period until August of 2008, Mr. Watts served as CFO to GDC.  (Tr. 1561.)  In or around August of 2008, Patello, who had joined GDC in March of that year, became CFO and Mr. Watts became CIO.  (Tr. 999, 1561.)  Mr. Watts was commonly viewed by those outside of GDC as the number two man at GDC behind its CEO, Dupree.  (*See* Tr. 1286, 1324.) Additionally, although he relinquished the title of CFO in August of 2008, "Mr. Watts always received copies of all financial data," and was copied by Patello on all emails between Patello and former executive vice president of Amalgamated George Jarvis ("Jarvis") regarding GDC's monthly financial statements.  (Tr. 1842; *see* Government's Exhibits ("GXs") 343, 344, 345, 91, 96, 165.)

Following Patello's resignation from GDC in March of 2010, Mr. Watts became acting CFO of the company.  (Tr. 2072, 2578, GX 198 (email from defendant to Jarvis dated July 1, 2010, stating that defendant had "assumed responsibility for accounting and financial reporting in April [2010].").)

**B.    2007 "Pre-Billing" / Fraudulent Revenue Recognition**

As an initial matter, the court agrees with the
government that although the term "pre-billing" was often used
by witnesses at the trial, particularly former GDC and GDC
subsidiary employees Patello, Serrano, Nusfaumer, Martha Xenakis
("Xenakis"), and Mark Jozefowski ("Jozefowski"), the witnesses
most often used this term as a colloquial shorthand for what was
understood by them to be the fraudulent premature recognition of
revenue prior to the delivery of products or the rendering of
services to the Company's customers, rather than as that term is
understood as a term of art in the accounting industry. (*See*
ECF No. 754, Mem. in Opp. to Def.'s Mots. for J. of Acquittal
and New Trial ("Gov. Opp.") at 4 n.6.)  Indeed, the witnesses
often used the term "pre-billing" in response to general
questions about false or fraudulent recordkeeping by the Company
via the recognition, as accounts receivable ("A/R")[2] or revenue,
of pending orders that had not yet been delivered to customers.
(*See, e.g.*, Tr. 1001 (Patello using "pre-billing" regarding
"accounts receivable [that] were false"); Tr. 745 (Nusfaumer
referring to "pre-billing" as reason why 2007 accounts
receivable report was inaccurate); Tr. 2175 (Serrano using "pre-

---

[2] A/R is a term for the money that customers owe a company for
goods or services.  (Tr. 428, 519, 723, 1275.)  From the perspective of the
company, A/R is considered an asset.  (Tr. 534.)  As an asset, A/R can be
used as collateral for a bank loan.  (*See* Tr. 2548-49.)

billing" regarding things Dupree wanted to "circumvent" in order to "trick people into thinking that it's real when it's not").)

For example, on December 3, 2007, Mr. Watts sent an email to GDC employees Nusfaumer and Valerie Griffin ("Griffin") stating, "I Need $450k in Billing . . . try not to go into 2008." (GX 465.) Nusfaumer testified that defendant's request for "billing" was an instruction to convert pending, undelivered customer orders into A/R in the Company's accounting system. (Tr. 733-34.) Around the same time, Hudson Bay accountant Xenakis noticed that approximately $4 million of Hudson Bay orders on the Hedberg accounting system had been converted from pending to completed status overnight. (Tr. 436; *see* Tr. 523.) Hudson Bay President Jozefowski also noticed an unusual overnight conversion in the Hedberg system of approximately $3 million in customer orders from pending or "backlog" status to "order" or A/R status. (Tr. 524-26.)

Xenakis, believing that this overnight change of order status for several million dollars' worth of orders was a mistake, raised the issue with defendant. (Tr. 438.) Mr. Watts repeatedly responded to Xenakis' concerns by saying "I know what I'm doing." (*Id.*) Still concerned, Xenakis then took the issue to Dupree, who authorized her to reverse the overnight changes and return the customer orders to pending or backlog status. (Tr. 438-39.) The next day, Mr. Watts demanded that Xenakis

"undo" what she did the previous day and re-invoice the orders, thereby returning them to A/R status. (*See* Tr. 439.) This time, when Xenakis again went to Dupree with her concerns, Dupree responded that he had spoken with defendant and now agreed with Mr. Watts that the several million dollars in orders should be re-invoiced as A/R. (*See* Tr. 440.) This action had the effect of increasing Hudson Bay's A/R, which inflated the company's 2007 revenue and net income numbers. (Tr. 436, 526.)

### C.    2008 Procurement of the Loans from Amalgamated

In 2008, the Borrower Subsidiaries applied for loans from Amalgamated. (*See* Tr. 741-743.) As part of the subsidiaries' application and at defendant's request, Nusfaumer provided Amalgamated with false financial information in the form of inflated 2007 and 2008 A/R and net income information during the bank's due diligence of GDC. (Tr. 743.) This false information included higher A/R figures than the Borrower Subsidiaries had actually earned at that time due to prior pre-billing or premature revenue recognition by Mr. Watts and others. (Tr. 744-45.)

Specifically, Mr. Watts and Patello modified invoices from the suppliers from which the Borrower Subsidiaries purchased inventory in order to reconcile the shipping and receiving dates on the supplier's invoices with pre-billed invoices to the Company's customers. (GX 472; Tr. 1346-51.)  In

10

an email dated May 30, 2008, while Patello and defendant were modifying invoices, Patello wrote to defendant, "If you haven't complete[d] the mods on the JDC invoices--stop--I've already corrected--see attached as an example." (GX 472.) The attached sample invoice was a bill to JDC Lighting from JDC supplier Kurt Versen that Patello had doctored to correspond to a pre-billed invoice from JDC to its customer Structure Tone. (*Id.*) Patello testified that "mods" referred to modifications that he and defendant were making to supplier invoices, and that the conspirators gave these doctored invoices to Amalgamated during the bank's due diligence of the Company. (Tr. 1346.) According to Patello, defendant had his own method for doctoring these invoices prior to September 2008, at which time Patello began making all of the modifications on his own. (Tr. 1348-50.)

The practice of pre-billing by defendant and others directly contradicted statements made to Amalgamated regarding the way in which the Company recognized revenue--the draft 2007 consolidated financial statement given to Amalgamated by Watts and his fellow GDC executives prior to execution of the loan agreement stated that the Company "recognize[d] revenue at the time products are delivered to customers or when maintenance services are provided." (GX 148.) Following execution of the loan agreement in August of 2008, GDC provided Amalgamated with a final version of the 2007 financial statement that included an

identical provision regarding the recognition of revenue. (GX 188; Tr. 1030.) Jarvis testified that if he knew that the Company was recognizing revenue prior to the delivery of products to customers, he would not have recommended that Amalgamated grant the loans. (Tr. 2549.)

In addition to inflating the Company's A/R, defendant and others deceived Amalgamated in financial reports regarding the Company's revenues by inflating its net income. Jarvis testified that the Company's net income was important to Amalgamated's decision whether to extend a loan "[b]ecause it shows that a company is viable, making money, [and] able to pay its debts." (Tr. 2549.) Patello testified that the draft and final 2007 consolidated financial statements given to Amalgamated falsely reported twice as much net income as the Company had actually earned that year. (Tr. 1019-20, 1024-26; GXs 148, 188.) According to Patello, Mr. Watts was at all times aware of this false information. (Tr. 1026.) For example, defendant, Dupree, and Patello discussed an $820,000 adjustment to the Company's accounting records that falsely inflated its net income figure, which the three agreed to leave in the 2007 financial statement to Amalgamated. (*Id.*) Mr. Watts was also copied on an email Patello sent to Jarvis about having sent to Amalgamated the final 2007 financial statements that contained fraudulent net income figures. (Tr. 2027.)

In August 2008, Amalgamated signed a credit agreement in which it agreed to lend $21 million dollars to the Borrower Subsidiaries, for which GDC was the guarantor. (*See* GX 8.) The credit agreement included two loans: a $2.5 million term loan, and an $18.5 million revolving line of credit. The collateral for those loans included the Borrower Subsidiaries' assets, inventory and A/R, and the amount of money that Amalgamated was willing to lend on the revolving line of credit was directly tied to the value of those A/R. (Tr. 2553-54.) Thus, if the Company's eligible A/R dropped in a given month, the amount of money it could borrow from Amalgamated would also decrease. (Tr. 2554.)

Under the agreement, the Borrower Subsidiaries had to submit monthly BBCs to Amalgamated stating the total value of the subsidiaries' A/R and current inventory so that the bank could determine the amount that the subsidiaries could borrow in any given month. (GX 8.) A/R older than 120 days were excluded from the borrowing base because A/R older than 120 days tended to "indicate some form of problem in collection." (Tr. 2553-54, 2630; GXs 8, 11.) The agreement further required that BBCs be certified as accurate by an officer of GDC. (GX 8).

### D.   Purchase and Concealment of Image Lighting

On December 5, 2008, defendant and others orchestrated GDC's purchase of the assets of Image Lighting Inc. and

formation of a new company, Image Lighting, LLC ("Image"). (GX 63; Tr. 1062-64, 1955, 1958.) Image's operations were then consolidated or merged with JDC Lighting. (*See* Tr. 2033; Tr. 1822 (Patello testifying that as of January 2010, "all new bookings done by the Image operating side were being recorded or supposed to be recorded on to JDC's books").)

This transaction was not disclosed to Amalgamated because Dupree said that it would violate the credit agreement. Patello testified that in the fall or winter of 2008, in a conversation with Dupree and defendant, Dupree said that the credit agreement with Amalgamated prohibited the purchase of Image. (Tr. 1061.) Additionally, Serrano testified that defendant, Dupree, and Patello each told him to keep Image a secret because they did not want to seek the required approval from Amalgamated before completing the acquisition. (Tr. 2073.)

Indeed, the credit agreement provided that the Borrower Subsidiaries could not "consolidate with, be acquired by, or merge into or with any person . . . except in the ordinary course of business." (GX 8 § 6.03.) Nor could the Borrower Subsidiaries "enter into any agreement for the purpose of providing funds or credit to, or make any other investment, by capital contribution or otherwise, in or with any Person" apart from a money market or investment account with Amalgamated, or "extension of credit in the nature of accounts

receivable." (*Id.* § 6.04.)  In addition to merging with JDC
Lighting, there was evidence at trial that Image was provided
with loan monies from Amalgamated by the Company.  (*See* Tr.
1823-24.)

