UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,    :           S2 10 CR 627 (KAM)
                                        :
           -v.-               :
                                        :
RODNEY WATTS,                 :
                                        :
                  Defendant.    :
------------------------------------------------------x

**Rodney Watts' Sentencing Memorandum**

GREEN & WILLSTATTER

/s/
Richard D. Willstatter, Esq.
200 Mamaroneck Avenue - Suite 605
White Plains, New York 10601
Tel: (914) 948-5656
willstatter@msn.com

THOMPSON & KNIGHT LLP

/s/
Marion Bachrach, Esq.
Andy S. Oh, Esq.
900 3rd Ave., 20th Floor
New York, New York 10022
Tel: (212) 751-3001
Marion.Bachrach@tklaw.com

*Attorneys for Rodney Watts*

Table of Contents

Introduction.........................................................................................................................1

The Sentencing Framework ...............................................................................................3

The Offense Conduct and Advisory Guidelines Range .....................................................4

A Comparison of Factors Relevant to Messrs. Watts and Dupree ....................................4

Mr. Watts' Role in the Offense..........................................................................................4

The Fraud Guidelines.........................................................................................................7

The Need for Just Punishment in Light of the Seriousness of the Offense .....................11

    A. Mr. Watts Was Not Motivated by Greed But by Loyalty to His Employer .....................11

    B. Mr. Watts' Conduct Was Aberrant ....................................................................12

Specific and General Deterrence .....................................................................................13

History and Characteristics of the Defendant ..................................................................14

Rodney Watts' History .....................................................................................................14

The Character of Rodney Watts........................................................................................16

Extraordinary Family Circumstances ..............................................................................20

Conclusion .......................................................................................................................23


ADDENDUM

Illustrative Photographs

Rodney Watts, his Grandmother and younger brother ....................................................1

Rodney Watts with Wendel, his late brother ...................................................................2

High School Graduation ..................................................................................................3

Graduation from Morehouse College ..............................................................................4

National Black MBA Association Award 1996................................................................5

Rodney Watts' Wedding ...................................................................................................6

First Set of Twins ............................................................................................................7

Rodney and Seana at the Baptism Ceremony ...................................................................8

After the Baptism of the Older Twins ...............................................................................9

The Older Girls with their parents ..................................................................................10

Mr. Watts brings his daughters to Swimming Lessons .....................................................11

Mr. Watts at the birth of his younger twins ....................................................................12

Mr. Watts with his older daughters .................................................................................13

With His Daughters in the Middle of the Night ...............................................................14

Seana Watts and her four children .................................................................................15

Letters of Support

John Charles Adams, Jr. ...................................................................................................1

Antonio R. Barner, MPA, CIOP ........................................................................................3

Vicki Bogan ....................................................................................................................5

William G. Bounds ...........................................................................................................7

Dr. Milton F. Brown .........................................................................................................9

Blaine Anthony Burnett ..................................................................................................11

Julia Carr-Ellis, LMSW ...................................................................................................12

Charon Darris ................................................................................................................13

Monique S. Dawson ......................................................................................................14

Colin Edey ....................................................................................................................15

Toni Eubanks .................................................................................................................16

Charmaine Fearon .........................................................................................................19

Diallo M. Gumbs ...........................................................................................................20

Nicholas Halikias ...........................................................................................................21

Rey Hollingsworth Falu ..................................................................................................23

Steve A. Jarrett .............................................................................................................24

Ash Kalra ......................................................................................................................26

Joseph Langhorn ...........................................................................................................27

Connie Liu .....................................................................................................................28

Greg McCrery ........................................................................................................................30

Adrian Anthony McLean ....................................................................................................31

Erik Moore ............................................................................................................................33

Douglas J. Nurse ..................................................................................................................35

Joseph Okpaku .....................................................................................................................37

William B. Pollard, III .........................................................................................................39

Dwayne Rayner ....................................................................................................................41

Tandi Reddick .......................................................................................................................42

Khaled Sakr ...........................................................................................................................43

John Saunders .......................................................................................................................44

Christopher D. Sheldon ......................................................................................................46

Barry L. Stewart ...................................................................................................................48

Fred Sullivan .........................................................................................................................50

Rufus Taylor ..........................................................................................................................52

Joel Washington ...................................................................................................................53

Rodney Watts, Sr. ................................................................................................................55

Seana Watts ...........................................................................................................................57

La Roi Williams .....................................................................................................................60

Norman Yun ..........................................................................................................................62

**Introduction**

On behalf of Rodney Watts, we respectfully submit this sentencing memorandum to address the key question before the Court: what sentence will be sufficient, but not greater than necessary, to meet the goals of the Sentencing Reform Act?

Mr. Watts was convicted of conspiracy to commit bank fraud, wire fraud, and mail fraud; substantive bank fraud; and two counts of making a false statement to a bank. Sentencing is scheduled for April 24, 2014.