The trial evidence showed that Mr. Watts and other GDC
executives hid the Image deal from Amalgamated by pretending
that Image was a customer of JDC Lighting.  (Tr. 1080, 1110-11;
GX 253.)  Specifically, "[t]he accounting staff" of GDC created
a new company called Interconnect Lighting, LLC that was
portrayed as JDC Lighting's supplier for fictitious sales to
Image.  (Tr. 1076-77.)  Nusfaumer also engaged in a series of
bank transactions designed to create the appearance that JDC
Lighting was both paying Interconnect (its purported supplier)
and receiving revenue back from Image (its purported customer).
(Tr. 748-49, 1077; *see also* GX 31.)  The GDC accounting
department also set up a mailbox in Mount Arlington, New Jersey
so that Image would not have the same mailing address as GDC.
(Tr. 2198; *see also* GX 281, Recording 9-1.)  On Recording 9-1,
the jury heard Mr. Watts discuss this mailbox during a
conversation with Serrano.  (GX 281.)  Additionally, testimony,
documentary evidence, and defendant's statements on Recording 3-
5 established that defendant was aware of the lies Dupree and
Patello told Jarvis to conceal the true relationship between
Image and JDC Lighting after a $500,000 check from Image to JDC

Lighting bounced.  (GX 364; Tr. 751-56, 1076-81, 2080, 2083, 2188; Recording 3-5.)

### E.  Transfer of $2 million of Image's Accounts Receivable to JDC Lighting

When GDC acquired Image in December of 2008, defendant and others improperly booked approximately $2 million in Image receivables on the books of JDC Lighting.  These A/R were not in fact collectible by JDC Lighting or any other GDC subsidiary because GDC's acquisition of Image expressly excluded the A/R owed to Image for services rendered prior to the acquisition. (GXs 63, 53; Tr. 1066-67, 2075-76, 2080.)  Rather, these A/R were retained by Image's prior president and owner, James McCarthy ("McCarthy").  (Tr. 1066-67.)

Nonetheless, in late-October of 2008, defendant, Patello, and Serrano discussed Image's A/R and agreed that in order to make payroll, they would add Image's A/R onto the books of JDC Lighting and float customer payments on these receivables through JDC's account and then to McCarthy, the rightful owner of Image's pre-acquisition A/R.  (Tr. 2078-79.)  Shortly thereafter, Serrano reported in an email to Patello and defendant that Image's A/R had increased from approximately $2 million to $2.7 million.  (GX 58.)  Mr. Watts replied, "Aaah YEAH!!! Now THAT'S what I'm talking about!"  (GX 58.)  Serrano testified that Mr. Watts was excited that Image's A/R had

increased because of their previous decision to record Image's receivables in a corresponding amount on the books of JDC Lighting. (Tr. 2079-80.)

Soon after closing the deal with Image in December 2008, Mr. Watts was present at a meeting in which Dupree instructed Patello to record approximately $2 million of A/R associated with Image on the books of JDC Lighting. (Tr. 1069.) Following this meeting, Serrano added the nearly $2 million in A/R that neither GDC nor its subsidiaries owned to the books of JDC Lighting. (Tr. 2077.) Because JDC was not actually entitled to collect these receivables, Amalgamated did not have any collateral for loan money extended to the Company on the basis of these receivables.

In early 2009, Patello created a summary of all of the financial transcations that should have been recorded in 2008 but were being improperly carried into 2009, and discussed this document with defendant and Dupree. (GX 298; Tr. 1097.) After accounting for all unrecorded expenses, including some associated with the acquisition of Image, Patello estimated that GDC's actual net income in 2008 was about $3.8 million lower than the net income figure on GDC's 2008 audited financial statement, GX 22, which was submitted to Amalgamated. (GX 298; Tr. 1098.)

**F.    2009 and 2010 Inflation of Accounts Receivable**

In 2009 and 2010, Mr. Watts was aware of and participated in efforts to borrow against the Company's inflated A/R figures.  Most of the inflation of A/R in 2009 and 2010 fell into one of two categories: (1) the creation of wholly fictitious receivables; and (2) the secret pre-billing, or premature recognition as revenue, of receivables.  The wholly fictitious invoices purported to be debts owed by the School Construction Authority ("SCA") and Columbia University.  (*See* Tr. 781-85, 1399, 1400, 1404-06, 1415, 1888-1907; GX 74 at 10-13, 20; GXs 94, 267, 454.)  Some of the more significant pre-billed invoices, totaling several million dollars in A/R, were included in both the November 30, 2009, BBC, which was the basis for Count Three of the S-2 Indictment, and the April 30, 2010, BBC, which was the basis for Count Four of the S-2 Indictment. The BBC that claimed to reflect the state of the Company's books as of November 30, 2009, was signed by Patello on January 6, 2010, and the BBC that claimed to reflect the state of the Company's books as of April 30, 2010, was signed by defendant and Dupree on May 24, 2010.

In 2009 and 2010, GDC regularly recognized revenue before product had been delivered.  As noted earlier, this directly contradicted the revenue recognition policy in the financial statements for 2007 and 2008 that GDC gave to

Amalgamated and purported to follow. (GXs 148, 188, 22.) It was also contrary to a statement Mr. Watts made to Jarvis in a July 1, 2010, email, in which defendant wrote: "While GAAP requires that we recognize revenue when the product changes hands or the service is performed, and in a manner that matches that sale to the expenses incurred to secure that revenue, our billing can occur at any time AFTER that GAAP[3] threshold has been met." (GX 198 (emphasis in original).) Evidence regarding GAAP and the relationship between revenue recognition, billing, and the expectation of collectability was presented by defendant's accounting expert witness, Solomon. Solomon testified that revenue recognition concerns whether money is earned and reasonably collectible. (Tr. 2857-58.) Solomon agreed that, in the absence of an agreement to the contrary, it is improper for a company to count towards A/R a bill for a product or service that was not delivered to a customer. (Tr. 2938-39.)

In contravention of this practice, however, in 2009 and 2010, GDC recorded revenue on its financial records without mailing customers the corresponding bills, thus making it unreasonable to expect that the recorded revenue would actually be collected. For example, the government presented a series of emails entitled "Invoiced but not mailed" sent by GDC accounting department employee Danielle Phelps ("Phelps") to Patello and

---

[3] GAAP stands for Generally Accepted Accounting Principles.

Nusfaumer. (GX 88, 93, 94, 473; Tr. 760-70.) The government also presented a similar email from Phelps to defendant and Nusfaumer on March 31, 2010. (GX 461; Tr. 958.) Nusfaumer explained that these were monthly updates concerning bills that had been "invoiced," or recorded in the accounting system, but not yet mailed to customers at that time because the product had not yet been delivered. (Tr. 761, 764-65, 767; *see also* Tr. 1130-31.) Rather, Phelps kept the hard copies of pre-billed invoices in a drawer in her working area. (Tr. 759.)

There was evidence at trial that Mr. Watts was also aware of false billing throughout 2009 and into 2010, including the fictitious SCA and Columbia University invoices, because he received and sometimes discussed handwritten monthly updates from Patello. (Tr. 1352-1401; GXs 258, 259, 261, 262, 281, 292, 293 (Patello's handwritten reports); *see also* Tr. 1389-1401; GX 272.) These handwritten updates represented reconciliations between the Company's inflated financial profile as recorded in BBCs and submitted to Amalgamated, and the Company's actual financial profile. (*See* Tr. 1357-1401 (Patello testifying about fictitious SCA and Columbia University A/R).) Among other things, Patello repeatedly told Mr. Watts that there was a multi-million dollar difference between the amount that GDC was borrowing from Amalgamated, based on the Company's submissions to the bank, and the amount that they were actually allowed to

borrow. This difference was due to wholly fictitious receivables, re-aging of A/R to make bills appear more recent and thus more likely to be paid, (Tr. 771-78, 1001, 1352, 1368-69, 2104-07; GXs 262, 281), pre-billing, (Tr. 1360-63, 1364, 1378, 1379-80; GXs 281, 261, 258, 292)[4], and unapplied cash, which were cash payments from customers that had not been applied to the customers' debts in order to keep the corresponding A/R on the Company's books, (Tr. 1361, 1364-65, 1398; GXs 281, 273, 262). Patello also made clear to defendant and Dupree that the size of the fraud was growing. (*See* GX 258 (showing that the borrowing not supported by legitimate A/R had increased from $5.3 million to $9 million between May and July of 2009).)

Defendant was also personally involved with premature revenue recognition of invoices to Zwicker Electric. On August 19, 2009, Watts emailed Patello and Dupree: "Per Courtney, . . . We have a P.O.[5] from Zwicker for Staten Island Courthouse ($1.325MM); if necessary, bill it." (GX 285.) Patello explained that this meant there was a purchase order from Zwicker but the product had not yet shipped. (Tr. 1386.) Mr.

---

[4] (*See also* GX 273 (Patello's 2009 year-end summary given to defendant and Dupree in February 2010, in which he notes, "[b]ad news, there is nothing in the backlog and I still [need] a [purchase order] for Columbia 1.2 million that I booked in October," regarding $1.2 million in A/R that was previously fraudulently logged on a Hudson Bay aging report included in the November 30, 2009, BBC sent to Amalgamated).)

[5] P.O. stands for purchase order.

Watts was therefore telling Patello to invoice the order if doing so was necessary in order for GDC's sales to reach the projections the Company had given to C3 Capital. (*Id.*) GDC did not ultimately book the $1.325 million in sales to Zwicker in August 2009; however, the Company did recognize this revenue on April 21, 2010, despite the fact that the products had still not been delivered to Zwicker. (*See* GX 75.) The Zwicker invoice was subsequently included on the BBC for April 30, 2010, which defendant signed, and was discussed between defendant and Serrano. (GXs 75, 245; Tr. 1911-12, 2116.)

### G. Attempt to Procure Loan from C3 Capital

C3 Capital was a "mezzanine" or subordinated debt lender; that is, if one of C3's borrowers is liquidated, C3 would be paid off after a senior lender like Amalgamated. Mr. Watts and others deceived C3 Capital in an attempt to obtain a $5 million loan. Discussions with C3 fell through in 2008, but when GDC again began negotiating with the lender in the Spring of 2009, Mr. Watts led GDC's borrowing efforts. (Tr. 1103-05, 1309-10.) Mr. Watts knew that the Company's financial information sent to C3 Capital was false because it included pre-billing, false billing, re-aged accounts receivable, and incorrect cost and profitability figures. (Tr. 1105-06.)