This felony conviction represents Mr. Watts' only criminal conviction. The Presentence Report ("PSR") and dozens of letters sent to the Court show that Mr. Watts is a hard-working, self-made man who worked his way through college and graduate school. He has always worked diligently at whatever tasks – blue or white collar, personal or professional – he undertakes. He worked hard as a bank employee, as a broker, and as a business executive. He has worked equally hard at jobs that involve less desk work and more leg work: cleaning offices as part of his own janitorial business and, more recently, helping to run two Laundromats owned by his wife. Equally significant are the testimonials from family and friends, which show that he works just as hard at his 24-hour job as a parent to two sets of twins, respectively seven (7) and two (2) years old.

In the case before this Court, Mr. Watts acted to advance the interests of his boss, Courtney Dupree, and what he perceived were the interests of Mr. Dupree's holding company, GDC Acquisitions, LLC ("GDC"). He did not hold equity in any of Mr. Dupree's companies, nor did he personally gain any money, other than his regular salary, from the conduct that underlies his conviction. He has now lost his career, and his finances are in disarray. The felony

conviction in this case will follow him for the rest of his life and will prevent him from obtaining jobs in his chosen field of finance.

Mr. Watts' overwhelming concern is for the well-being of his wife and four young children. He worries, with good reason, that no single working parent can properly bring up and care for two sets of twins, all under the age of eight, without the help of a spouse or family who, in this case, live far away. That problem is exacerbated here, where the sole caretaker parent is also the sole breadwinner and has a demanding full-time job that involves a daily commute and also requires a certain amount of travel. Mr. Watts and his wife also worry that the requirements of caring for all the twins may cause his wife to lose her job and thereby the prime means of support for the children.

This memorandum will provide the Court with the information it needs to fashion an appropriate sentence under the circumstances. We are asking the Court, under the extraordinary family circumstances present here, to impose a sentence that does not require lengthy incarceration and that does not require the term of incarceration to be served in one block of time. We ask the Court to consider an alternative type of sentence that would allow Mr. Watts to continue to provide a physical presence at home, even if intermittent, and continue to provide financial support to his family, while also serving a sentence of confinement, whether in jail and/or at a community correction center, on particular days, weeks or weekends. Title 18, United States Code, Section 3563(b)(10) authorizes a term of intermittent confinement for as long as one year. *See* U.S.S.G. § 5C1.1 (permitting intermittent confinement as a condition of probation or supervised release).

## The Sentencing Framework

As the Supreme Court reaffirmed in *Pepper v. United States*, 131 S. Ct. 1229 (2011), the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 1239-40 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  That process is embodied in the advisory sentencing system instituted by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which "breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them." *United States v. Jones*, 531 F.3d 163, 170-71 (2d Cir. 2008) (district court must make an "individualized assessment" of the sentence warranted by § 3553(a) "based on the facts presented" and "may not presume that the Guidelines range is reasonable") (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)); *see also United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime").  The deference granted a district court's determination springs from its "singular advantage of actual and extensive sentencing experience," as well as its familiarity with the individual case and the individual defendant before it.  *Jones*, 531 F.3d at 181-82 (citations omitted).

The Guidelines provide "the starting point and the initial benchmark" for the district court, but they do not usurp the district court judge's "superior position to find facts and judge their import under § 3553(a)." *Gall*, 552 U.S. at 49, 51.  Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary" to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a).

## The Offense Conduct and Advisory Guidelines Range

The initial PSR was disclosed on March 24, 2014.  It recommends a base offense level of 7, adds 20 levels because the line of credit from Amalgamated Bank exceeded $7 million, and also adds three levels for aggravating role in the offense.  The PSR shows that the range Probation had recommended for GDC's CEO, Courtney Dupree, was higher:  Probation recommended four instead of three levels for Dupree's aggravating role and, in addition, two offense levels for obstruction of justice.  As a result, Dupree's total offense level was 33 and his recommended guideline range was 135-168 months.  Dupree was sentenced on May 29, 2013 to serve 84 months' imprisonment followed by five years' supervised release.  He was also ordered to pay $15,324,293.92 in restitution and forfeit $18,157,000.00.

## A Comparison of Factors Relevant to Messrs. Watts and Dupree

There are many factors that distinguish Mr. Watts from Mr. Dupree.  Mr. Watts did not own any part of GDC or any of its subsidiary companies.  He did not profit – or stand to profit – from this offense, other than by receipt of his regular salary.  He was not the organizer of the offense.  He never testified or faced any allegation or claim of obstruction of justice.  In further contrast, Mr. Watts, unlike Mr. Dupree, has children: twin toddlers and twin grade-schoolers.

## Mr. Watts' Role in the Offense

Mr. Watts was a salaried employee of GDC, the holding company owned by Courtney Dupree.  GDC had a number of subsidiaries also owned by Dupree.  By contrast, Mr. Watts had no equity or ownership in GDC or any of its subsidiaries.  (Tr. 1560).

The tenuous nature of Mr. Watts' position as an employee is evidenced by the history of his positions and demotion.  In early 2008, he was removed from his position as Chief Financial Officer ("CFO").  Mr. Watts had outsourced GDC's invoicing/billing to India, which Dupree

considered an "accounting fiasco".  In addition, Mr. Watts had moved the accounting systems of some subsidiaries to the same platform – the "Hedberg" system – which had caused further disruption to the functioning of the accounting department.  (Tr. 1559, 3103-05, 3064-69).  It is worth noting in a criminal case based in large measure on the issue of billing – *e.g.*, the timing and standards for proper billing and the question of who controlled that function – that Mr. Watts was ousted from his senior position as CFO because he gave up control over billing and outsourced that function.