Additionally, Mr. Watts helped deceive C3 Capital when C3 asked to speak with a representative of Image, a company that

C3 had been led to believe was an independent, outside customer of JDC Lighting. (Tr. 1106-07, 1323; GX 271.)  Mr. Watts was included on an email in which Patello wrote to Jared Poland ("Poland"), who was conducting due diligence for C3 Capital, that, "[o]ur contact person at Image is out of the country for at least the next two weeks . . . do you want to select a different customer." (GX 271.)  After Poland indicated that he wanted to speak to an Image representative even if he had to wait, defendant and Dupree held a role-playing session in which they prepared Serrano to play the role of a fictitious employee of Image on a phone call with Poland, in which he was to express satisfaction and future projected business with JDC Lighting.[6] (GX 271; Tr. 2120.)  Serrano then posed as an Image employee named "Ernest Sullivan" during a phone call with Poland during which he told Poland that he anticipated that Image would conduct future business with JDC Lighting. (Tr. 2122-23, 1329-33; GX 439.)

**H. Spring 2010 Efforts to Retain Inflated Borrowing Base**

The last BBC that Patello signed was the BBC for the Company's financial books as of November 30, 2009, which he signed in January 2010. (GX 11.) After that time, Patello told defendant and Dupree that he was no longer willing to sign

---

[6] In preparation for the call with C3, Serrano purchased a disposable cellular phone on which to make the call, and was provided with a fake email address by GDC's IT department. (Tr. 2118-22; GXs 36, 37.)

additional BBCs.  (Tr. 1422-25; see also GX 250.)  Although the
Amalgamated credit agreement required the Company to submit
monthly BBCs, Amalgamated did not receive BBCs for the months
between December 2009 and March 2010.  (See GX 8; Tr. 2577.)

In mid-February 2010, Patello gave defendant and
Dupree a letter in which he announced his intention to step down
as CFO of GDC effective March 1, 2010, and stated that he would
report to defendant or whoever else would be appointed to serve
as acting CFO.  (GX 250; Tr. 1422-24.)  Patello also summarized
what fraudulent accounting he was willing engage in before he
left GDC, and called for a meeting of GDC's top executives.
(See GX 250; Tr. 1422-24.)  Shortly after sending out the
letter, Patello met with Mr. Watts and Dupree to discuss its
contents.  (Tr. 1425.)  Mr. Watts and Dupree did not object to
Patello's requests and agreed to hold the executive meeting
Patello requested. (Id.)

The executive meeting was held in early March, during
which defendant, Dupree, Foley, human resources officer Veronica
Finn, and Patello met for approximately two hours.  (Tr. 1425-
26.)  Patello explained that this meeting "was my chance to
confirm to everybody who I had individual conversations with in
terms of what was pre-billed; not specifics, but in
generalities, what was pre-billed, what was falsely billed
including Columbia, the SCA."  (Tr. 1426.)  Patello also told

24

defendant and the others present that in order to pass an outside audit scheduled for late-March and an Amalgamated bank examination scheduled for April, additional fraud would be necessary. (Tr. 1426-27.) Patello further explained that in order to find $7 million in necessary billing that did not exist, the Company would have to falsify shipping and receiving documents. (*Id.*) Following this meeting, Patello, defendant, and Dupree held another meeting to continue discussing the Company and its executives' path forward. (Tr. 1430-31.) At this time, Patello repeated a prior suggestion that GDC come clean and restate its financials; however, Mr. Watts and Dupree both strongly opposed this approach. (Tr. 1431.)

A few days later, on March 12th, Patello memorialized his thoughts about what had to be corrected on the books of GDC and its subsidiaries in a letter to Dupree, writing:

> In my opinion, we need to restate both our 2008 and 2009 financial results to:
> 1) exclude all pre-billing and related transaction[s]
> 2) properly record all costs, including trailing costs and accruals, including commissions and PM bonus
> 3) consolidate the full results of Image Lighting 2009's results into GDC, while reversing the receivables on JDC's books
> 4) re-age out trade receivables to properly reflect the actual date of sale and
> 5) restate the BBC's and interim financial statements previously provided to Amalgamated.

(GX 251.)  Patello also informed Dupree that he would not attend a March 17th meeting with Amalgamated.  (*Id.;* Tr. 1437.)

Shortly after sending this letter to Dupree and Foley, Dupree called Patello into his office.  (Tr. 1437.)  Although Patello had not provided Mr. Watts with a copy of his letter, defendant was sitting next to Dupree at Dupree's desk and holding a copy of Patello's letter.  (*Id.*)  At this time, Dupree asked Patello to resign from GDC.  (*Id.*)

On March 15, 2010, Patello sent Dupree his resignation letter.  (GX 252.)  In that letter, Patello stated that GDC's real EBITDA, that is Earnings Before Interest, Taxes, Depreciation and Amortization, showed a loss of approximately $2.5 million.  (*Id.*)  Patello left the company the following day.  (Tr. 1440.)  In the days following his departure, Patello and Dupree agreed that each would tell Jarvis that the health of Patello and his wife was the reason for his resignation, rather than his unwillingness to continue the fraudulent activity. (Tr. 1442-43; *see also* Tr. 2578.)  In a July 1, 2010, email to Jarvis, Mr. Watts also cited personal and family health issues as the reason for Patello's departure.  (GX 198.)

On March 17, 2010, defendant, Dupree, and Foley met with Jarvis and other Amalgamated employees at the bank's offices.  (Tr. 2593-99.)  At this meeting, Mr. Watts explained

that GDC had not been sending Amalgamated BBCs because the accounting department had been in a state of disarray during Patello's exit from the company. (Tr. 2599.) Dupree further explained to Jarvis that Mr. Watts would be filling in for Patello until the company hired a new CFO. (*Id.*)

One month later, Jarvis scheduled a meeting with GDC's management team for April 26, 2010, because he still had yet to receive the Company's BBCs. (Tr. 2602.) The night before this meeting, Serrano and defendant exchanged a series of emails about generating false invoices and financial figures in order to reach a desired borrowing base figure.[7] The emails continued the next morning, when Mr. Watts discovered that Image was "cross-aged," which refers to a provision in the credit agreement, pursuant to which if more than 50% of a customer's receivables were more than 120 days old, then none of that customer's receivables could be borrowed against. (Tr. 1138.) Defendant therefore directed Serrano to either book new false

---

[7] At 11:43 PM on April 25, 2010, Serrano wrote to Mr. Watts that he had "found another 5.3," which he said would bring the Company to $21,203,236 in eligible receivables. (GX 25.) Serrano then stated that "[w]e have 1.5 in Inventory so we are at 16.6 million for the bank." (*Id.*) Serrano testified that this email meant that he had found $5.3 million worth of pending orders in the backlog that he could improperly include in A/R, which he estimated would bring the Company's maximum borrowing level up to $16.6 million. (Tr. 2138-39.) Mr. Watts responded at 11:54 PM: "Do the math yourself: 75% of $21MM is $15.75MM. Not enough, even with $1MM inventory." (GX 25.) Thus, Mr. Watts was explaining to Serrano that they needed to further increase the Company's A/R to reach the necessary borrowing level. (Tr. 2140.)

receivables or change the age of existing Image receivables in order to make them appear as if they were not cross-aged.[8]

On April 26, 2010, Jarvis came to GDC's offices and met with defendant, Dupree, and Foley. (GX 158; Tr. 2600-16.) Jarvis told the men that he would not leave until he received a BBC. (Tr. 2787.) By the end of the meeting, Mr. Watts handed Jarvis a BBC for the Company's books as of April 21, 2010. (Tr. 2605.) The BBC was signed by both defendant and Dupree. (Tr. 2605.) The GDC executives also provided Jarvis with a consolidated balance sheet. (Tr. 2614; GX 158.) That document stated that the Company's EBITDA for 2009 was a gain of $4,219,469, (GX 158), rather than, as Patello had stated in his March 15th letter to Dupree, a loss of $2.5 million, (GX 252). At the April 26th meeting, Jarvis, Dupree, and defendant also discussed certain customers that had invoices over 120 days old, including the SCA and Columbia University. (Tr. 2605-06.) Jarvis wrote in his meeting notes that defendant and Dupree were

---

[8] At 11:03 AM on the morning of the April 26, 2010, meeting with Jarvis, Mr. Watts wrote an email to Serrano with the subject "Image is crossed-aged . . . I need you to bill $215k for Image, or move an equal amount out of the 120 bucket." (GX 18.) The body of the message read, "Please call me . . . George will be here in 20 minutes . . ." (*Id.*) Serrano explained that this meant that Jarvis would be arriving for his meeting with the GDC executives in 20 minutes and that Watts was directing Serrano to "either book another $215,000 or take out (sic) $215,000 out of the 120-day bucket and put it as a current value." (Tr. 2142.) Serrano complied with Mr. Watts' directions and re-aged $215,000 worth of Image receivables that were more than 120 days old. (Tr. 2144.) Serrano then sent an email to Mr. Watts with the subject "Moved exactly 215k," to which defendant responded "Thanks." (GX 19.) This manipulation of the books maintained the eligibility for borrowing purposes of all of the Image receivables. (Tr. 2145.) At 12:28 PM, Watts emailed Serrano: "We are good on billing." (GX 20.)

"well-versed" in the customers with invoices older than 120 days, and that he had been told that these invoices were "fully collectible." (GX 158; *see also* Tr. 2606.)

On May 7, 2010, Amalgamated sent the Company a letter notifying it that the Borrower Subsidiaries had defaulted under the terms of the credit agreement due to their failure to submit balance sheets, BBCs, aging reports, and other documents on a timely basis, and due to their failure to meet the required EBITDA target of $5.5 million. (GX 144; Tr. 2616-17.) In the days that followed, Mr. Watts and Serrano worked to prepare a BBC for April 30, 2010. On May 18, 2010, Dupree and Serrano had a conversation that Serrano recorded as part of his cooperation with the FBI. (GX 363, Recording 3-4.) Dupree told Serrano that there would be no more pre-billing in the future but that they would first need to pre-bill to get through the April 30, 2010, BBC. (*Id.*; Tr. 2184-85.) That same day, Serrano recorded a conversation with defendant in which defendant confirmed how the Company would reach the A/R number on the April 30, 2010, BBC that would allow the Company to maintain its level of borrowing. (GX 364, Recording 3-5.) Mr. Watts said to Serrano, "So, just to be clear: you are swapping out some of the complete bullshit from 12/31 for some shit in the backlog, right?" (*Id.*) Serrano testified that Mr. Watts was instructing him to take the totally fictitious invoices off of the books and replace them

with pending sales from the backlog; that is, to "pre-bill."
(Tr. 2189.)  Serrano explained that it was easier to make pre-
billed invoices appear genuine than it was to make totally
fictitious invoices appear genuine.  (*Id.*)  Per Mr. Watts'
directive, Serrano converted pending orders in the backlog to
A/R, after which aging reports containing these doctored figures
were sent to Amalgamated and borrowed against.  (Tr. 2191-92.)