As a result of the "fiasco" caused by the outsourcing of billing, Mr. Watts lost his position as CFO.  His boss, Courtney Dupree, removed him and selected Frank Patello as his replacement.  (Tr. 728-29, 3070-71).  Mr. Watts fell into such disfavor and was so far down in the chain of command that he did not even interview Patello when the latter applied for the job.  Patello did not report to Mr. Watts; he reported directly to Dupree.  (Tr. 1557-61, 1640).

It was Patello who hired Emilio Serrano in August 2008.  (Tr. 1581, 2072).  Serrano reported to Patello and Dupree.  (Tr. 2258).  When Patello left GDC, Dupree planned to hire yet another CFO.  Dupree interviewed a number of candidates and ultimately chose a Mr. Thaltham, but he directed Mr. Watts to serve both as CIO (Chief Investment Officer) and acting CFO in the interim.  (Tr. 2759-61, 2799, 3074).  Even after Patello left GDC, the accounting personnel did not report directly to Rodney Watts; it was the job of Ernest Gary and then Lorna Brown – both hired by Mr. Dupree – to supervise the accounting department.  (Tr. 3073-74).

Following his demotion, Mr. Watts was made Chief Investment Officer.  Once Patello was hired, Mr. Watts no longer had the responsibility of running the Accounting Department or being responsible for reporting functions.  Instead, it was his job to look for companies for GDC to acquire.  (Tr. 1561).  He did not find Image Lighting – that connection came through Courtney

Dupree, who knew Jim McCarthy, the owner of Image – but he did work on the due diligence for that deal.  (Tr. 1058-59, 2072-74).  While Mr. Dupree formulated the plan to purchase Image, Mr. Watts was looking into West Texas Lighting, a company that GDC did acquire and re-named Unalite Southwest Inc. ("USW").  (Tr. 1570-71).

Mr. Watts' selection of West Texas Lighting was a very good one.  It was Mr. Watts, not Patello, who was in charge of USW at its inception.  GDC acquired the company without taking on its liabilities, and promptly and fully disclosed USW's existence to the Bank.  (Tr. 1574-79, 1570-71).  Indeed, Amalgamated Bank had every reason to be pleased because USW was so successful that Patello regularly used its revenues to remit payments to the Bank that were owed by three other GDC subsidiaries: the borrower companies JDC Lighting Co. ("JDC"), Unalite Electric and Distribution Co. ("Unalite NY"), and Hudson Bay Environments ("HBE").  (May 13, 2011 Monsanto hearing, Tr. 13-14, 32).

Mr. Watts should not receive an enhancement for aggravating role in the offense pursuant to U.S.S.G. § 3B1.1.  He was not an organizer, leader, manager or supervisor of the criminal activity at GDC. U.S.S.G. § 3B1.1, cmt. n.2.

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.  This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, cmt. n.4.  Here, it was Dupree who made the decisions.  Mr. Watts was an employee and received directions from Dupree.  It was Dupree and Patello, not Mr. Watts, who

hired the other members of the accounting and operational staff at GDC.[1]   Dupree also hired

Tom Foley as counsel, later brought him in-house and then appointed him Chief Operating

Officer.  (Tr. 1572).

Mr. Watts received no share in the proceeds of the offense other than his regular salary.

*See* U.S.S.G. §3B1.1(b).  The perception of some witnesses that Mr. Watts was Mr. Dupree's

purported "right hand man" appears to derive from the fact that both men are African-American,

in contrast to the other executives at the company.  The fact that Mr. Watts met Dupree at

graduate school also does not serve as a basis for a characterization of Mr. Watts as Dupree's

"right hand man" and is not a sufficient basis for this enhancement.  *See United States v. Burgos*,

324 F.3d 88, 93 (2d Cir. 2003); *United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004)

("enhancements should not be *automatically* imposed on business owners or executives")

(emphasis in original).

Accordingly, the Court should not find an aggravating role in the offense applies to Mr.

Watts.  If the Court finds no aggravating role in the offense, the expected total offense level

would be 27.  If the Court applies the three-level enhancement recommended in the PSR, the

total offense level would be 30.  With a criminal history category I, the range of imprisonment

for level 27 would be 70-87 months, whereas the range for level 30 would be 97-121 months.

**The Fraud Guidelines**

"While the fraud guideline focuses primarily on aggregate monetary loss and

victimization, it fails to measure a host of other factors that may be important, and may be a basis

---

[1]   The evidence showed that Mr. Watts made one appointment: the promotion of Irma Nusfaumer.
When the former Controller at Hudson Bay Environments left, Mr. Watts promoted Nusfaumer, who had
already been working in the accounting staff of HBE before GDC acquired HBE, to replace him.  She
claimed at trial that she consider herself unprepared for that role, and served in that position for less than
one year – from the Spring of 2007 until early 2008 – until Dupree hired Patello as Controller for GDC
and all its subsidiaries.  (Tr. 726-27).

for mitigating punishment, in a particular case." Alan Ellis, John R. Steer, Mark H. Allenbaugh,

*At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37

(2011); *see also United States v. Ovid*, No. 09-CR-216 (JG), 2010 WL 3940724, *1 (E.D.N.Y.

Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for

many of the myriad factors that are properly considered in fashioning just sentences, and indeed

no workable guideline could ever do so.").  A substantial variance is needed in this case because

of the following mitigating factors, all of which are highly relevant to the purposes of sentencing

and none of which is taken into account by the guideline range.

As Judge Underhill pointed out in his recent concurring opinion in *United States v.

Corsey*, 723 F.3d 366 (2d Cir. 2013):

> The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences. Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission.

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb.  The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. As a well-known sentencing commentator has put it, "For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges." Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent'g Rep. 167, 168 (2008).

*Id.* at 380.  *Accord United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*

mem., 301 Fed.Appx. 93 (2d Cir. 2008); *United States v. Lenagh*, No. 8:07 CR 346 (JFB, C.J.),

2009 WL 296999 at *6 (D. Neb. Feb. 6, 2009) ("because the fraud offense Guidelines were

promulgated pursuant to Congressional directive rather than by application of the Sentencing

Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines").

When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure that white collar offenders faced "short but definite period[s] of confinement." U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 56 (Nov. 2004) (available at http://www.ussc.gov/Research_and_Statistics/Research_Projects/ Miscellaneous/15_Year_Study/chap2.pdf). The Fraud Guidelines have been greatly increased since 1987, however, for political and not empirical reasons. Short but definite periods of imprisonment can now be imposed, but only by dint of a Section 3553(a) variance.

If the original sentencing guidelines as enacted in 1987 were applied to this case as recommended by the PSR, the total offense level would have been 19:

| 2F1.1 — | base offense level: | 6 |
| 2F1.1(b)(1)(J) — | amount of loss more than $5,000,000: | 8 |
| 2F1.1(b)(2) — | more than minimal planning: | 2 |
| 3B1.1(b) — | aggravating role in the offense: | 3 |

With no criminal history, the corresponding sentencing range under the 1987 guidelines would have been 30 to 37 months' imprisonment. Such a range cannot be considered "short", but it is certainly much closer to the Commission's stated goal of a "short but definite" period of imprisonment than is the staggering prospect of serving eight to ten years (97 to 121 months).

Although the Commission likely intended that cases in which the offense level determined under U.S.S.G. § 2B1.1 "substantially overstates the seriousness of the offense"

would be unusual, that is no longer the case.[2]  While the offense conduct in this case is serious, the guideline recommended for Rodney Watts is substantially and unfairly higher than is sufficient to meet the goals of the Sentencing Reform Act.  "The loss guideline, like the child pornography guideline at issue in [*United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010)], was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices.  As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Corsey,* 723 F.3d at 379 (Underhill, J., concurring op.).

Federal courts in this Circuit and elsewhere have exercised their considerable discretion to impose sentences well below the applicable fraud guidelines, understanding that financial crimes vary and not every one deserves a long period of imprisonment.  Examples abound.  In the Southern District of New York, Judge William Pauley III sentenced the defendant, a former Goldman Sachs trader in *United States v. Matthew Taylor*, 13 Cr. 251 (WP), to nine months' imprisonment upon his plea of guilty to wire fraud by fraudulently building an $8.3 billion futures position for his own gain.  Chief Judge Loretta A. Preska recently sentenced an attorney who had been convicted after trial of $1 billion of securities and accounting fraud in connection with a brokerage firm to serve just one year and one day.  *See United States v. Joseph P. Collins*, 07 Cr. 01170 (LAP).  After three men were convicted at trial of a large scale wire fraud and variously faced guidelines from 11 to almost 20 years' imprisonment, Judge Kimba M. Wood sentenced them to serve 16, 18 and 27 months, respectively.  *See United States v. Ghavami et al.*, 10 Cr. 01217 (KMW).  Last summer, Judge Garaufis sentenced a lawyer at a major international

_____

[2]  "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted." U.S.S.G. § 2B1.1, comment. n. 20(C).

law firm to two years' imprisonment for a $55 million securities fraud and money laundering scheme.  *See United States v. Martin Weisberg*, 08 CR 00347 (NGG).[3]

**The Need for Just Punishment in Light of the Seriousness of the Offense**

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his or her degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity."  Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).  The guidelines include none of the factors bearing on Mr. Watts' degree of culpability.

**A.**      **Mr. Watts Was Not Motivated by Greed But by Loyalty to His Employer**

A defendant's motive is highly relevant at sentencing.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Mahan*, 232 Fed.Appx. 796, 799, 2007 WL 1430288, at *3 (10th Cir. 2007) (sentence was procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun, *i.e.*, that he had been violently beaten by three men and sought to defend his wife); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did not take the

---

[3]  *See also United States v. Warner*, 1:13-cr-00731 (N.D. Ill.), where Ty Warner, who was convicted of filing 16 false tax returns that shielded $24 million of income from the IRS, was sentenced to probation by U.S. District Judge Charles P. Kocoras.  Former Spectranetics CEO John Schulte was sentenced by Chief U.S. District Court Judge Wiley Daniel in Denver to one year of probation after being convicted of lying to federal investigators about his role in the allegedly illegal importation of laser medical devices for a clinical trial.  *See United States v. Schulte*, Crim. Case No. 10-cr-455-WYD.