On May 24, 2010, defendant and Dupree signed a BBC for
the Company's books as of April 30, 2010.  (*See* GX 11-A.)  At
defendant's direction, that BBC included the numbers generated
by Serrano, one of the pre-billed and re-aged Columbia
University invoices, and invoices never received by customers
Henegan Construction and Bedford Stuyvesant Family Health
Center.  (*See* GX 75 at DOJ-FC-GDC000005314; GX 76 at DOJ-FC-
GDC000005402, 5387; Tr. 2111.)  Serrano testified that only
between $8 million and $11 million of the $22 million in
eligible receivables listed on page two of GX 11-A were
legitimate receivables.  (Tr. 2174.)  The government also
presented evidence that $1.2 million in previously pre-billed
Columbia University invoices were re-aged and included in the
borrowing base for April 30, 2010, to appear as if the sales had
occurred in the past 30 days.  (*See* GX 76 at 18; Tr. 775-78,
2104-08.)  According to Serrano, Mr. Watts helped prepare the
BBC for April 30, 2010, and thoroughly discussed with Serrano

the A/R figure in that document, including the re-aged Columbia University invoices. (Tr. 2104, 2112.) Mr. Watts also signed a certification that this BBC was true and correct. (*See* GX 11-A).

The April 30, 2010, BBC also included a $587,925.01 invoice that Zwicker never received. (GX 75 at 23; GXs 112, 245.) Further, on a recording by Serrano made on or about June 23, 2010, the jury heard Mr. Watts discussing the fraud involved with altering that particular Zwicker invoice. (GX 404, Recording 14-1; *see also* Tr. 2225.) Additionally, the government presented evidence of invoices for Bedford Stuyvesant Family Health Center and Henegan Construction that were included on 2010 aging reports and BBCs sent to Amalgamated, but were never sent to these customers. (Tr. 1874-84, 1923-33; GXs 246, 247.) Specifically, the aging report for Hudson Bay as of April 30, 2010, included four bills that were never sent to Bedford Stuyvesant, (GXs 76, 246), and the aging report for JDC Lighting as of April 30, 2010, included a bill that was never sent to Henegan Construction, (GXs 75, 247; Tr. 1927). These aging reports correspond to the BBC that serves as the basis for Count Four of the Indictment.

On June 3, 2010, in another recorded conversation with Mr. Watts, Serrano said that he would be able to give defendant "the invoices" by the following day. (Recording 9-1.) Mr.

31

Watts also spoke about how he would "cut up the backup." (*Id.*)
Serrano explained to the jury that he was giving Mr. Watts
invoices that defendant would alter by changing the shipping
dates. (Tr. 2193-94, 2208.) In a recorded conversation on June
10, 2010, Mr. Watts and Serrano again discussed pre-billing and
doctoring shipping documents. Specifically, Mr. Watts
instructed Serrano to "[g]o to the backlog and bill some more
shit." (GX 293, Recording 12-5.) That is, Mr. Watts told
Serrano to take more pending orders out of the Hudson Bay
backlog and invoice them so that they would count toward A/R.
(Tr. 2211.) Mr. Watts then said to Serrano, "all I have to do
in order to fix that is make the shipment document look like it
was timely to bill." (Recording 12-5.) Mr. Watts again spoke
about doctoring figures and dates on accounts payable invoices
in a conversation with Serrano recorded on June 23, 2010.
(Recording 14-1; *See* Tr. 2214.)

On July 16, 2010, Mr. Watts signed and sent to
Amalgamated the BBC for the Company's books as they stood on May
31, 2010. (*See* GX 11-A.) The back-up for that BBC included the
A/R aging report for Hudson Bay as of May 31, 2010. (GX 443.)
Serrano testified that of the $2 million in accounts receivable
listed on this aging report as being 30 days old or younger, all
but approximately $2,000 represent pre-billed, or prematurely
recognized as revenue, invoices. (*See* Tr. 2233.) Additionally,

this aging report still included the pre-billed and re-aged Columbia University invoice. (*Id.* at DOJ-FC-GDC000037531; *see also* Tr. 2230-32.)

## IV. The Instant Motions

Mr. Watts first stated his intention to make a Rule 29 motion following the close of the government's case and the beginning of his defense case on May 14, 2013. (*See* Tr. 2946-54.) Following oral argument on Mr. Watts' Rule 29 motion, the court preliminarily denied defendant's motion for acquittal. (Tr. 2954; Minute Entry of May 14, 2013.)

After the jury returned a guilty verdict, the court provided the parties with an opportunity to make written submissions on Mr. Watts' renewed motion for judgment of acquittal pursuant to Rule 29(c)(1), and motion for new trial pursuant to Rule 33. (*See* ECF No. 753-1, Mem. of Law in Supp. of Def.'s Post-Trial Motions under Rule 29 and Rule 33 ("Watts Mem."); Gov. Opp.; ECF No. 755, Reply Mem. of Law in Further Supp. of Def.'s Post-Trial Motions ("Watts Reply").)

In his motion papers, as the government notes, Mr. Watts fails to differentiate the bases on which he moves for a judgment of acquittal pursuant to Rule 29 and for a new trial pursuant to Rule 33. (*See generally* Watts Mem.) Rather, Mr. Watts blends together six different arguments regarding his Rule 29 and Rule 33 motions. (*See generally id.*) The court concurs

with the manner in which the government has bifurcated its analysis of Mr. Watts' arguments in its opposition papers, to which defendant has not objected, and so addresses each motion below.  (*See generally* Gov. Opp.; Watts Reply.)

**DISCUSSION**

## I.   Defendant's Rule 29 Motion for Acquittal

### A.    Rule 29 Standard

Rule 29 provides that, on a defendant's motion, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Mr. Watts has renewed his Rule 29 motion for acquittal following the jury's verdict pursuant to Rule 29(c).  "Once a defendant offers evidence after the denial of a motion for acquittal at the close of the Government's case in chief, of course, the defendant waives any claim as to the sufficiency of the Government's case considered alone." *United States v. Pui Kan Lam*, 483 F.2d 1202, 1208 n.7 (2d Cir. 1973); *see also United States v. Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001).

"A defendant who challenges the sufficiency of the evidence supporting his conviction 'bears a heavy burden.'" *Id.* at 370.  "Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld

if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citation omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999) ("[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'").  In determining a Rule 29 motion for judgment of acquittal, the court must "view pieces of evidence 'not in isolation but in conjunction.'" *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)).

In resolving Rule 29 motions, a court should "avoid usurping the role of the jury." *Guadagna*, 183 F.3d at 129. Rather, a court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000). Moreover, a court cannot "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129 (internal quotation marks omitted).  Therefore, the jury's verdict will be upheld even if it is based entirely on

circumstantial evidence. *Jackson*, 335 F.3d at 180; *see also Mallette v. Scully*, 752 F.2d 26, 32 (2d Cir. 1984) ("[I]t is seldom possible to present testimonial or direct evidence of an accused's state of mind. . . . Circumstantial evidence of this subjective fact is therefore indispensable."). "The fact that a conviction may be supported only by the uncorroborated testimony of a single accomplice is not a basis for reversal if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990). Thus, "any lack of corroboration goes only to the weight of the evidence, not to its sufficiency. The weight is a matter for argument to the jury, not a ground for reversal on appeal." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). "In fact, if the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Guadagna*, 183 F.3d at 129 (internal quotation marks omitted).

**B. Discussion**

**1. Evidence of Three Bases of Fraud by Defendant**

The government correctly notes that Mr. Watts' Rule 29 motion focuses almost exclusively on the government's evidence regarding the Company's premature recognition of revenue or "pre-billing." (Gov. Opp. at 23; *see generally* Watts Mem.)

Assuming, *arguendo*, that the government failed to meet its burden on the issue of pre-billing, which, as discussed *infra*, it has met, there was still ample evidence at trial regarding the other aspects of the scheme to defraud alleged in the S-2 Indictment to sustain Mr. Watts' conviction.

The government was not required to prove every aspect of the scheme to defraud alleged in the S-2 Indictment in order to satisfy it burden as to Mr. Watts' guilt. *See United States v. Walker*, 254 F. App'x 60, 62-63 (2d Cir. 2007) (summary order) ("[T]he jury was not required to find every aspect of the scheme [to defraud] in order to convict [defendant of bank fraud], so long as it found the essential elements of that scheme." (citing *United States v. Amrep Corp.*, 560 F.2d 539, 546 (2d Cir. 1977) (distinguishing the existence of a scheme to defraud from the "means adopted to effectuate that scheme," and holding that the government need not prove every means charged in the indictment so long as "there is sufficient overall proof that the scheme exists" (internal quotation marks omitted)))); *see also United States v. Miller*, 471 U.S. 130, 136 (1985) ("The Court has long recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways.").

The allegations against Mr. Watts regarding pre-billing or premature revenue recognition constitute only one aspect of the complex scheme to defraud alleged in the S-2

Indictment, which spans a total of ten paragraphs. (S-2
Indictment ¶¶ 8-17.) Putting aside the evidence regarding pre-
billing, there was still sufficient evidence presented at trial
for the jury to find beyond a reasonable doubt that Mr. Watts
knowingly participated in a scheme to defraud Amalgamated and C3
by creating fictitious A/R, re-aging A/R, and failing to apply
cash payments by customers to A/R.

For instance, in 2008, Mr. Watts had a conversation
with Patello and Dupree about a net income figure that was
inflated by approximately $820,000 and that was ultimately
provided to Amalgamated in the 2007 financial statement in order
to obtain the loan. (*See* Tr. 1019-26.) Additionally, while CFO
in 2008, Mr. Watts worked with Patello to doctor invoices with
fake dates to mislead Amalgamated about the Company's A/R. (GX
472; Tr. 1346-51.) While acting as CFO in 2010, Mr. Watts also
worked with Serrano to continue the fraudulent scheme.
(Recording 9-1; Recording 14-1; Recording 12-5; Tr. 2193-94,
2208, 2214.)