The excessive nature of the fraud guidelines has been recognized by a wide variety of district courts.  According to the Sentencing Commission, non-government sponsored below-range sentences in this Circuit have exceeded within-range sentences in fraud offenses.  *See Report on the Continuing Impact of United States v. Booker on Federal Sentencing*, U.S.S.C., Part A at 88 (2012).

11

bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat"); *United States v. Salazar-Hernandez*, 431 F. Supp. 2d 931, 935 (E.D. Wis. 2006) ("one significant difference between the mandatory and advisory regimes is the court's ability to consider motive.").

Mr. Watts did not set out to steal money from Amalgamated Bank. His efforts to obtain and maintain the loan stemmed from his loyalty to GDC and its owner, his employer, Courtney Dupree. He did not receive, nor did he expect to receive, any proceeds of the alleged fraud. All he expected and received was his regular salary as an officer of the company. While the Court ruled it could not be considered a defense to the charges in the indictment, it is fair for the Court to consider on sentencing that Mr. Watts did subjectively believe that GDC would be successful and its loans repaid in full. It is worth considering that a defendant is typically considered more culpable when his conduct is motived out of avarice and/or he takes advantage of vulnerable victims. Accordingly, we call to the Court's attention that the facts here show the converse: Rodney Watts did not act out of a motive to steal from the bank for his personal benefit, *e.g.,* to support a lavish lifestyle.

### B.   Mr. Watts' Conduct Was Aberrant

Mr. Watts lived a law-abiding life until the instant offense began when he was in his late thirties. He has always been an active member of the community and a dedicated husband and father. His offense is completely uncharacteristic when viewed in the context of his entire productive adult life. We ask the Court to grant a variance based on the aberrant nature of his conduct. *See, e.g., United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly

dumb thing"); *United States v. Davis*, No. 07 Cr. 727 (HB), 2008 WL 2329290 (S.D.N.Y. June 5,

2008) (defendant was a first offender who had worked throughout his 15-year marriage to

educate his six children and whose offense was prompted by economic pressures).  As was said

of a defendant in another case, "the defendant's commission of the instant offenses was aberrant

behavior  — not aberrant as defined by the U.S. Sentencing Guidelines, but rather as defined by

Merriam-Webster: . . . atypical."  *See United States v. Gupta*, 904 F. Supp. 2d 349, 354

(S.D.N.Y. 2012) (sentence of 24 months imposed as variance from advisory range of 78 to 97

months' imprisonment).

## **Specific and General Deterrence**

There is no likelihood of recidivism here.  Mr. Watts does not require a term of

imprisonment to deter him personally from committing further offenses.  This case represents his

only criminal conviction.

Furthermore, the general deterrence rationale for high sentences under the Guidelines

cannot be supported by empirical data.  *See* David Weisburd et al., *Specific Deterrence in a*

*Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); Zvi D.

Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White*

*Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence

to support the conclusion that harsh sentences actually have a general and specific deterrent

effect on potential white-collar offenders.").

13

## History and Characteristics of the Defendant

### Rodney Watts' History

Mr. Watts was born in East Lansing, Michigan in 1971 and moved to Highland Park, Michigan, near Detroit, when he was two years of age. His brother, Wendel, was born when Rodney was five years old. His father, also named Rodney Watts, was a lawyer. His parents separated when he was a small child. He and Wendel[4] moved with his mother, Toni Eubanks Meekins, to Detroit when he was six years old. Later they moved to New York City. According to Ms. Meekins, Mr. Watts' father was often absent from family affairs. His mother married William B. Pollard, III in 1979, an attorney with Paul, Weiss who went on to become an Assistant United States Attorney in the Southern District of New York.[5] He and Rodney's mother divorced in 1986, but Rodney lived with his stepfather and mother from the time he was in third grade until he was in eighth grade. During those years, Mr. Watts attended the Ethical Culture Fieldston School. Rodney respected his stepfather and has continued to maintain a good relationship with him. When he was in the ninth grade, his family moved to the Bronx and he entered the Fordham Preparatory School. Mr. Watts' mother began dating Ronald Meekins, a psychotherapist and Master of Social Work. Mr. Meekins married Mr. Watts' mother in 1991 when Rodney was 20 years old. Mr. and Mrs. Meekins moved to Arizona nine years ago.

Mr. Watts attended Morehouse College, a historically black college in Atlanta, Georgia. He had to and did work his way through college. Although he had a scholarship during his Freshman year at Morehouse, he worked more than one job at a time to cover his expenses

---

[4]  Mr. Watts was devastated when his three-year old brother, Wendel, died of complications from Sickle Cell Anemia.