Mr. Watts was also intimately involved in GDC's
impermissible acquisition of Image and the efforts to conceal
the acquisition from Amalgamated: Mr. Watts performed due
diligence on Image, (Tr. 1059), and he, along with Dupree and
Patello, told Serrano that the acquisition of Image violated the
credit agreement, (Tr. 2073). Additionally, on Recording 9-1,

the jury heard Mr. Watts discussing the post office box that the GDC accounting department had set up for Image in New Jersey so that Amalgamated would not learn that Image was located at the same address as GDC, (Recording 9-1), and on Recording 3-5, defendant discussed the lies that Dupree told Jarvis after a check from Image signed by Patello bounced, (Recording 9-1). Moreover, defendant, Patello, and Serrano together decided to add receivables belonging to the pre-acquisition incarnation of Image onto the books of JDC Lighting, despite the fact that GDC had not purchased those receivables as part of the acquisition. (GX 63; Tr. 1066-67, 2075-76, 2080; *see also* GX 53.)  Mr. Watts responded enthusiastically to a higher-than-anticipated pre-acquisition A/R number because more A/R could therefore be added to the books of JDC Lighting, as subsequently instructed by Dupree.  (GX 58; Tr. 1069, 2079-80.)  Patello's monthly handwritten reconciliations regularly reminded Mr. Watts that the false Image receivables had been booked under JDC Lighting. (*See* GX 258, 259, 261, 262, 273 281, 292, 293.)

Mr. Watts was also aware of the totally fictitious SCA receivables and the duplicated Columbia University receivables on the Company's books by virtue of the 2009 year-end summary that Patello prepared for Watts and Dupree, as well as Patello's

monthly reconciliations.[9] (GX 273, 292, 293; Tr. 1389.)  Mr.
Watts also discussed the Columbia University invoices at a
meeting in March 2010.  (Tr. 1418.)

　　　　Furthermore, Mr. Watts played a very active and direct
role in deceiving C3 Capital when GDC was attempting to obtain a
$5 million mezzanine loan in 2009.  First, defendant led GDC's
efforts to obtain a loan from C3 Capital and knew that the
Company was lying to C3 Capital by sending the lender
information containing the same fraudulent financial information
as had been sent to Amalgamated.  (Tr. 1105.)  Moreover, Mr.
Watts coached Serrano to play "Ernest Sullivan," a fictitious
Image employee, in order to hide from C3 Capital the fact that
Image was essentially a division of JDC Lighting, not an
independent outside customer who purchased products from JDC
Lighting.  (Tr. 2120.)

　　　　Mr. Watts also knew of and in some instances
instructed his staff to participate in the re-aging of old,
unpaid invoices in furtherance of the fraudulent scheme.  For

---

[9] Mr. Watts correctly notes that "[m]ere knowledge of another
participant's criminal acts . . . will not make a defendant criminally
responsible for his co-defendants' acts."  (Watts Reply at 7 n.7 (quoting
United States v. Mulder, 273 F.3d 91, 118 (2d Cir. 2001)).)  Here, however,
the government presented abundant evidence that all of the fraudulent
activity at GDC was within the scope of the conspiracy agreed to and
participated in by Mr. Watts and others and was foreseeable by Mr. Watts, and
that Mr. Watts was a leader of the conspiracy.  See Mulder, 273 F.3d at 118;
see also United States v. Huezo, 546 F.3d 174, 180 n.2 (2d Cir. 2008) ("A
single act may be sufficient for an inference that an individual is involved
in a conspiracy; the qualitative nature of the act viewed in the context of
the entire conspiracy determines whether that inference can be drawn in a
particular case.").

example, Patello told defendant about a pre-billed $1.2 million Columbia University invoice added to the Company's books in October 2009. (GX 273; Tr. 1394-95.) Later, while Mr. Watts was acting as CFO following Patello's exit from the Company in 2010, Serrano re-aged the same invoice for the April 30, 2010, BBC so that it appeared to have been earned during the previous 30 days. (*See* GX 76 at 18; *see also* Tr. 775-78, 2104-08.) Mr. Watts thoroughly discussed the accounts receivable included in the April 30, 2010, BBC, including this specific re-aged invoice, with Serrano. (Tr. 2112.) Moreover, during the frantic morning of the April 26, 2010, meeting with Jarvis, Watts told Serrano to re-age $215,000 worth of Image A/R so that it would remain eligible to borrow against. (GX 18; Tr. 2142.)

Lastly, the jury heard testimony from Patello that Mr. Watts was fully aware of instances in which cash payments by customers were not applied to the customers' debts in order to keep the corresponding A/R on the Company's books, (Tr. 1361, 1364-65, 1398; GXs 281, 273, 262).

Therefore, the court finds that even without the evidence of pre-billing by Mr. Watts, there was sufficient evidence to support his conviction for fraud.

### 2. Sufficient Evidence of 2007 Pre-Billing/Premature Revenue Recognition

Mr. Watts argues that the government failed to prove premature revenue recognition at GDC in 2007 because the government did not present documents to support Xenakis' and Jozefowski's testimony, and because these witnesses recalled slightly different amounts of money that disappeared overnight from the backlog of pending orders. (Watts Mem. at 20.) Under the Rule 29 standard, however, a single witness's uncorroborated testimony is sufficient to support a conviction. Therefore, the court cannot find that the evidence is insufficient on the ground that the government "did not show either Xenakis or Jozefowski any corroborating backlog reports or accounts receivable reports." (*Id.* at 20.) As the court found in its March 22, 2013, Memorandum and Order on the parties' motions *in limine*, "[a]ny lack of corroboration goes only to the weight of the evidence, not to its sufficiency." (ECF No. 683, Order at 20 (quoting *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003) (internal quotation marks omitted); *id.* ("The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal.").)

Xenakis and Jozefowski testified about millions of dollars moving from the pending order backlog to accounts receivable overnight. (Tr. 436, 523-24.) Though there were

42

slight inconsistencies in the witnesses' recollections about the exact dollar amount that was altered on the Company's books in 2007, the testimony was more than sufficient to show that defendant was responsible for millions of dollars' worth of premature revenue recognition in 2007. Their testimony, in conjunction with Nusfaumer's, was sufficient for the jury to find that false financial data was created in 2007 and was submitted to Amalgamated in 2008, part of the acts for which Mr. Watts was convicted as charged in Counts One and Two. *See United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) ("We have explained that even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not 'incredible on its face,' or does not 'def[y] physical realities.'" (citations omitted)).

Accordingly, the court finds that Mr. Watts has not sustained his burden for a new trial based on the government's allegedly insufficient evidence of defendant's involvement in pre-billing or premature revenue recognition in 2007.

### 3. The Jury Could Conclude that 2007 Pre-Billed Accounts Receivable were Subsequently Provided to Amalgamated

Mr. Watts also argues that the government failed to demonstrate that the pre-billing in 2007 was connected to the charges in the indictment; specifically, that the Company's 2007 pre-billing was included in the financial information and other

application materials provided to Amalgamated. (Watts Mem. at 20-23.) The court finds, however, that there was abundant evidence from which the jury could have concluded that the pre-billing from 2007 was included in the financial statements sent to Amalgamated in 2008.

Xenakis testified that after she discovered and reversed the pre-billing in late-2007, Mr. Watts demanded that she log into the Hedberg database and move the pending orders back into accounts receivable, which she did. (Tr. 439.) Nusfaumer also testified that a few months later, in 2008, defendant ordered her to compile financial information, including data from the 2007 financial year, from the Hedberg accounting system and provide it to Amalgamated in order for the bank to conduct its due diligence. (Tr. 743-45.) Nusfaumer further testified that the 2007 aging report sent to Amalgamated included pre-billed accounts receivable.[10] (Tr. 745.) Viewed in conjunction, this evidence was sufficient for the jury to infer that the pre-billing Nusfaumer referred to having submitted to Amalgamated in 2008 included the multi-million dollar shuffling

---

[10] Mr. Watts also argues that had A/R been paid in the time between the 2007 pre-billing and the time when Nusfaumer submitted 2007 A/R reports to Amalgamated, "they would not be in whatever A/R report Nusfaumer gave the bank after April 21, 2008." (Watts Reply at 2.) This argument is illogical, however, because the A/R reports sent to Amalgamated were not contemporaneous reflections of the Company's A/R as of the date they were sent in 2008; rather, they were an immutable snapshot of the Company's pre-billing-inflated A/R at the end of 2007.

of orders to A/R that Xenakis and Jozefowski testified had

occurred mere months previously.  *See Torres*, 604 F.3d at 67.

> **4.     The Jury Could Conclude that Defendant Engaged in a Conspiracy to Prematurely Recognize Revenue in Contravention of the Company's Loan Agreement and Financial Statements**

Mr. Watts argues, as he did at the close of the

government's case on May 14, 2013, (*see* Tr. 2946-48), that the

government failed to prove that billing prior to delivery, that

is, "pre-billing," is fraudulent, (*see* Watts Mem. at 25-32), and

that the government wrongfully conflated the concepts of billing

and revenue throughout the trial (*see id.* at 32-38).

As the court noted *supra*, however, the witnesses most

often used the term pre-billing as a colloquial shorthand for

what was understood by them to be the fraudulent recognition of

revenue prior to the delivery of products or the rendering of

services to the Company's customers, rather than as that term is

understood as a term of art in the accounting industry.  True,

defendant's expert accounting witness, Solomon, testified that

"billing before goods are delivered or services rendered . . .

in and of itself is not fraudulent and doesn't render the

transaction fraudulent."  (Tr. 2863.)  Solomon additionally

testified, however, that, in the absence of an express agreement

to the contrary, "if there's a bill issued *and there's an*

*expectation that it's going to be paid*, that . . . would be an

accounts receivable that qualifies under" the definition

provided in the loan agreement with Amalgamated.  (Tr. 2864-65

(emphasis added); Tr. 2857-58, 2860-61; *see also* GX 8 at 24

(defining accounts receivable in the loan agreement as "any

right of any Borrower to payment for goods sold or services

rendered, whether now existing or hereafter arising").)  Here,

the evidence established that GDC never had a reasonable

expectation that all of the subsidiaries' pre-billed invoices

were going to be paid, and therefore constituted legitimate A/R,

because (1) many such bills were created and kept in Phelps'

drawer but were never sent to customers,[11] (Tr. 759, 765, 1131);

(2) five of the Company's customers testified that they would

not have paid a bill for products that had not yet been

delivered,[12] (Tr. 1878, 1891, 1913, 1929); and (3) the 2007 and

---

[11] Representatives from the Company's customers Columbia University, Zwicker Electric, Bedford Stuyvesant Family Health Center, and Henegan Construction all testified to instances where bills printed by the Company and counted toward A/R were never received by them. (*See* Tr. 1945-46, 1911-12, 1874-84, 1923-33; GXs 452, 245, 246, 247.)