[5]  Mr. Pollard rose to become Deputy Chief of the Criminal Division. He left the government in 1993 to enter private practice. He is a partner in the New York City law firm Kornstein Veisz Wexler & Pollard, LLP.

throughout college.  Mr. Meekins and Rodney's mother were unable to support him, although he received some financial assistance from Mr. Pollard.  Rodney nonetheless looks back on those years with fondness because they provided him a great educational experience.  He graduated with a degree in Finance and some $17,000 in student loan debt.  Mr. Watts worked at NationsBank before entering the University of Pennsylvania's Wharton School for his Master's in Business Administration ("M.B.A.") on partial scholarship.  He always had a job while in graduate school, but given the expenses of higher education, he had nonetheless accumulated some $75,000 in debt by the time he was awarded his M.B.A. in 1997.  Out of a class of some 800 students, only 32 were African-American.  Mr. Watts' interest was in sales and trading; he hoped to work at an investment bank.  While at Wharton, he met Courtney Dupree who was one year behind him.  Mr. Dupree was interested in Mr. Watts' experience as an analyst at NationsBank because of Dupree's desire to work on Wall Street.  Mr. Watts remained friendly with Mr. Dupree over the years, but saw him infrequently until he began work at GDC Acquisitions.

After graduating from Wharton, Mr. Watts started working at Salomon Brothers.  He lost his job when Salomon was acquired by Smith Barney six months later.  In September 1998, he started work at a small fund called WorldCo where he worked – except for short stint at other firms including Madison Trading – until September 2003.  Mr. Watts started his own janitorial business in 2004, which lasted until 2010.  He worked at another hedge fund, Hold Brothers, from September 2005 to July 2006.  Mr. Watts started work at GDC as its CFO on September 26, 2006.

Mr. Watts' wife owns two modest Laundromats in Mt. Vernon, New York where Mr. Watts now works.

**The Character of Rodney Watts**

There are dozens of letters of support for Mr. Watts.  Significantly, it is not their number but rather the recurrent themes that appear in them which provide the Court with insight into his character.  These letters make clear that the negative impression left by witnesses at the trial – who depicted Mr. Watts as harsh, cold and rude – is far from the whole truth.  Mr. Watts has many close friends from every facet of his life, who have written the Court because they admire his generous and supportive character.  Mr. Watts has touched many people in such positive ways that they freely and unhesitatingly proclaim their love and respect for him in this, his darkest hour.

Even as a child, Mr. Watts warmly offered his hand in friendship to outsiders.  Adrian Anthony McLean, an attorney admitted to practice in New York, was a newcomer to elementary school with limited English.  It was Mr. Watts who helped him adjust to a new environment.  Mr. Watts also helped another 13-year-old adjust to Fordham Prep.  As Barry L. Stewart writes:  Mr. Watts "was always there to tutor me in any of the disciplines that gave me trouble, or more importantly, offer strong words of encouragement.  He directly influenced me to become a more confident student."

Mr. Watts routinely offers his support to others.  Mr. McLean has seen Mr. Watts informally mentor young men at risk.  Dwayne Rayner, a friend from Wharton, recalls that Mr. Watts would often spend hours offering him advice and would always conclude by offering to spend more time to help.  La Roi Williams remembers how it was Mr. Watts – a friend from Morehouse College – who helped him obtain materials to study for the New York bar examination, when Mr. Williams could not otherwise afford to buy those materials.  He

describes Mr. Watts as "the kind of individual who would always put the needs of others before his own."

Erik Moore, an investment banker, recalls that when he could not master a certain class at Wharton, it was Rodney Watts who helped him learn the material.  Mr. Moore believes that Mr. Watts is "incapable of being intentionally ill-willed."  Julia Carr-Ellis, a former prosecutor, describes Mr. Watts as "loyal, honest and principled."  New York City School Guidance Counselor Steve A. Jarrett writes that "Rodney is someone that has always been a strong proponent of giving back.  He is an avid supporter of those less fortunate.  His enthusiasm is contagious, his spirit unstoppable and his compassion for others, uplifting."  Joseph Okpaku, another former prosecutor, recalls that when he confided his frustration at not having the financial wherewithal to enter private practice, Mr. Watts simply offered his financial assistance.  St. Barnabas Hospital facilities manager Blaine Burnett, who has known Mr. Watts for 35 years, tells the Court:

> Rodney is and has always been the kind of individual people look to for help.  He has shown caring and compassion since a very young age.  He was the kid who made sure everyone got picked in sand lot football, the teen that seemed to have adult-like responsibilities and shouldered them well, the college classroom star that made sure he and his peers succeeded.  I remember countless times, at almost every age, being late to functions we were attending together because Rodney had one more thing to do for someone else.

It is part of the fabric of Mr. Watts' character to look out for the well-being of others. Monique Dawson recalls that when a Wharton classmate was paralyzed from the waist down, it was Rodney Watts who organized a fund-raising effort to assist him.  Joel Washington, another friend from Morehouse College, recalls that Mr. Watts regularly offered his assistance to other college students and has continued to offer moral guidance and support to Mr. Washington ever since.  Mr. Washington maintains that Mr. Watts "is one of the smartest and most morally

responsible people" he knows.  According to Mr. Washington, Mr. Watts "has been an

inspiration" who encourages "everyone he knows to always work to not only better themselves

but also others around him."