[12] Mr. Watts' reliance on *Dent-A-Med, Inc. v. Weiner*, No. 05 B 54630, 2008 Bankr. LEXIS 2015 (Bankr. N.D. Ill. July 3, 2008), for the proposition that "prebilling that is not specifically barred by the governing contractual language should not form the basis of criminal liability" is misplaced. (Watts Mem. at 27-28.)  In *Dent-A-Med*, the court found that a dentist's pre-billing practices could not be converted into fraudulent representations because the parties' agreement did not "on its face indicate a prohibition against billing before authorized goods or services are provided, also known as 'pre-billing.'" 2008 Bankr. LEXIS 2015, at *8.  The court based its decision in large part on the fact that the plaintiff, Dent-A-Med, knew about and accepted the defendant's practice of pre-billing, which defendant had always disclosed. *See id.* at *10, 15-16.  Here, in contrast, Mr. Watts and his co-conspirators falsely represented in the Company's financial statements submitted to Amalgamated and C3 the manner in which revenue was recognized, and concealed the fact that they prematurely recognized revenue or "pre-billed."

2008 financial statements reviewed by defendant and sent to Amalgamated stated that the Company recognized revenue at the time products were delivered to customers, (GXs 22, 148, 188). Furthermore, unlike the examples offered by Solomon such as the voluntary online purchase of an airline ticket prior to the airline's rendering of services, Amalgamated and C3 testified that they would not have approved or moved forward with a loan to the Company had the lenders known that GDC and its subsidiaries were secretly recognizing revenue before products were delivered. (Tr. 2549, 1288.) Indeed, Solomon conceded that if GDC told Amalgamated that it recognized revenue at Hudson Bay at the time when products were delivered but in fact secretly recognized revenue after products were ordered, "that would not be in accordance with their policies" or GAAP. (Tr. 2896.)

The issuance of bills to customers prior to delivery of products "in and of itself is not fraudulent and doesn't render the transaction fraudulent." (Tr. 2863.) Nonetheless, in the context of the company's representation regarding revenue recognition in its financial statements, coupled with the Company's undisclosed classification as A/R of created but not mailed bills which created the appearance of assets upon which Amalgamated loaned the Company money, there was adequate

evidence for the jury to find that this "pre-billing" by Mr. Watts and others was part of the fraud conspiracy.

### 5. There was Sufficient Evidence for the Jury to Conclude that Defendant Aided in Submitting the False November 2009 BBC to Amalgamated

Mr. Watts argues that there was insufficient evidence to support Count Three of the S-2 Indictment because he did not sign the November 2009 BBC, which forms the basis of that count, and that there is no evidence that defendant discussed this BBC with Patello before its submission to Amalgamated. (Watts Mem. at 39-40.) Counts Three and Four of the S-2 Indictment charged Mr. Watts with making a false statement to Amalgamated on or about January 6, 2010, and May 24, 2010, respectively, in violation of 18 U.S.C. §§ 2 and 1014. (S-2 Indictment ¶¶ 22-27.)

"Section 1014 criminalizes 'knowingly making any false statement or report . . . for the purpose of influencing in any way the action' of a Federal Deposit Insurance Corporation (FDIC) insured bank 'upon any application, advance, . . . commitment, or loan.'" *United States v. Wells*, 519 U.S. 482, 490 (1997) (quoting 18 U.S.C. § 1014). As noted by the Supreme Court, Section 1014 "makes a false statement to one of the enumerated financial institutions a crime only if the speaker knows the falsity of what he says and intends it to influence the institution." *Id.* at 499. Unlike bank fraud, the

government does not have to prove the materiality of the false statements made to Amalgamated. *Id.* at 498-500; *see also United States v. Autorino*, 381 F.3d 48, 52 n.3 (2d Cir. 2004) (stating that the Supreme Court in *Wells* "ruled that a false statement need not be material to the decision at issue to give rise to a violation of § 1014.").

Under Section 2 of Title 18 of the Criminal Code, Mr. Watts can be convicted of Counts Three and Four if he "aids, abets, counsels, commands, induces or procures" the commission of those crimes, or "willfully causes an act to be done which if directly performed by him or another would" constitute those crimes. 18 U.S.C. § 2. The Second Circuit has stated that this "statute requires only that the underlying crime was committed by someone other than the defendant and that the defendant [him]self either acted or failed to act with the specific intent of advancing the commission of the underlying crime." *United States v. Litwok*, 678 F.3d 208, 213 (2d Cir. 2012) (internal quotation marks omitted).

Viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, there was more than ample evidence from which a jury could find beyond a reasonable doubt that Mr. Watts knowingly made or aided and abetted the making of false statements in the BBCs and accompanying aging reports submitted to Amalgamated on January

6, 2010 (Count Three), and May 24, 2010 (Count Four), for the purpose of securing advances on the revolving line of credit and influencing Amalgamated to maintain that line of credit at the current levels.

First, Count Three does not require that defendant signed the BBC, but only that "Watts . . . together with others . . . caused to be submitted to Amalgamated Bank a false Borrowing Base Certificate." (S-2 Indictment ¶ 23.) Second, the government presented evidence that Mr. Watts knew that the November 2009 BBC contained false information that he and others had knowingly put on the Company's books. For instance, there was evidence at the trial that defendant decided with Patello and Serrano to book fake A/R corresponding to the receivables for Image on the books of JDC Lighting, which receivables were included in the financial reports for the November 2009 BBC. (Tr. 2078-79.) Furthermore, Mr. Watts knew those fake Image receivables, which he had directed Serrano to book, were still in the A/R at the time that the BBC was submitted because they were included in each of the monthly reconciliations that Patello had distributed to defendant and Dupree. Lastly, the November 2009 BBC was sent to Amalgamated in an email copied to Mr. Watts, who was the number two employee at GDC during this time period, and there was evidence that defendant was involved in decisions to prematurely recognize revenue in 2009. (*See,*

*e.g.*, GX 285 ("Per Courtney, . . . We have a P.O. from Zwicker for Staten Island Courthouse ($1.325MM); if necessary, bill it.").

This case is analogous to *United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000), where the Second Circuit affirmed a defendant's convictions under Section 1014 for false statements similar to those at issue in this case. In *Carboni*, a company called Cableco entered into a revolving loan agreement that enabled Cableco to borrow a percentage of "eligible" accounts receivable and that required Cableco to submit BBCs reporting its eligible accounts receivable to the bank. *Id.* at 42. Under the terms of that revolving loan agreement, like the one at issue in this case, the bank could require Cableco to repay the amount by which a borrowing base certificate did not support the existing loan balance. *Id.* At some point, Cableco "began to engage in deceptive practices that increased the amounts it could borrow under its line of credit," including by "pre-billed invoices, that is, it created invoices for items it had not yet shipped." *Id.* "Cableco then included these pre-billed invoices as eligible accounts receivable in daily borrowing base certificates that [the defendant] periodically reviewed before their submission to [the bank]." *Id.* Although the Second Circuit did not decide a Rule 29 motion in affirming defendant Carboni's convictions under Section 1014, the Second Circuit

noted that there was "overwhelming evidence" of Carboni's guilty intent. *Id.* at 45. Like the evidence presented with respect to Mr. Watts, the Second Circuit noted that the "overwhelming evidence" at trial in the *Carboni* case established that Carboni was (1) exposed to pre-billed invoices in meetings, (2) responsible for what was to be billed; (3) reviewed the BBCs; (4) directed others to book false sales; and (5) that "Cableco pre-billed two large invoices totaling over $130,000." *Id.* at 45. Additionally, like Patello, Serrano, and Nusfaumer, in *Carboni*, a number of former Cableco employees, including the comptroller, "testified that [the defendant] knew about the pre-billed invoices and understood their effect on the base borrowing certificates." *Id.* at 43.

Considered in conjunction, as in the *Carboni* case, the above evidence was sufficient for the jury to conclude that Mr. Watts, together with others, caused a false statement to be made to Amalgamated on January 6, 2010, and, alternatively, for the jury to have found Mr. Watts guilty of Count Three as an aider and abettor. *See United States v. Walsh*, 133 F.3d 908 (2d Cir. 1998) (finding defendant guilty of aiding and abetting where false documents he helped create were submitted to a bank by a co-defendant and evidence suggested defendant knew the documents would be submitted).

### 6. There was Sufficient Evidence for the Jury to Conclude that the April 30, 2010, BBC was Sent to Amalgamated

Mr. Watts argues that there was no evidence that the BBC as of April 30, 2010, which he and Dupree signed and comprises the statement at issue in Count Four of the S-2 Indictment, was ever sent to Amalgamated. (Watts Mem. at 40.) The court disagrees.

In a July 1, 2010, email from Mr. Watts to Jarvis, defendant himself indicated that the BBC to which he referred in the email was sent to Amalgamated: "As of 4/30 . . . A/R per BBC." (GX 198.) The BBC also included a fax date stamp indicating the same date on which that BBC was signed by defendant and Dupree. (GX 11-A.) Furthermore, Jarvis testified that he received GX 220, an A/R aging report that was part of the backup to the April 30, 2010, BBC. (Tr 2618.) Serrano also testified that another A/R aging report that formed part of the backup, GX 75, was sent to Amalgamated along with the BBC. (Tr. 2115). Lastly, Serrano testified that defendant personally sent a third part of the backup, GX 76, to Amalgamated. (Tr. 2104.)

Therefore, the court finds that the government presented sufficient evidence to support Mr. Watts' conviction for Count Four of the S-2 Indictment.

## II. Defendant's Rule 33 Motion for a New Trial Due to Manifest Injustice

### A. Rule 33 Standard

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted); *see also United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) ("'The test is whether it would be a manifest injustice to let the guilty verdict stand.'" (quoting *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir. 1992))). "While [the Second Circuit] generally allow[s] district courts greater deference to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary circumstances." *Cote*, 544 F.3d at 101 (internal quotation marks omitted).