Mr. Watts shows genuine concern for the well-being of others and is generous with his

time as well as financial support.  Diallo M. Gumbs remembers a time when Rodney Watts went

out of his way to see that guests who might be intoxicated did not drive themselves home.  When

Nicholas P. Halikias, a co-worker, needed a place to stay, Mr. Watts housed him for several

months and would not accept any payment.  Ash Karla, a City Council member for San Jose,

California, attests to Mr. Watts' caring and concern for others and to his "upstanding character."

Vicki Bogan, Ph.D. recounts how very supportive Mr. Watts was to her when her mother died

suddenly at the age of 56, and notes that Mr. Watts has been "an extremely positive force in [her]

life in countless ways."  When investment banker Norman Yun became depressed, it was

Rodney Watts who helped him regain perspective and save his marriage; Mr. Yun sees Mr.

Watts as "a kind, gentle man, a trustworthy friend and a loving father."

While he traded securities, Mr. Watts was known for his honesty and fair dealing.

Connie Liu, now a Senior Dealer at Cargill, Inc., worked with Mr. Watts at WorldCo and writes:

> To most new traders on the floor, Rodney was known as the pillar of knowledge,
> with uncompromising standards.  In his own way, Rodney would keep new
> traders in line, teach them market conventions, and vet any new trading ideas.
> When many a young and eager trader have come up with trade ideas that came
> even close to seeming like market manipulation of stocks with low trading
> volumes, they would very quickly be put in their place by Rodney Watts.  In that,
> Rodney has always displayed firm principles of fair trading by market
> participants.

Like so many others, Ms. Liu saw that Mr. Watts acted as a mentor to many with a style of

"tough love."

According to Charmaine Fearon, Mr. Watts is actually known in his community as someone who avoided shortcuts to success and, instead, believed that, as a Black man, he had to work harder than others to achieve his goals.  William G. Bounds, who mentored Mr. Watts back in 1993 when Mr. Watts worked for him at NationsBank, regards Mr. Watts as "exceptionally bright . . . Yet at the same time, [] remarkably human with strong values."  According to Barry L. Stewart, Mr. Watts "has devoted his life to one of service through consultancy, entrepreneurship, job creation, faith, and family."  Rey Hollingsworth Falu has seen Mr. Watts go out of his way to hire young people who are at risk in order to help them get started on the right path.  Mr. Falu writes, "As a board member of the Chamber of Commerce, I wish we had more men like Rodney Watts in our membership."

In his thoughtful and perceptive letter, Dr. Milton F. Brown, a well-known college educator and former college president, explains that Mr. Watts is "a rather serious and relatively quiet young man" whose "intellectual brilliance, reserved demeanor, cerebral approach to encounters with others, and cautious engagement of life overshadows his desire for life and its more enriching attributes."  Dr. Brown has continued to rely on Rodney's financial advice even after the indictment and after the jury's verdict because he trusts him.  In Dr. Brown's letter to the Court, he explains why he continues to trust Mr. Watts to handle with honesty and integrity the investment of his retirement portfolio of $500,000, which represents most of his assets:

> I continue to trust Rodney…. After discussing Rodney's situation with him, I unhesitatingly asked him to help me invest a little more than $500,000.  This amount represented the bulk of my available monetary assets.  I am 70 years old and a retired College Professor.  I am not a person of wealth by any means nor am I naive.  It was intuitively clear to me that I was essentially putting my life in Rodney's hands.  The federal indictment and investing with Rodney were seemingly two very different issues.  I was more concerned for Rodney's well-being and future than I was about the money I would turn over to him.  Not once have I wavered from that stance.  Even after Rodney's conviction, he continues to

have great influence and access to my investments.  I have removed not one penny from his investment counseling purview.

The loss of his chosen career path is a tremendous blow to Mr. Watts.  As Joseph Okpaku points out, "Rodney has lost everything that he was worked his entire life to accomplish." William Bounds notes that "the Watts family has been financially ruined and [] Rodney's professional opportunities in profit and not-for-profit organizations will be extremely limited for the rest of his work life.  That is in itself harsh punishment."  While the government will predictably respond by laying the blame for that loss squarely on his own shoulders, this consequence undeniably represents a profound loss for Mr. Watts and his family. Notwithstanding this loss of career opportunities, Mr. Watts has remained productive and hard-working.  He has gone on to run laundry facilities in a low-income neighborhood, and still hires young people at risk.

## Extraordinary Family Circumstances

Those who know Mr. Watts see his profound commitment to his wife and small daughters.  Mr. Watts' father, Rodney Watts, Sr., is "amazed at his patience, his kindness and his appreciation for the nuanced differences in their personalities that allows him to give each one of [his daughters] just what she needs in that moment."  John Charles Adams, Jr. writes, "Both [Rodney] and his wife have demonstrated great strength and character by balancing their respective careers and providing a loving home environment for their children.  Although Rodney has been convicted of a serious crime, I still believe him to be an honest man and central to the upbringing of his girls."  John Saunders tells the Court, "Rodney is a loving and understanding husband and father.  His daughters look up to him with love, pride and joy.  He constantly teaches while providing care and guidance to his children."  Like so many others whom Mr. Watts has guided, Rufus Taylor sees how difficult life will be for Mr. Watts' children

20

when he is imprisoned.  He writes, "Mr. Watts is a great father and his children need him so that

they can maximize their lives and their potential.  If Mr. Watts were to spend time in prison it

would severely impact his children['s] potential to grow up with the hopes and dreams that []

every child deserves."