**B. Application**

   **1. Defendant Specifically Intended to Defraud
        Amalgamated by Submitting False Information**

Mr. Watts argues that the court erred in admitting evidence of pre-billing in 2007 because those acts occurred before the Company began negotiations with Amalgamated and C3 in 2008 and, therefore, could not have been a part of the scheme to defraud those institutions. (*See* Watts Mem. at 23-24.) The court respectfully disagrees.

"In order to show bank fraud, the government must prove that defendant (1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution[13] into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss." *Crisci*, 273 F.3d at 239-40 (internal quotation marks omitted). Additionally, "the government must prove that the defendant engaged in a deceptive course of conduct by making material misrepresentations." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007); *see also Neder v. United States*, 527 U.S. 1, 16 (1999) ("[A] false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was

---

[13] The parties stipulated at trial that at all relevant times Amalgamated was a financial institution as used in 18 U.S.C. § 1344 and that its deposits were insured by the Federal Deposit Insurance Corporation. (Tr. 2839.)

addressed.'"(citation omitted)).  Importantly, "actual or
potential loss to the financial institution need not be proven,
so long as there is evidence that the defendant intended to
expose the institution to such loss." *United States v. Laljie*,
184 F.3d 180, 189 (2d Cir. 1999).  The fact, however, that a
defendant believes (rightly or wrongly) that ultimately no harm
or loss will be suffered by the bank does not negate criminal
intent where some real and immediate harm or loss is
contemplated.  *United States v. Stathakis*, 320 F. App'x 74, 76
(2d Cir. 2009).[14]

   Mr. Watts challenges admission of evidence of the 2007
pre-billing on the basis that he could not have specifically
intended to defraud Amalgamated or C3 in 2008 at the time the
pre-billing took place in 2007.  (*See* Watts Mem. at 23-24.)  The
court, however, rejected this exact argument by Mr. Watts in its
March 2013 Order on pretrial motions *in limine*.  (*See* Order at
18-19.)  Mr. Watts again misconstrues the timing and nature of
the fraudulent intent at issue in this case.  Although the 2007
pre-billing occurred some months before the Company applied for

---

[14] *See also United States v. Rossomando*, 144 F.3d 197, 201 (2d
Cir. 1998) ("[W]here a defendant deliberately supplies false information to
obtain a bank loan, but plans to pay back the loan and therefore believes
that no harm will 'ultimately' accrue to the bank, the defendant's good-faith
intention to pay back the loan is no defense because he intended to inflict a
genuine harm upon the bank – *i.e.*, to deprive the bank of the ability to
determine the actual level of credit risk and to determine for itself on the
basis of accurate information whether, and at what price, to extend credit to
the defendant.").

loans from Amalgamated in 2008, the question for the jury with regard to Mr. Watts' criminal liability for fraud against Amalgamated was what his intent was at the time that he submitted what he knew to be the falsified 2007 pre-billing data to Amalgamated in connection with the loan.  What determined the admissibility of testimony about 2007 pre-billing is whether it related to Mr. Watts' intent to use the falsified 2007 pre-billing to obtain financing from Amalgamated later in 2008.

Furthermore, contrary to defendant's argument, *United States v. Nkansah*, 699 F.3d 743 (2d Cir. 2012), does not suggest that the court's decision to admit 2007 pre-billing was in error.  In *Nkansah*, the government was unable to "prove beyond a reasonable doubt that appellant intended to expose the banks to loss." *Id.* at 750.  Here, the testimony of Xenakis, Jozefowski, and Nusfaumer about 2007 pre-billing was relevant to the government's attempt to prove beyond a reasonable doubt Mr. Watts' intent to defraud Amalgamated as of the time that the fraudulent 2007 pre-billing data was submitted to Amalgamated in connection with the loan application, and in connection with obtaining funds from the revolving credit line once the loan was consummated.  *Nkansah* does not militate against the admissibility of this evidence.

As detailed above, Xenakis, Jozefowski, and Nusfaumer offered evidence that pre-billing took place in 2007, and that

the Company's 2007 financial records which included that pre-billing were sent to Amalgamated in 2008. Therefore, there was evidence for the jury to find that Mr. Watts possessed the knowledge and specific intent to defraud Amalgamated in 2008, and the court's admission of evidence of 2007 pre-billing was not in error.

### 2. The Government Sufficiently Distinguished Between Revenue Recognition and Billing

Mr. Watts argues that throughout the trial, the government wrongfully and inaccurately conflated the concepts of pre-billing and revenue recognition by eliciting testimony and making arguments directed at the question of pre-billing but which, in fact, concerned revenue recognition. (*See* Watts Mem. at 32-38.) Mr. Watts claims that "[t]he government simply chose to disregard defendant's repeated objections that billing and revenue recognition are two separate functions," and that the government "ignored the unrefuted testimony of [Solomon], which confirmed that billing and revenue recognition are separate functions, which is why the latter is governed by GAAP and [the] former is not." (*Id.* at 33.) Once again, the court disagrees.

First, as the court discussed *supra*, it was clear at trial that use of the term "pre-billing" by Patello, Serrano, Nusfaumer, and other GDC employee witnesses was a company-wide colloquialism for premature revenue recognition.

Second, the government did in fact differentiate between the two concepts and referred specifically to "revenue recognition" when addressing violations of the policy for revenue recognition stated in the Company's consolidated financial statements. (*See, e.g.*, Tr. 1119 (asking Patello, "did GDC consistently follow that policy of recognizing revenue at the time of delivery or when services are provided?"), 1288 (asking C3 Capital partner Patrick Healy, "did it matter to you whether revenue was recognized before a product had been delivered?"), 2548-49 (asking Jarvis, "if there was a different revenue recognition policy than the way that I described, would that have made the collateral less valuable?"), 2896 (asking Solomon a hypothetical question about GDC's revenue recognition).) Further, Patello explicitly testified that Mr. Watts and the rest of the GDC executive team intentionally and knowingly violated the revenue recognition policy found in GX 22. (Tr. 1119.)

Lastly, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985); *see also United States v. Ozsusamlar*, 349 Fed. App'x 610, 612 (2d Cir. 2009) ("We will

vacate a conviction on grounds of prosecutorial misconduct only if the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial." (internal quotations marks omitted)).  Assuming, *arguendo*, that the government occasionally conflated the concepts of pre-billing and revenue recognition during the trial, the alleged misconduct did not deprive defendant of a fair trial when viewed against the entire body of evidence before the jury, including the testimony of defendant's expert witness.[15]  *See Ozsusamlar*, 349 Fed. App'x at 612; *see also United States v. Modica*, 663 F.2d 1173, 1182 (2d Cir. 1981) ("[T]he case against appellant was so strong that the jury in all probability would have found him guilty even absent the improper comments.").

Therefore, Mr. Watts' motion for a new trial on the basis of the government's conflation of the concepts of pre-billing and revenue recognition is denied.

### 3.   DX 746 was Properly Admitted on a Limited Basis

Mr. Watts argues that he was prejudiced by the court's decision to limit the basis on which he was permitted to introduce defense exhibit ("DX") 741, subsequently redacted as

---

[15] Solomon defined revenue recognition as "when the income from the transaction, the bill or charges that are prepared are actually *recorded in the books* as income." (Tr. 2857 (emphasis added).)  Thus, the evidence before the jury was clear that recording sales as A/R in the Company's books by Mr. Watts and others for orders for which a bill was created but not sent for products not delivered, and against which money was subsequently loaned by Amalgamated, constituted premature revenue recognition.

DX 746, which was a lengthy Order Exception Report entitled

"Customer Invoiced but not Delivered." (*See* Watts Mem. at 29-

32.) According to defendant, this report "showed that during

the 10 months prior to its acquisition by GDC in 2006, Old HBE[16]

booked orders, with an aggregate value of $8,869,952.10, where

customers had been invoiced but the product had not yet been

delivered." (*Id.* at 29.) This, Mr. Watts argues,:

> [W]ould have directly impeached the
> testimony of the government's first three
> witnesses: Xenakis, Jozefowski and
> Nusfaumer, who all claimed that at Old HBE
> there was no billing prior to delivery, a
> practice they all eschewed as improper. DX
> 746 was also important because it showed
> that billing before delivery is so far from
> being fraudulent that a third-party vendor,
> Hedberg, created a database program that
> could specifically identify sales that had
> been invoiced prior to delivery (and
> aggregate them for any given period of
> time).

(*Id.*) The court respectfully disagrees that its decision to

limit the basis on which defendant was permitted to present DX

746 was prejudicial.

Federal Rule of Evidence 901(a) provides that

"authentication or identification as a condition precedent to

admissibility is satisfied by evidence sufficient to support a

finding that the matter in question is what its proponent

claims." Fed. R. Evid. 901(a). "This requires little more than

---

[16] "Old HBE" refers to Hudson Bay prior to its acquisition by GDC.

a prima facie showing of authenticity: it 'does not erect a particularly high hurdle.'" *CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 223 (E.D.N.Y. 2009) (quoting *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001)). Nonetheless, there must be "a showing that 'a reasonable juror could find in favor of authenticity or identification.'" *Id.* (quoting same).

During the direct testimony of Griffin as part of Mr. Watts' defense case, the court admitted DX 746 "not for the truth of the data contained in that document, but merely to establish that such a document existed at the time reflected . . . on the document." (Tr. 3103.) The court limited the admissibility of DX 746 in this way because none of the four former GDC employees through whom defendant attempted to admit this document had actually worked with or had familiarity with any Order Exception Reports like DX 746. Defense witness Griffin testified to only a single incident at an unspecified time when she saw one such report sitting on the desk of a colleague whom she could not remember. (*See* Tr. 3011–15.) Further, Griffin testified that she did not examine the report in any detail, did not use Order Exception Reports in her job, and recalled that the amount of invoicing prior to delivery at Hudson Bay in 2006 totaled "several hundreds of thousands" of dollars, rather than the more than $8 million DX 746 purports to reflect. (Tr. 3011–15, 3058, 3091.)

In light of Griffin's relative lack of personal knowledge and experience with Order Exception Reports, including DX 746, she was not competent to establish a foundation on which the authenticity of the specific information contained in this exhibit could be established. Indeed, defendant's best course of action for admitting DX 746 in its entirety would have been to call a witness who worked at Hudson Bay in 2006 and was familiar with the document or the Hedberg database from which it was retrieved, which he did not do.