Mr. Watts' support for his children is not limited to financial or emotional support.  He is

responsible for taking care of their needs while his wife, Seana, sleeps and for certain hours

during the day when she is at work.  Seana Watts has to rise unusually early in order to be at

work by 7:30 a.m. as an in-house attorney for a major corporation in Connecticut.  Mr. Watts'

mother resides in Arizona, where she teaches at a local community college.  Mr. Watts' father

lives in southern New Jersey but has never been active in his grandchildren's lives.  Seana

Watts' parents live in California, where her mother also has a job that helps support her and her

husband.  None of the grandparents can afford to move to New York to take care of their

grandchildren as they must work to support themselves.

One of Mr. Watts' children has been repeatedly hospitalized.  Each of the older twins is

severely farsighted, and one has a compromised optic nerve, requiring regular visits to the eye

doctor.  One of the four children is usually up at some point at night – often for hours – and Mr.

Watts is responsible for their care during the wee hours of the morning.  From time to time, he

has to bring a child to the urgent care center for medical attention during the night.

As his mother notes, Mr. Watts "is and has always been an active father, transporting the

girls to doctor appointments, swimming lessons and soccer.  He stays up late with whoever is

teething or sick or upset.  He is very supportive in this way to his wife who has an early morning

commute to work." Mr. Watts' stepfather, William Pollard, has seen how close Mr. Watts is with

his children and how dependent they are upon him for support and guidance.  He respectfully

asks the Court "to temper any custodial sentence that it imposes on Rodney because of the unusually heavy burden it will visit on his family, particularly given the family circumstances here which include two sets of twins, one, not quite two years old, the other, age 7."

As Probation Officer Langone has pointed out, it may be impossible for Seana Watts to keep her demanding job as an in-house attorney for a large corporation and also be the sole caretaker for two sets of twins if Mr. Watts is imprisoned. *See* PSR ¶ 105. The loss of her position would be a devastating blow to Seana Watts' own career and financial stability. Even without that looming problem, it is questionable whether Mrs. Watts will be able to maintain the mortgage on their home. No summary of Seana Watts' letter can adequately convey the disastrous situation she will face upon Mr. Watts' incarceration, so we refer the Court to her poignant letter. *See United States v. Huerta*, 371 F.3d 88, 95 (2d Cir. 2004) ("the absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's dependents – is a central part of the extraordinary family circumstances inquiry."); *United States v. Kon*, No. 04 Cr. 271-03 (RWS), 2006 WL 3208555, at *5-6 (S.D.N.Y. Nov. 2, 2006) (imposing non-Guidelines, non-incarceration sentence where defendant had no prior criminal history and after considering factors in 18 U.S.C. § 3553(a) and finding that incarceration would damage the defendant's young daughter, who relied on her). The Court may consider the effect of Mr. Watts' imprisonment on his wife and four small children as "extraordinary family circumstances" within the meaning of U.S.S.G. § 5H1.6. Alternatively, the Court can consider those facts in its §3553(a) analysis.

Given the extraordinary circumstance of a family with two sets of twins under the age of eight, we ask the Court to consider imposing an alternative type of sentence that would allow Mr. Watts to provide some presence as well as support at home, while serving time in prison

22

intermittently on varying weeks, days or weekends.  That would constitute painful and shameful punishment for Mr. Watts but would not leave his family bereft.

**<u>Conclusion</u>**

Rodney Watts is substantially less culpable than Mr. Dupree.  He was a salaried employee at GDC Acquisitions who did not set out to join a criminal conspiracy, but rather sought to advance his career under the control of its charismatic CEO, Courtney Dupree.  He advanced what he thought were the company's interests but not with the idea that he would defraud Amalgamated Bank to line his own pockets.  His case differs from the usual fraud case in which defendants make misrepresentations in order to steal money to convert it to their own use.  This is not to minimize the offense conduct, but rather to put it in perspective.

Now that Mr. Watts is a convicted felon, he has lost his chosen career and is financially ruined.  His family's welfare is jeopardized.  But, notwithstanding the offense conduct in this case, Mr. Watts is not a criminal by nature.  He is a good man, and there is no likelihood he will commit further crimes.  If a term of imprisonment is required, we respectfully request that any period of imprisonment be short and further request that the Court impose an alternative type of sentence that would allow Mr. Watts to serve the time intermittently on varying weeks, days or weekends.  While the government may view the jeopardy facing Mr. Watts' two sets of twins as his own fault, that does not require to Court to ignore the children and their needs.

Dated:   April 10, 2014
        White Plains, New York

Respectfully submitted,

GREEN & WILLSTATTER

/s/
Richard D. Willstatter, Esq.
200 Mamaroneck Avenue - Suite 605
White Plains, New York 10601
Tel: (914) 948-5656
willstatter@msn.com

THOMPSON & KNIGHT LLP

/s/
Marion Bachrach, Esq.
Andy S. Oh, Esq.
900 Third Ave., 20th Floor
New York, New York 10022
Tel: (212) 751-3001
Marion.Bachrach@tklaw.com

*Attorneys for Rodney Watts*