Furthermore, the plethora of evidence throughout the trial of instances in which fraud was committed by manipulating and entering false date in the Hedberg system gave the court a sufficient basis to find doubt that the information contained in DX 746 was what defendant claimed, absent authentication by a witness who had direct knowledge of that same information in 2006. *Cf. CA, Inc.*, 780 F. Supp. 2d at 224 ("[A] party opposing computer generated data must put forth more than mere assertions of tampering."); *id.* at 226 (offering party presented witness with specific knowledge of the disputed computer-generated data, *i.e.*, its creator).

Finally, the specific financial information contained in DX 746 was, for several reasons, too attenuated from the time period and facts of this case to have overcome the risk it posed of confusing the jury. (*See* Fed. R. Evid. 403.) First, any HBE

billing activity in 2006 would have predated both the charged period and the time during which Dupree owned HBE.  Second, even if Old HBE had a practice of pre-billing, that would not establish, as defendant argues, that pre-billing was "accepted and commonplace."  (Watts Mem. at 31.)  Third, regardless of HBE's billing practices in 2006, HBE's later premature recognition of revenue after acquisition by Dupree still ran counter to the policy stated in the Company's 2007 and 2008 financial statements provided to Amalgamated, and in Mr. Watts' July 1, 2010, email to Jarvis.  (GXs 148, 188, 198.)  Fourth, Mr. Watts was permitted, through Griffin's testimony, to introduce evidence that Old HBE pre-billed prior to the charged conduct by defendant and others.  (*See* Tr. 3057-62.)

The court therefore finds that its decision to admit DX 746 only for its existence cannot have caused a "manifest injustice," or cast doubt on the validity of the jury's verdict. *Sanchez*, 969 F.2d at 1414.

### 4. Evidence of A/R Collections and the Government's Seizure of GDC Bank Accounts was Properly Excluded

Mr. Watts first argues that the court erred by not allowing him to introduce evidence of collections unless those collections were tied to specific accounts receivable alleged by the government to have been fictitious.  (*See* Watts Mem. at 38-39.)  Mr. Watts specifically argues that he was unjustly

prevented from establishing that "[t]he fact that collections
between December 2009 and July 2010 were in excess of $19
million would have proven wrong Patello's claim that, as of the
end of November 2009, the maximum amount of receivables that
could have been collected was $9 million." (*Id.* at 38 (citing
Tr. 1391-92, 1397-98).)  Mr. Watts also argues that evidence of
collections "would have also rebutted Jozefowski's claim that
cash flow at HBE was 'pretty bad' in early 2010." (*Id.* (citing
Tr. 534).)  The court finds that its order limiting the evidence
of collections Mr. Watts was permitted to introduce was not in
error.

     As an initial matter, at the April 26, 2013, pretrial
conference, the court did not prohibit defendant from
introducing all evidence of collections on A/R between December
2009 and July 2010.  (*See* Minute Entry of Apr. 26, 2013.)
Rather, the court ruled that "Mr. Watts is permitted to
introduce evidence of specific customer deposits made to USW[17] or
other GDC entities to rebut evidence presented by the government
suggesting that specific accounts receivable were fraudulent."
(*Id.*)  That is, to the extent that the government presented
evidence suggesting that a specific A/R was wholly fictitious or
re-aged, Mr. Watts was permitted to introduce evidence of
collections to rebut that evidence.  Of the many receivables

---

[17] USW, or Unalite Southwest, was another subsidiary of GDC.

that the government's evidence showed were wholly fictitious or re-aged, Mr. Watts was permitted but not obligated to present evidence of their genuineness and did not do so. Moreover, during trial, Mr. Watts argued for the right to introduce this evidence if the government presented evidence of actual losses by Amalgamated, which it did not do. (*See* Tr. 3147, 3148-50.)

More importantly, permitting Mr. Watts to introduce a lump-sum collections figure would only have confused the jury and would have failed to rebut Patello or Jozefowski's testimony because a lump-sum figure would not tend to prove that fraudulent A/R were in fact genuine. As the government correctly offers as an example, if Mr. Watts and his co-conspirators doctored a 150-day-old bill to appear only 30 days old so that Hudson Bay could borrow against it, the fact that the customer eventually paid the bill would not negate the initial lie to Amalgamated about the bill's age. (Gov. Opp. at 38.) Additionally, throughout the end of 2009 and the first half of 2010, the Company was still a going concern with many genuine clients and A/R; thus, assuming, *arguendo*, that the Company had collected $18.3 million by July 2010, that figure would not necessarily render false Patello's testimony that, more than six months earlier, readily collectible cash had only

been approximately $9 million.[18]  Therefore, the court limited
the extent to which Mr. Watts was permitted to introduce
evidence of A/R collections.

Mr. Watts second argues that the court erred in not
allowing him to present evidence that the government seized all
of the GDC subsidiaries' bank accounts, thereby causing the
subsidiaries to collapse.  (Watts Mem. at 38-39.)  Again,
however, the government never introduced evidence or argued that
the Company failed to pay back its loan, nor did it ever discuss
actual losses, only the risk of loss.  Indeed, this is why the
court ruled on April 26, 2013, that "the government's seizure of
bank funds from accounts in the name of GDC and its
subsidiaries, including USW, are not relevant to Mr. Watts'
trial and therefore may not be raised by either party during
trial."  (Minute Entry of Apr. 26, 2013.)

The court accordingly finds that it did not err in
preventing Mr. Watts from introducing evidence of the
government's seizure of the Company's bank accounts.

### 5. Cross-Examination of Patello Regarding R.A. was Properly Limited

Mr. Watts challenges the court's May 14, 2013, order
limiting the scope of his cross-examination of Patello regarding

---

[18] The government also correctly notes that it is possible that
some of the collections made between November 2009 and July 2010 were for
bills older than 120 days that had already been dropped from the eligible A/R
reported to Amalgamated in November 2009, and thus would not have affected
the borrowing base at all.  (Gov. Opp. at 39.)

Patello's recent involvement with non-party R.A., her personal finances, and R.A.'s son. (*See* Watts Mem. at 40-44.) Mr. Watts specifically challenges (1) the court's May 3, 2013, order excluding testimony "about the age, health, mental state, or personal circumstances of R.A. or R.A.'s son absent further order of the court," (*id.* at 42 (quoting ECF No. 719, Order at 3); and (2) the court's decision to preclude testimony by witness H. Stein ("Stein") for purposes of "establish[ing] that Patello had falsely testified about the April 10 telephone call," (*id.* at 41).

Mr. Watts' arguments about the admissibility of this testimony for purposes of establishing Patello's bias in favor of the government were previously fully briefed by the parties and discussed extensively in the court's May 14, 2013, Memorandum and Order denying defendant's motion *in limine*. (*See generally* ECF No. 719, Order denying Mot. in Limine.) Therefore, for the reasons previously discussed by the court in that order, Mr. Watts' Rule 33 motion for a new trial on the basis of the court's exclusion of evidence of Patello's relationship with R.A. to establish bias is denied.

In addition to the bias argument previously addressed by the court, Mr. Watts now argues that the above evidence was admissible because Stein's testimony would have "contradicted

many of the critical aspects of Patello's testimony relating to
[R.A.] and the phone call."  (Watts Mem. at 43.)

Federal Rule of Evidence 608 ("Rule 608") was amended
in 2003 "to clarify that the absolute prohibition on extrinsic
evidence applies only when the sole reason for proffering that
evidence is to attack or support the witness' character for
truthfulness," and not "to bar extrinsic evidence for bias,
competency and *contradiction impeachment*."  (Fed. R. Evid. 608,
Advisory Committee's Note to 2003 Amendment (emphasis added).)
Thus, "[a]lthough Rule 608(b) generally prohibits extrinsic
evidence of specific instances of conduct, an exception to that
rule exists when evidence contradicts a witness's testimony.
Impeachment by contradiction, as opposed to evidence of a
witness's character for truthfulness or untruthfulness, is a
permissible exception to the general proscription of Rule
608(b)."  *United States v. Rodriguez*, 539 F. Supp. 2d 592, 595
(D. Conn. 2008).

Nonetheless, "a witness may not be impeached by
extrinsic evidence (contradiction by another witness or
evidence) on a collateral issue."  *United States v. Tarantino*,
846 F.2d 1384, 1409 (D.C. Cir. 1988); *see also United States v.
Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1995) ("extrinsic
evidence to impeach is only admissible for contradiction where
the prior testimony being contradicted was itself material to

the case at hand"); *Rodriguez*, 539 F. Supp. 2d at 595. "The determinative question in deciding whether extrinsic evidence contradicting a witness' testimony is admissible is . . . whether the assertions that the impeaching party seeks to contradict are . . . material or collateral." *Rosario v. Kuhlman*, 839 F.2d 918, 925-26 (2d Cir. 1988); *see also Rosario v. Ercole*, 582 F. Supp. 2d 541, 596 (S.D.N.Y. 2007). Furthermore, district courts have "wide discretion to impose limitations on the cross-examination of witnesses." *United States v. Flaharty*, 295 F.3d 182, 190-91 (2d Cir. 2002).

At trial, testimony by Patello about his telephone conversation with Stein was admitted only "for the purpose of probing Mr. Patello's character for truthfulness or untruthfulness pursuant to Federal Rule of Evidence 608(b)." (Order at 2-3.) Under Rule 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for untruthfulness." (Fed. R. Evid. 608(b).) Therefore, once Patello "denie[d] having engaged in alleged untruthful conduct on cross-examination," Mr. Watts was forced to "take (or [be] bound by) the witness's answer." *United States v. Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005) (internal quotation marks omitted).

Additionally, any potential contradiction of Patello's testimony by Stein would only have been relevant to assertions Patello made about his prior telephone conversation with Stein about R.A., and wholly immaterial to the issues at trial. Because these assertions were unquestionably collateral to Patello's testimony about Mr. Watts' criminal conduct, the court properly excluded Stein's contradiction impeachment testimony.

## CONCLUSION

For the foregoing reasons, the court hereby denies Mr. Watts' motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or, alternatively, for a new trial pursuant to Federal Rule of Criminal Procedure 33. The sentencing of Mr. Watts shall proceed as scheduled on December 10, 2013, at 10:00 AM.

**SO ORDERED.**

Dated:    September 26, 2013
          Brooklyn, New York

                              _____ /s/ _____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York